UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

JOSE CRESPO,

                                             **Case No. 1:22-cv-6599-JPO**

                        **Plaintiff,**

          -against-

**GUTMAN, MINTZ, BAKER & SONNENFELDT, LLP,**
**GARY THIGPEN, ERIC KEILBACH,**
**1511 SHERIDAN LLC, and**
**HILLTOP MANAGEMENT GROUP LLC**

                        **Defendants.**

------------------------------------------------------------------------X

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Jose Crespo brings suit against the debt collection law firm Gutman, Mintz, Baker & Sonnenfeldt, LLP ("GMBS"), GMBS's collector Gary Thigpen, and GMBS's attorney Eric Keilbach (collectively "the GMBS Defendants") for violating the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA"), and against the GMBS Defendants and putative judgment creditor 1511 Sheridan LLC for violating N.Y. Gen. Bus. Law § 349, committing conversion, and committing negligence and gross negligence, including by executing on and refusing to release exempt unemployment funds.

### Summary of Claims[1]

After Jose Crespo agreed to vacate his apartment and a judgment was entered against him in housing court, his former landlord 1511 Sheridan LLC filed another collection lawsuit against him for the same rental arrears through the debt collection law firm GMBS. Mr. Crespo received no notice of this lawsuit because the lawsuit papers were allegedly served at an address where he did not live and had never lived. Mr. Crespo only learned about the lawsuit over 13 years later,

---

[1] This summary is not intended to limit the basis of Plaintiff's claims. The full factual basis for the claims is laid out in greater detail in the Statement of Facts.

when Defendants used the default judgment to garnish his wages, but by this time Mr. Crespo lived in Buffalo, New York and was unable to travel to New York City to fight the default judgment. Mr. Crespo eventually lost his job and became homeless, moving back to New York City to sleep on the couches of family and friends and saving his unemployment funds while looking for a new job.

It was at this vulnerable time that Eric Keilbach, a partner at GMBS, restrained Mr. Crespo's bank account containing only his unemployment benefits, which are exempt under the law from restraint and garnishment. When Mr. Crespo called GMBS, he spoke to its collector Gary Thigpen, who misrepresented to Mr. Crespo that the only way he could have his exempt funds released was to sign a Conditional Release forfeiting $1,200 to GMBS. Relying on this misrepresentation and desperate to regain access to his unemployment benefits, Mr. Crespo signed the Conditional Release, but even then GMBS would not release his bank account. Mr. Crespo, with the help of New Economy Project, contacted GMBS to tell them that the funds were being improperly restrained and that the entire account should be released without his having to forfeit the $1,200. Though GMBS, specifically Eric Keilbach, agreed by email to do so, the account remained restrained.

Mr. Crespo therefore filed an Order to Show Cause. Lacking a good faith basis to oppose the Order to Show Cause, GMBS did not appear at the hearing and the court ordered a traverse hearing. Despite its default at the initial hearing on the Order to Show Cause, GMBS appeared at the traverse hearing and requested an adjournment to file opposition papers. Despite requesting and obtaining this adjournment, GMBS ultimately never filed opposition papers, and the court granted Mr. Crespo's Order to Show Cause, vacating the judgment and ordering the return of all the monies taken from Mr. Crespo.

GMBS has a practice of restraining exempt bank funds from consumers and using deceptive conduct to drag out the release of those exempt funds to consumers after being put on notice that the funds are exempt and must be released. This practice is evinced by two other FDCPA cases, *Arias* and *Fadlevich*. In *Arias*, GMBS restrained exempt Social Security retirement benefits and then filed a baseless objection to delay their release. In *Fadlevich*, GMBS restrained exempt Social Security Disability funds and continued to restrain the funds in various amounts again and again, though the consumer sent four letters putting GMBS on notice that the funds were entirely exempt from restraint.

Defendants restrained Mr. Crespo's exempt unemployment benefits, failed to provide him notice of the garnishment, and refused, despite clear and convincing evidence of their wrongdoing, to return the funds. Even now, Defendants still have not returned all of Mr. Crespo's garnished wages.

According to Gutman's discovery responses, it was acting as the agent for the property management company HILLTOP MANAGEMENT GROUP LLC ("Hilltop") for the misconduct that forms the basis of the liability of the state law claims against Gutman. Therefore, Hilltop is jointly and severally liable for the state law claims against Gutman.

## A.  JURISDICTION AND VENUE

1.      The Court has federal question jurisdiction over the lawsuit because the action arises under the FDCPA. Jurisdiction of the Court arises under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law under the FDCPA. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to the claims occurred in Bronx County, New York.

## B. PARTIES

3.      Plaintiff Jose Crespo ("Mr. Crespo") is an individual currently residing in Bronx County, New York.

4.      Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5), i.e., an alleged obligation to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes—in this case, alleged rent arrears for an apartment.

5.      Defendant GMBS is a limited liability partnership organized under the laws of the State of New York. GMBS's principal place of business is 813 Jericho Turnpike, New Hyde Park, NY 11040.

6.      GMBS is a debt collection law firm, regularly filing collection lawsuits on behalf of putative creditors, collecting on putative judgments by issuing information subpoenas, bank restraints, and garnishments, sending collection letters, and making and receiving collection phone calls.

7.      GMBS regularly collects consumer debts alleged to be due to another, primarily residential rent, and that is its primary purpose.

8.      GMBS is thus a "debt collector" as defined by the FDCPA.

9.      Gary Thigpen is a collector at GMBS. Upon information and belief, Thigpen is a resident of the state of New York.

10.     Thigpen regularly collects consumers debts alleged to be due to another, primarily residential rent, by making and receiving collection calls and sending and receiving conditional releases.

11.     Thigpen was personally involved in restraining and executing on Mr. Crespo's exempt unemployment benefits, was the employee that Mr. Crespo spoke to on the phone about the restraint and the conditional release, and emailed the conditional release to Mr. Crespo after being told that GMBS was restraining exempt funds.

12.     Thigpen is thus a "debt collector" as defined by the FDCPA.

13.     Eric Keilbach is a partner at GMBS. Keilbach resides in Queens, New York.

14.     Keilbach regularly files consumer collection lawsuits on behalf of putative creditors and collects on putative consumer judgments by issuing information subpoenas, bank restraints, and garnishments, and sending collection letters.

15.     Keilbach was personally involved in restraining and executing on Mr. Crespo's exempt unemployment benefits, and signed information subpoenas and bank restraints to restrain and then seize Mr. Crespo's exempt unemployment benefits.

16.     Keilbach is thus a "debt collector" as defined by the FDCPA.

17.     Defendant 1511 Sheridan LLC ("the Landlord") is a domestic limited liability company organized and existing under the laws of the State of New York. The Landlord engages in business in New York and maintains a designated agent for service of process in New York. The Landlord is the putative judgment creditor.

18.     The GMBS Defendants are "debt collector[s]" as defined in 15 U.S.C. § 1692a(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed, or due or asserted to be due another. The GMBS Defendants are also "debt collector[s]" as defined in 15 U.S.C. §

1692a(6) as their principal purpose is the collection of debts.

19.    According to the discovery answers and correspondence from the Gutman Defendants in this action, Defendant Hilltop was a property management company upon whose behalf it was attempting to collect the putative judgment. Specifically, Interrogatory # 7 asked, "Identify the property management company for Defendant 1511 Sheridan LLC during the collections lawsuit and during the attempts to collect on the putative judgment, including but not limited to the restraint of the M&T Bank account." In response Gutman Defendants stated, "Upon information and belief, Hilltop Management was the management company during attempts to collect upon the judgment."

20.    Gutman was acting as the agent of Hilltop within the course and scope of that agency when it committed the state law violations that form a basis of the claims against Gutman. Therefore, Hilltop is jointly liable for the state law violations of Gutman. Consequently, the state law claims brought against Gutman are brought against Hilltop jointly and severally.

## C. STATEMENT OF FACTS

*The Landlord Obtained a Default Judgment Against Mr. Crespo*

21.    On October 2, 2002, the Landlord, by and through its attorneys GMBS, initiated an action for rental arrears and possession of Mr. Crespo's residence, captioned *1511 Sheridan LLC v. Jose Crespo*, LT-83929-02/BX in the Civil Court of the City of New York, County of Bronx. **Exhibit A** (LT Lawsuit).

22.    The LT Lawsuit sought $4,279.97, including rent from February 2002 through October 2002. *Id.*

23.    Mr. Crespo had been withholding his rent from the Landlord due to deplorable conditions in the apartment.

24.     At first, Mr. Crespo was grateful to have a nice apartment with an affordable rent, but then, in around June 2002, there was a big leak two floors above him leading down into his kitchen and living room.

25.     The leak was so bad that he would fill buckets full of water from it.

26.     The leak caused the ceiling over his kitchen to fall apart, and the remaining hole allowed for cockroaches, dust, and sand to fall constantly over his sink, stove, and refrigerator. As a result, he was unable to cook, and he had to spend more money on food.

27.     Mr. Crespo has asthma, so he was worried about inhaling the dust and sand.

28.     He told the manager of the building about the leak, as did the tenant who lived above him, but nothing was done.

29.     On October 10, 2002, Mr. Crespo filed an Answer in the LT Lawsuit. **Exhibit B** (LT Answer).

30.     On October 21, 2002, Mr. Crespo and the Landlord entered into a stipulation for Mr. Crespo to pay the arrears and for the Landlord to make repairs. **Exhibit C** (First Stipulation).

31.     A judgment was also entered against Mr. Crespo on October 21, 2002 for $3,996.97. **Exhibit D** (First Judgment).

32.     On December 12, 2002, GMBS filed an affirmation alleging that Mr. Crespo had failed to make payments per the stipulation entered into on October 21, 2002. **Exhibit E** (Affirmation for Warrant).

33.     On January 7, 2003, a warrant was issued for possession of the apartment. **Exhibit F** (First Warrant for Possession).

34.     On January 10, 2003, Mr. Crespo filed an Order to Show Cause.

35.     On February 5, 2003, Mr. Crespo appeared in court and explained why he was

withholding his rent. Accordingly, the parties entered into a stipulation of settlement that required (1) Mr. Crespo to pay the amount he had withheld over 18 months and (2) the Landlord to make repairs starting on either February 26, 27, or 28, 2003, and to substantially complete them within 30 days of first accessing the apartment. **Exhibit G** (Second Stipulation).

36.     Mr. Crespo made his required payment on February 10, 2003, but February 26, 27, and 28, 2003 came and went and the Landlord did not access the apartment, much less make substantial repairs.

37.     Accordingly, Mr. Crespo stopped making payments on the stipulation that the Landlord had breached.

38.     On August 4, 2003, a judgment of possession was entered against Mr. Crespo, along with a money judgment of $2,574.98. **Exhibit H** (LT Judgment).

39.     The judgment of possession stipulated that the warrant would be stayed until August 31, 2003 for Mr. Crespo to vacate the subject premises, and that in consideration therefore the Landlord would waive $1,000 of the outstanding arrears, thus leaving a judgment of $2,574.98. *Id.*

40.     Mr. Crespo vacated the apartment accordingly.

41.     Unbeknownst to Mr. Crespo, the Landlord retained Defendant GMBS to file another lawsuit on January 21, 2005, captioned *1511 Sheridan LLC v. Jose Crespo*, Index No. CV-002890-05/BX in the Civil Court of the City of New York, County of Bronx. **Exhibit I** (Collection Lawsuit).

42.     The Collection Lawsuit sought a money judgment of $4,078.98 for rental arrears from February 2003 through October 2003.

43.     The Collection Lawsuit deceptively sought a judgment on rental arrears that had already

8

been reduced to a money judgment in the LT Lawsuit, and sought an amount $1,504 higher than what was agreed to be owed in the LT Lawsuit.[2]

44.     Mr. Crespo was never served with the Summons and Complaint.

45.     The Affidavit of Service claims to have served Mr. Crespo on January 11, 2005 at 1229 Franklin Ave., Apt. BB, Bronx, NY 10456. **Exhibit J** (Affidavit of Service).

46.     The Affidavit of Service is false: Mr. Crespo never lived at this address; rather, it was the address of someone Mr. Crespo worked with doing window repair work for various landlords, including the Landlord.

47.     Mr. Crespo had moved to 523 Fifth Ave., Apt. 284, Pelham, NY 10803 after leaving the Sheridan Avenue apartment in 2003; in around January 2005 moved from the 523 Fifth Ave. apartment to a new apartment at 2420 Webster Ave., Apt. B3, Bronx, NY 10457; and then on September 1, 2006, moved from the 2420 Webster Ave. apartment to 6 Schley Ave., New Rochelle, NY 10801.

48.     Mr. Crespo was never informed by the actual resident of Apt. BB at the 1229 Franklin Ave. address that any papers were received for him, by mail or otherwise, and he was never given a copy of the Summons and Complaint by this resident.

49.     Notably, the Affidavit of Service claims to have served Mr. Crespo on January 11, 2005, before the Collection Lawsuit was even commenced on January 21, 2005.

50.     The process server, Ricardo Diaz, was fined $500 and enter into a consent order with the New York City Department of Consumer Affairs (now the New York City Department of Consumer and Worker Protection) in 2013 for violations of the Rules of the City of New York, specifically for failing to attempt to learn the result of traverse hearings scheduled in matters for

---

[2] Plaintiff does not bring FDCPA claims on this or any other conduct more than one year from the filing of this instant Complaint.

which he was alleged to have served process despite having received notice of the hearings, and failing to timely report the result of the hearings or that he attempted to learn the results of the hearings. **Exhibit K** (DCA Consent Order).

51.     Defendants used a false affidavit of service and obtained a judgment via "sewer service"— the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit of service claiming that service was properly effectuated.[3]

52.     Because Mr. Crespo had no notice of the lawsuit, he did not answer or appear in court. The court entered a default judgment against him on April 7, 2005. *See* **Exhibit L** (Default Judgment).

53.     Mr. Crespo did not know that a judgment had been entered against him, and he never received a copy of the Default Judgment or notice of entry in the mail.

*As a Result of the Default Judgment, Mr. Crespo's Wages Were Garnished and His Bank Account Restrained*

54.     On or around December 11, 2018, the Erie County Sheriff's Office served Mr. Crespo with an Income Execution for $11,515.16 based on the Default Judgment. **Exhibit M** (Income Execution).

55.     Mr. Crespo's work human resources department at this time notified him of the Income Execution. This was Mr. Crespo's first notice that there was a default judgment against him.

56.     At this time, Mr. Crespo was living in Buffalo, New York, attending Buffalo State College full-time and working 20-30 hours a week to support himself.

57.     Mr. Crespo had also recently had quadruple bypass surgery, which caused him to miss a few weeks of school and work. Accordingly, he could not afford to take more time off from

---

[3] *See Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) ("Plaintiffs allege that defendants did so by engaging in 'sewer service'—the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.").

school or from his job in Buffalo to travel to New York City to challenge the Default Judgment

and garnishment, nor could he afford to hire an attorney to represent him.

58.     From January 21, 2019 to November 10, 2019, a total of $1,458.30 was garnished from

Mr. Crespo's wages.

59.     In or around November 2019, Mr. Crespo lost his job in Buffalo, and after a few months

of unsuccessfully trying to find another job in Buffalo, he moved back to New York City in the

beginning of March 2020, staying with his sister.

60.     In June 2020, his sister lost her apartment, and she and Mr. Crespo had to move into their

mother's one-bedroom apartment, where two other relatives also resided. Because of the

overcrowding, Mr. Crespo became homeless and had to live with various friends.

61.     The loss of his job and housing, his multiple health issues, his financial hardship, and the

COVID-19 pandemic prevented Mr. Crespo from challenging the Default Judgment even after

he had returned to New York City.

62.     On or around August 30, 2021, Defendants used the Default Judgment to restrain his

M&T Bank account.

63.     All of the funds in Mr. Crespo's bank account were exempt from restraint.

64.     The Exempt Income Protection Act mandates that the first $3,000 of any account into

which statutorily exempt payments are made electronically or by direct deposit are exempt from

execution, C.P.L.R. §§ 5205(l), 5222(h), and that the first $3,600 of any other individual account

are exempt from execution, C.P.L.R. § 5222(i).[4] At least the first $3,000 of the $5,191.99 in Mr.

Crespo's bank account should have been exempt.

65.     All of the $5,191.99 was from unemployment insurance payments made by direct deposit

---

[4] *See* Dept. of Fin. Servs., Current Dollar Amount of Payments Statutorily Exempt from Enforcement of Judgments, https://www.dfs.ny.gov/industry_guidance/exemption_from_judgments (last visited Aug. 1, 2022).

to Mr. Crespo's bank account.

66.     Upon information and belief, GMBS should have known this money was at least partially exempt from the bank's response to the information subpoena, which will generally show the source of the last three or more deposits into the account; indeed, the last 18 deposits into Mr. Crespo's account before the restraint were all noted on his account transaction history as "NYS DOL UI," or New York State Department of Labor Unemployment Insurance.

67.     When Mr. Crespo learned about the restraint, he became very anxious because he had bills for his phone, storage unit, student loans, personal loans, and credit cards set up to debit automatically from his restrained bank account, and he was scared about missing payments on these bills due to the restraint.

68.     Mr. Crespo called his bank, which provided him with the contact information for GMBS.

69.     Mr. Crespo called GMBS and spoke to Defendant Gary Thigpen. Mr. Crespo told Mr. Thigpen that all the money in Mr. Crespo's bank account was COVID-19 stimulus funds and unemployment benefits. Mr. Thigpen told Mr. Crespo that GMBS would call the bank to find out how much money was in the account, see how much they would be willing to take in order to release the account, and call him back.

70.     Mr. Thigpen called Mr. Crespo back and told him that they would release his account in exchange for a payment of $1,200 from his account. Mr. Crespo had read online that COVID-19 stimulus funds and unemployment benefits were exempt from debt collection, and so he again told Mr. Thigpen that the money in his account was COVID-19 stimulus funds and unemployment benefits and therefore exempt. Mr. Thigpen said that he would still have to pay $1,200 if he wanted his account released.

71.     Desperate to release his account and relying on Mr. Thigpen's false representation that he

had to pay $1,200 from his account in order to release the rest of his exempt funds from restraint, Mr. Crespo reluctantly agreed to pay the $1,200.

72.     On or around September 2, 2021, Mr. Thigpen sent Mr. Crespo a Conditional Release whereby Mr. Crespo would agree to pay GMBS $1,200 from his account in exchange for the release of his account. **Exhibit N** (Email with Conditional Release).

73.     The Conditional Release was signed by Eric Keilbach. *Id.*

74.     The Conditional Release was deceptive and void because (1) Defendants fraudulently represented that Mr. Crespo would have to pay $1,200 from his account if he wanted his account released, even though he had told them that all the money in his account was exempt unemployment benefits, (2) Mr. Crespo relied on this misrepresentation to his detriment, and (3) the agreement goes against public policy deeming unemployment benefits exempt from restraint and garnishment.

75.     Mr. Crespo signed the agreement and returned it to GMBS the same day, September 2, 2021.

76.     For nearly two more months, Defendants did not take the $1,200 from Mr. Crespo's bank account or release his account.

77.     Mr. Crespo called his bank several times and confirmed each time that his bank had still not received the Conditional Release from GMBS. Mr. Crespo offered to send the Conditional Release to the bank himself, but his bank told him that it needed to receive the Conditional Release directly from GMBS.

78.     On or around September 12, 2021, Mr. Crespo received documents in the mail from his bank, including an Exemption Claim Form and a letter stating that he could withdraw up to $3,600 from his bank account.

79.     Mr. Crespo called his bank to ask about these documents, and he was told, inaccurately, that filling out the Exemption Claim Form would "not make any difference" and that he could withdraw $3,600 but would then forfeit the remaining amount of money in his account.

80.     Mr. Crespo did not want to forfeit any of his money, and did not want to keep $3,600 on his person because he was homeless, so he decided against withdrawing the $3,600.

81.     Because of the restraint on his account, Mr. Crespo was unable to pay his bills for his phone, storage unit, credit cards, and personal loans, incurring multiple late fees.

82.     With his bank account still restrained and his bills piling up, Mr. Crespo went to the clerk's office at the Civil Court of the City of New York, County of Bronx, to see if there was anything else he could do, and was given a list of free legal services he could reach out to.

83.     Mr. Crespo got into contact with the nonprofit organization New Economy Project through their NYC Financial Justice Hotline, which provided him with free limited-scope legal assistance to try to help him get his exempt funds released and vacate the sewer service judgment against him.

84.     On October 27, 2021, New Economy Project, on behalf of Mr. Crespo, emailed GMBS, attaching an extensive breakdown, along with supporting documentation, showing that all the money in the bank account at the time of GMBS's restraint was exempt unemployment benefits (by this time Mr. Crespo's COVID-19 stimulus funds had been spent down) , and demanding that the account be released immediately. **Exhibit O** (Email with Bank Documents). Mr. Crespo was copied on this email.

85.     The supporting documentation included statements from January 5, 2021 to September 3, 2021 for Mr. Crespo's restrained account. *Id.*

86.     On October 28, 2021, Eric Keilbach at GMBS responded to New Economy Project,

stating, "I just wanted to make sure you are aware that Mr. Crespo signed a conditional release for $1200 that we are following up with the bank about. He also apparently never filed an exemption claim with the bank." **Exhibit P** (Emails between GMBS and NEP). Mr. Crespo was copied on Mr. Keilbach's response.

87.     However, later that day, GMBS agreed to send a release to the bank "without prejudice, despite the fact that the judgment debtor signed a conditional release and never filed an exemption claim form." *Id.*

88.     However, when Mr. Crespo contacted his bank, he was told that GMBS had sent the Conditional Release and that $1,200 had been taken from his account.

89.     On October 29, 2021, New Economy Project emailed GMBS, again copying Mr. Crespo, about what Mr. Crespo's bank had told him, and Eric Keilbach stated in a reply email to New Economy Project and Mr. Crespo that if a check for the $1,200 was being sent to their office, they would send it to Mr. Crespo. *Id.*

90.     On November 4, 2021, with the assistance of New Economy Project, Mr. Crespo filed a *pro se* Order to Show Cause in the Civil Court of the City of New York, County of Bronx, to vacate the Default Judgment against him, order restitution of all funds levied and/or garnished, and dismiss the Collection Lawsuit for lack of personal jurisdiction. **Exhibit Q** (OSC).

91.     GMBS did not put in any papers on the Landlord's behalf opposing Mr. Crespo's *pro se* Order to Show Cause and did not appear for the November 17 hearing on the Order to Show Cause.

92.     GMBS knew that it did not have a basis to oppose Mr. Crespo's Order to Show Cause, and thus did not appear for the hearing, but still made Mr. Crespo have to come to court for the hearing rather than stipulating to vacate the judgment and return his money.

93.     As a result, the court marked the Order to Show Cause as "Submitted – No Opposition" on the November 17, 2021 return date.

94.     On November 22, 2021, the court issued a decision on Mr. Crespo's Order to Show Cause ordering a traverse hearing for February 14, 2022.

95.     GMBS appeared at the February 14th traverse hearing and raised the issue of the Conditional Release, arguing that Mr. Crespo had agreed to liability.

96.     Upon GMBS's request, the court permitted GMBS to file papers attaching the Conditional Release, and the February 14th traverse hearing was adjourned to February 25, 2022.

97.     Despite requesting and being granted an adjournment of Mr. Crespo's traverse hearing to file papers with the court, GMBS failed to file any papers with the court before the February 25th hearing, and consequently the court refused to consider the Conditional Release further.

98.     GMBS knew that it had no good faith basis for opposing the Order to Show Cause, but instead sought and obtained an adjournment of Mr. Crespo's traverse hearing for the purpose of dragging out the proceedings, hoping to wear him down by making him to come to court for an additional appearance.

99.     In the absence of any written opposition from Defendants, the court entered an order on March 8, 2022 (amended March 11, 2022), that the Default Judgment be vacated and all monies collected be returned to Mr. Crespo within 30 days. **Exhibit R** (Order Vacating Judgment).

100.    On March 17, 2022, Mr. Crespo mailed GMBS a copy of the court's Order Vacating Judgment with a notice of entry. **Exhibit S** (Notice of Entry).

101.    Per the Order Vacating Judgment, GMBS should have returned the money by April 11, 2022.

102.    However, by April 11, 2022, Mr. Crespo still had not received any of the money.

103.    On or around April 21, 2022, GMBS sent Mr. Crespo a check for $1,378.86, which he received on or around April 25, 2022.

104.    These funds did not fully refund Mr. Crespo: $1,458.30 of his wages had been garnished by Defendants in 2019, so there was a deficit of $79.44.

105.    On April 28, 2022, Mr. Crespo sent Eric Keilbach at GMBS an email explaining the deficiency and demanding that GMBS refund him the remaining $79.44. **Exhibit T** (Emails between Mr. Crespo and Mr. Keilbach).

106.    On April 29, 2022, Mr. Keilbach emailed Mr. Crespo telling him that GMBS was following up with the Sheriff about "if they are sending back the difference." *Id.*

107.    On May 9, 2022, Mr. Crespo emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS did not respond.

108.    On May 25, 2022, Mr. Crespo again emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS again did not respond.

109.    As of this filing, Mr. Crespo has not been returned the remaining $79.44. He has also never been reimbursed for the $110 legal processing fee that his bank charged due to Defendants' restraint of his exempt funds.

*In Addition to Economic Injury, Mr. Crespo Suffered Anxiety and Distress Because of Defendants' Illegal Restraint*

110.    Mr. Crespo first found out about the Default Judgment against him when he received the notice of garnishment of his wages from his employer in Buffalo on or around December 11, 2018.

111.    He felt horrible when he got this notice. His job did not pay much money, he was still in school (he would graduate in May 2019), and he was not able to travel from Buffalo to New York City to try to get this wrongfully obtained judgment vacated.

112.    He did not understand why Defendants waited to enforce the judgment until he moved to Buffalo and until 2019, since Defendants had obtained the judgment in 2005, when he still lived in New York City. It felt to Mr. Crespo as if Defendants waited on purpose so that he could not fight the judgment.

113.    Mr. Crespo was angry about the garnishments because the Landlord had never fixed his apartment and now Defendants were going after him, not for the amount he allegedly owed when he moved out ($2,574.98), but for $11,515.16—a principal of $4,873.91 and interest of $5,996.91 (along with other costs and fees).

114.    He felt as if Defendants were pursuing more than he allegedly owed just to see if they could get away with it.

115.    His employer at that time told him to work overtime to make up for the garnishments from his paycheck, but the more overtime he worked the more money Defendants got from the wage garnishments, stressing him out even more. He saw the garnishments every time he got his paycheck.

116.    The garnishment was an additional stressor on top of finishing school and his heart attack and quadruple bypass surgery.

117.    He thought about the garnishments all the time. It felt as if every time he was improving his life it turned out that his life was actually getting worse.

118.    As for many people around the world, the COVID-19 pandemic threw Mr. Crespo's life into chaos.

119.    He lost his job in Buffalo and another job offer to him was rescinded, and he moved back to New York City to stay with family.

120.    Because his mother's apartment was overcrowded, he had to rely on friends as well,

sleeping on their couches.

121.    Even though he was homeless, Mr. Crespo had managed to stay on top of his bills until Defendants restrained his bank account.

122.    He felt worried and overwhelmed about not being able to pay his bills.

123.    Without access to his unemployment benefits he could no longer afford to pay for the haircut and shave he would need to get before a job interview, or for public transportation to get to any job interviews.

124.    The stress gave him chest pains, shortness of breath, sharp pains on his sides and arms, dizziness, and anxiety, which was very troubling given his history of heart problems as well as his diabetes and asthma.

125.    His ECG and stress test yielded normal results, so his doctor believed that his symptoms were caused by stress rather than his heart.

126.    Mr. Thigpen was very forceful over the phone, and Mr. Crespo felt like he was being hammered.

127.    Mr. Crespo felt that the GMBS Defendants were so confrontational toward him because he knew what his rights were and had told them that his funds were exempt.

128.    The GMBS Defendants made him feel small, like he was being bombarded.

129.    Because the bank restraint prevented Mr. Crespo from being able to pay his phone bill, his phone was shut off and he consequently was not able to access any voicemails, which made him worry that GMBS was trying to contact him and would not be able to.

*GMBS Has a History of Restraining Exempt Funds*

130.    Mr. Crespo is not the first consumer to have exempt funds in a bank account deceptively and unfairly restrained by GMBS.

131.    A FDCPA lawsuit was brought against GMBS and another landlord in 2015, captioned *Arias v. Gutman, Mintz, Baker & Sonnenfeldt, P.C., et al.*, Case 1:15-cv-09388 (SDNY). **Exhibit U** (*Arias* Complaint).

132.    Like Mr. Crespo, Franklin Arias had a sewer service judgment obtained against him by GMBS on September 28, 2006. *Id.* ¶¶ 12-15.

133.    Eight years later, GMBS executed on the sewer service judgment by restraining Mr. Arias's bank account. *Id.* ¶ 16.

134.    As with Mr. Crespo, the funds in Mr. Arias's bank account were entirely exempt, except that Mr. Arias's funds consisted entirely of Social Security retirement benefits. *Id.* ¶¶ 17-20.

135.    The same day the funds were restrained, Mr. Arias faxed GMBS bank statements showing that his account contained only exempt Social Security retirement benefits, and also called GMBS to tell them that he had faxed the bank statements and his restrained funds were exempt Social Security benefits. *Id.* ¶¶ 44-50.

136.    As with Mr. Crespo, GMBS, despite being told that the funds were exempt, told Mr. Arias that they would remove the restraint only if Mr. Arias sent them a payment. *Id.* ¶ 51.

137.    GMBS later doubled down on this improper conduct by requesting a hearing and filing an objection to Mr. Arias's exemption claim, despite having no good faith basis for doing so. *Id.* ¶¶ 60-61.

138.    This deceptive and unfair litigation conduct is similar to GMBS's unduly delaying the traverse hearing in Mr. Crespo's case on the basis of the fraudulently obtained Conditional Release.

139.    Another FDCPA lawsuit was brought against GMBS and another landlord in 2019, captioned *Fadlevich v. JD 34th Street Realty LLC, et al.*, Case No. 1:19-cv-04227-AMD-CLP

(EDNY). **Exhibit V** (*Fadlevich* Complaint).

140.     On or about August 19, 2016, a default judgment for $13,785 was obtained against Mark Fadlevich. *Id.* ¶ 15.

141.     More than two years later, on or about November 16, 2018, GMBS executed on the judgment by restraining Mr. Fadlevich's bank account for $16,550.97. *Id.* ¶ 16.

142.     All of the money in Mr. Fadlevich's bank account was Social Security Disability Insurance ("SSDI") benefits, and thus entirely exempt from restraint and garnishment. *Id.* ¶¶ 29-30.

143.     On December 4, 2018, Mr. Fadlevich emailed GMBS, giving them notice that the money was exempt SSDI benefits and providing screenshots of the corresponding deposits. *Id.* ¶ 48.

144.     Despite this email and an Exemption Claim Form sent on December 7, 2018, GMBS levied an additional $952.19 of Mr. Fadlevich's exempt funds on December 11, 2018. *Id.* ¶ 50.

145.     Mr. Fadlevich sent GMBS, as well as the bank and the marshal, a letter on or around December 14, 2018, again giving GMBS notice that all the restrained funds were exempt SSDI benefits, that he had filled out and sent an exemption claim form, and that he had emailed GMBS about the money being exempt. *Id.* ¶ 51.

146.     The marshal responded by releasing the portion in his control back to Mr. Fadlevich, $17,522.40, but this left a remaining balance of $7,519.68 being restrained, so Mr. Fadlevich sent a second letter giving notice of the remaining exempt funds that had not been released. *Id.* ¶ 53.

147.      Rather than release the exempt funds, GMBS restrained an additional $8,016.44 in Mr. Fadlevich's same bank account on March 14, 2019. *Id.* ¶ 57.

148.     Accordingly, Mr. Fadlevich sent a third letter on April 24, 2019 to GMBS, the bank, and

the marshal, once again giving notice that GMBS was restraining his exempt Social Security

funds, and after receiving no response sent a fourth letter on May 22, 2019. *Id.* ¶¶ 59-60.

149.    On May 31, 2019, 190 days after the restraint began, GMBS had Wells Fargo release the

$7,269.68 it was holding from the first restraint, though GMBS continued to restrain $8,391.44

of Mr. Fadlevich's exempt funds, and then on July 15, 2019 restrained an additional $2,055.67.

*Id.* ¶¶ 62-63.

150.    Finally, on July 17, 2019, Defendants released the remaining restrained exempt SSDI

benefits. *Id.* ¶ 64.

151.    In sum, from November 21, 2018 to July 15, 2019 (236 days), Defendants restrained

anywhere from $7,519.68 to $25,042.08 of Mr. Fadlevich's exempt SSDI benefits, despite his

four written notices that the funds were exempt. *Id.* ¶ 65.

152.    GMBS also never reimbursed Mr. Fadlevich for the $500 of exempt funds taken due to

bank fees caused by the illegal restraints. *Id.* ¶ 66.

153.    Upon information and belief, these instances of restraining exempt funds, whether Social

Security or unemployment insurance benefits, represent a regular practice of GMBS to deceive

consumers into believing that their funds are not exempt from garnishment.

## FIRST CLAIM FOR RELIEF

### *Violations of the Fair Debt Collection Practices Act*
### (against GMBS Defendants)

154.    Plaintiff repeats and realleges each and every allegation contained in the previous

paragraphs as though fully set forth herein.

155.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt

collectors, to insure that those debt collectors who refrain from using abusive debt collection

practices are not competitively disadvantaged, and to promote consistent State action to protect

consumers against debt collection abuses." 15 U.S.C. § 1692(e).

156.    Defendants materially violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f. By way of example and not limitation, Defendants materially violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive, or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the compensation which may be lawfully received; falsely representing or implying that any individual is an attorney or that any communication is from an attorney; representing or implying that nonpayment of any debt will result in the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action; threatening to take and actually taking an action prohibited by law, or threatening to take an act not intended to be taken; communicating or threatening to communicate to any person credit information which is known or which should be known to be false; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law; and taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if the property is exempt by law from such dispossession or disablement..

157.    Defendants' violations of 15 U.S.C. § 1692 et seq. render them liable to Plaintiff.

158.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages.

159.    The injuries that Defendants inflicted on Plaintiff are concrete and particular, and have a close relationship to harms traditionally recognized as providing a basis for lawsuits in United

States courts.

160.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in United States courts, including but not limited to the $79.44 of wages that have not been returned to him and the costs of fees from bills he was not able to pay due to the bank restraint.

161.    Plaintiff's injuries are analogous to, inter alia, the following common law claims: negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

162.    Defendants had a duty to exercise reasonable care in the collection of debts.

## SECOND CLAIM FOR RELIEF

### *Conversion*
### (against all Defendants)

163.    Plaintiff repeats and realleges each and every allegation contained in the previous paragraphs as though fully set forth herein.

164.    A cause of action for conversion lies when a plaintiff establishes a) his legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with his property interest in defiance of his rights.

165.    Intent to possess another's property is not an essential element of conversion, nor does the converter need to take physical possession of the property. Any wrongful exercise of dominion over a piece of property by someone other than the owner constitutes a conversion.

166.    Property subject to conversion includes readily identifiable funds from a bank account and wages.

167.    Here, Defendants garnished Mr. Crespo's unemployment benefits despite their being exempt. They knowingly and fraudulently exercised dominion over his exempt funds, interfering with his right to possession and ability to use his money for his expenses.

168.    Defendants, now in defiance of a court order, exercise dominion over $79.44 of the funds

garnished pursuant to the vacated sewer service judgment.

169.    Defendants' improper restraint of Mr. Crespo's unemployment benefits and their continued refusal to return the entire amount of his garnished wages have wrongfully interfered with his right to control his own property, and thus constitutes conversion.

170.    For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, inter alia, the remaining funds that have not been returned, loss of use of money for the period Defendants wrongfully exercised dominion and control over Plaintiff's money, and resulting consequential damages resulting therefrom, including but not limited to fees resulting from his subsequent inability to pay his bills. Plaintiff suffered serious mental distress and disruption of his daily life.

### THIRD CLAIM FOR RELIEF

***N.Y. Gen. Bus. Law § 349***
**(against all Defendants)**

171.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

172.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. § 349(h).

173.    As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 et seq. by using deceptive acts and practices in the conduct of their businesses.

174.    Defendants committed the above described acts willfully and/or knowingly.

175.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and

unless enjoined will cause further irreparable injury.

176.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 et seq., Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, and exemplary damages, together with costs and attorney's fees.

177.    Defendants' deceptive conduct toward Plaintiff is the type of conduct that has a broad impact on consumers at large. That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability. Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

178.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages.

179.    The injuries that Defendants inflicted on Plaintiff are concrete and particular, and have a close relationship to harms traditionally recognized as providing a basis for lawsuits in United States courts.

180.    Plaintiff suffered economic injuries that historically have provided a basis for lawsuits in United States courts, including but not limited to the $79.44 of wages that have not been returned to him and the fees from bills he was not able to pay due to the bank restraint.

181.    Plaintiff's injuries are analogous to, inter alia, the following common law claims: negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

182.    Defendants had a duty to exercise reasonable care in the collection of debts.

## **FOURTH AND FIFTH CLAIM FOR RELIEF**

### *Negligence & Gross Negligence*
**(against all Defendants)**

26

183.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

184.    By way of example and not limitation, Defendants' negligence consisted of the following: (1) restraining Mr. Crespo's exempt funds after receiving notice that the funds were exempt; (2) opposing Mr. Crespo's Order to Show Cause, including with baseless adjournments, when Defendants had no good faith basis to oppose it; and (3) failing to comply with the court's order and return all of the funds taken from Mr. Crespo.

185.    Defendants' failure to exercise even slight care or diligence amounts to, at minimum, negligence, and in the alternative, amounts to gross negligence.

186.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

187.    As to Plaintiff's claim of gross negligence, made in the alternative to Plaintiff's claims for negligence, Defendants' actions evince a reckless disregard for the rights of Mr. Crespo and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general. Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Mr. Crespo is entitled to a punitive damage award.

## **PRAYER**

**WHEREFORE**, Plaintiff Jose Crespo respectfully requests the following relief:

a.    Actual damages;

b.    Statutory damages under 15 U.S.C. § 1692k;

c.    Punitive damages;

d.    Costs, disbursements, and attorneys' fees under 15 U.S.C. § 1692k;

Last saved: 1/24/2023 3:32 PM

e.      Prejudgment and post-judgment interest as allowed by law;

f.      All other relief, in law and in equity, both special and general, to which Plaintiff

may be justly entitled.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  January 24, 2023
        Brooklyn, New York

Respectfully submitted,

/s/

_____

Susan Shin
NEW ECONOMY PROJECT
121 West 27th Street, Suite 804
New York, NY 10001
Phone: (212) 680-5100
Fax: (212) 680-5104
Email:  raquel@neweconomynyc.org
        susan@neweconomynyc.org

/s/

_____

Ahmad Keshavarz
Emma Caterine
THE LAW OFFICE OF AHMAD KESHAVARZ
16 Court Street, 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax: (877) 496-7809
Email: emma@newyorkconsumerattorney.com
       ahmad@newyorkconsumerattorney.com
*Attorneys for the Plaintiff*

cc: To all counsel via ECF