## Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

JOSE CRESPO,

Case No.:1:22-cv-06599-JPO

Plaintiff,

-against-

GUTMAN, MINTZ, BAKER & SONNEFELDT, LLP,

GARY THIGPEN, ERIC KEILBACH, and

1511 SHERIDAN LLC,

Defendants.

----------------------------------X

REMOTE ZOOM DEPOSITION OF

Gary Thigpen

DEPOSITION TAKEN ON:

Wednesday March 22, 2023

11:00 a.m. - 3:35 p.m.

DEPOSITION TAKEN AT:

Dorchester County, South Carolina 29483

REPORTED BY: Kaitlin A. Guertin, CVR

JOB #: J9462565

## Page 2

APPEARANCES (VIA VIDEOCONFERENCE)

For the Plaintiff:
        Emma Caterine, Esquire
        Law Offices of Ahmad Keshavarz - Brooklyn
        16 Court Street, 26th Floor
        Brooklyn, New York 11241-1026

        Ahmad Keshavarz, Esquire
        Law Offices of Ahmad Keshavarz - Brooklyn
        16 Court Street, 26th Floor
        Brooklyn, New York 11241-1026

        Susan Shin, Esquire
        New Economy Project - New York
        121 West 27th Street, Suite 804
        New York, New York 10001

For the Defendants:
        Kenneth A Novikoff, Esquire
        Rivkin Radler - Uniondale
        926 RXR Plaza
        Uniondale, New York 11556

Also present:
Eric Keilbach

## Page 3

INDEX

Stipulations                                        5

Examination by Ms. Caterine                         6

Certificate                                       111

Errata                                            112

## Page 4

INDEX EXHIBITS

PLAINTIFF'S       DESCRIPTION                      PAGE

Exhibit A         Collection Notes                   41

Exhibit B         Legal Information Sheet            46

Exhibit C    First Information Subpoena Response     47

Exhibit D         Collection Notifications           52

Exhibit F   Second Information Subpoena Response     59

Exhibit G         GMBS Internal Emails               83

Exhibit H     Bank Statement and Analysis           85

Exhibit I    Stipulation of Conditional Release     93

Exhibit J     Transmitted Conditional Release       94

Exhibit K              Emails                        95

Exhibit L       Order Vacating Judgment             99

Exhibit M          Sheriff Accounting              100

Exhibit N    Fax to Erie Sheriff to Refund         102

*DIGITALLY RECORDED AUDIO RETAINED FOR TWELVE (12)

MONTHS FROM DATE OF CERTIFICATION.



Page 5

```
 1                    STIPULATIONS

 2

 3        THE COURT REPORTER:  Pursuant to The Order

 4   issued by the South Carolina Supreme Court on April

 5   3rd, 2020, all parties stipulate and agree that the

 6   witness was identified as Gary Thigpen and the

 7   witness's testimony will be treated as if the

 8   witness is under oath.  This deposition shall be

 9   used for all purposes like other depositions.

10   Counsel, can you please identify yourselves for the

11   record, state whom you represent, name any other

12   parties in attendance in your location, and state

13   on the record that you agree to the stipulation?

14        MS. CATERINE:  Good morning.  My name is Emma

15   Caterine.  I'm with the Law Office of Ahmad

16   Keshavarz for the plaintiff Jose Crespo and I'm

17   here with Ahmad Keshavarz also for the plaintiff

18   and Susan Shin of New Economy Project also for the

19   plaintiff Jose Crespo.

20        MR. NOVIKOFF:  Okay.  For the Gutman

21   defendants, the law firm of Gutman Mintz,

22   Mr. Keilbach, and Mr. Thigpen.  Ken Novikoff from

23   the law firm of Rivkin Radler.  Eric Keilbach just

24   joined the deposition so let's make that for the

25   record.  And, yes, I agree to the stipulation.
```

Page 6

```
 1        The same stipulations with regard to the
 2   deposition as last time; right?
 3        MS. CATERINE:  Yes.
 4        MR. NOVIKOFF:  Okay.  Thank you.
 5        THE COURT REPORTER:  Mr. Thigpen, please raise
 6   your right hand.
 7        (The Oath was administered.)
 8        THE WITNESS:  Yes.
 9        Whereupon, GARY THIGPEN,
10   being duly sworn and cautioned to speak the truth, the
11   whole truth, and nothing but the truth, testifies and
12   deposed as follows:
13                  EXAMINATION
14   BY MS. CATERINE:
15        Q    Good morning, Mr. Thigpen.  I know we've been
16   over this before, but just have it for the record.  If I
17   ask you a question and you don't ask me to rephrase the
18   question is it reasonable for me to assume that you
19   understood the question?
20        A    No.  I might need you to rephrase it again.
21        Q    Okay.  And if you have any questions about any
22   terminology I'm using, will you ask me to rephrase,
23   please?
24        A    Yes.
25        Q    And what is the source of your knowledge as to
```

Page 7

```
 1   Gutman Mintz's attempts to collect the debt from Jose
 2   Crespo?
 3        A    What do you mean by "the source of my
 4   knowledge?"
 5        Q    Well, do you have personal recollection or
 6   looking at documents or what's the source of your
 7   knowledge?
 8        MR. NOVIKOFF:  Note my -- hold on.  Note my
 9        objection to the question.  Mr. Thigpen, you can
10        answer.  And the only time you are not to answer a
11        question, Mr. Thigpen, is if I tell you not to.
12        Even if I object, you still have to answer the
13        question.
14            THE WITNESS:  Okay.
15        A    My only source is looking at my notes or
16   referring to my notes in the file.
17        Q    (BY MS. CATERINE) So you don't have any
18   personal memory of this case at all?
19        A    No.
20        MR. NOVIKOFF:  Note my objection.  I believe
21        you asked that at the last deposition.  And just so
22        I don't burden the record, I'm going to have a
23        standing objection to any question that has already
24        been asked and answered at the first part of the
25        deposition.  So go ahead, Emma.
```

Page 8

```
 1        MS. CATERINE:  Understood.
 2        Q    (BY MS. CATERINE) And other than your attorney
 3   Ken Novikoff, who have you communicated with about
 4   allegations in the FCDPA lawsuit?
 5        A    No one.
 6        Q    And this is, of course, your second time
 7   sitting for a deposition in this case.  In between the
 8   first time and the second time, did you communicate with
 9   anybody about your deposition?
10        MR. NOVIKOFF:  Other than counsel?
11        Q    (BY MS. CATERINE) Including counsel.  Without
12   divulging the contents of that conversation.
13        MR. NOVIKOFF:  Fair enough.
14        A    Only with counsel.
15        Q    (BY MS. CATERINE) Okay.  And what steps did
16   you take to prepare for your deposition today?
17        MR. NOVIKOFF:  Hold on now.  You can answer
18        the question, Gary, to the extent that you talked
19        to me, you can say that but other than what -- you
20        can't talk about what we talked about; okay?
21            THE WITNESS:  Okay.
22        MR. NOVIKOFF:  Go ahead.
23        A    What was the question again, Counselor?
24        Q    (BY MS. CATERINE) What steps did you take to
25   prepare for your deposition today.
```



Page 9

1    A    Just going over things with my attorney.
2    Q    Okay.  Did you take any steps to obtain
3    additional information in preparation for your
4    deposition today other than speaking with your attorney?
5    A    No.
6    Q    And I believe you testified that you looked at
7    account notes in preparation for your deposition; is
8    that correct?
9        MR. NOVIKOFF:  Objection.
10    A    No, I didn't say that.  I said earlier I don't
11    have any personal recollection of it, only what my notes
12    say.  But I didn't look at any additional account
13    information since the last time we spoke.
14    Q    (BY MS. CATERINE)  Okay.  And what's your
15    understanding of what happened to Mr. Crespo as alleged
16    in this lawsuit?
17        MR. NOVIKOFF:  Objection.
18    A    My understanding?  What do you mean by my
19    understanding?
20    Q    (BY MS. CATERINE)  Well, what is your
21    understanding of what this case is about?
22        MR. NOVIKOFF:  Objection.
23    A    He made some allegations that weren't true.
24    Q    (BY MS. CATERINE)  And what are those
25    allegations?

Page 10

1    A    He failed to mention to me that the funds in
2    that account were similar.  So unemployment funds that
3    were direct deposited to that account.  He failed to
4    mention that to me in the very beginning.
5    Q    And I'm going to try to avoid asking some of
6    the questions that were asked last time, but I might
7    repeat myself so I apologize for that ahead of time.
8        MR. NOVIKOFF:  Hence my standing objection.
9    Q    (BY MS. CATERINE)  Remind me.  What is your
10    title at Gutman Mintz?
11    A    I am an account representative.
12    Q    And what are the general responsibilities of
13    an account representative?
14    A    I take incoming phone calls, take payments,
15    work judgment accounts, send out bank restraints,
16    negotiate settlements, you know, that sort of thing.
17    Q    And negotiating settlements, that would
18    include settlements involving conditional releases;
19    correct?
20    A    It might.
21    Q    And what sort of accounts are you collecting
22    on?  I think you said judgment accounts; is that right?
23        MR. NOVIKOFF:  Objection.
24    A    Landlord and tenant judgments.  Also
25    nonjudgments.

Page 11

1    Q    (BY MS. CATERINE)  In the May 1st, 2020,
2    application for a PPP loan by Gutman Mintz it says that
3    they had 78 jobs.  Does that sound accurate to you?
4        MR. NOVIKOFF:  I'm sorry.  What was the end of
5        that question?
6    Q    (BY MS. CATERINE)  It's said that they had 78
7    jobs at the firm.  Does that sound accurate to you?
8        MR. NOVIKOFF:  Note my objection.  You can
9        answer.
10    A    I don't know.
11    Q    (BY MS. CATERINE)  Okay.  What would you
12    estimate the number of jobs at Gutman Mintz is?
13        MR. NOVIKOFF:  Note my objection.
14    A    You mean the number of employees that work
15    there?
16    Q    (BY MS. CATERINE)  Yes.
17    A    I don't know but I would say between 70 and
18    90.
19        MR. NOVIKOFF:  Note my objection to that
20        question even though it's after the fact.  Go
21        ahead.
22    Q    (BY MS. CATERINE)  And are you involved at all
23    with the filing of taxes for Gutman Mintz?
24        MR. NOVIKOFF:  You mean Gutman Mintz taxes?
25        MS. CATERINE:  Yes.

Page 12

1        MR. NOVIKOFF:  Okay.
2    A    I'm an account representative.  I don't file
3    taxes for the company.
4    Q    (BY MS. CATERINE)  Sure.  Who does do the
5    accounting of the firm?
6        MR. NOVIKOFF:  Note my objection to the
7        question.
8    A    Again, I'm an account representative.  I don't
9    have a clue.
10    Q    (BY MS. CATERINE)  And you talked about sending
11    out bank restraints.  Who else at Gutman Mintz sends out
12    bank restraints besides yourself?
13    A    I think there are three or four individual
14    collectors in there that do that as well.
15    Q    And about how many accounts do you, Gary
16    Thigpen, collect on average per year?
17        MR. NOVIKOFF:  On average per year was the
18        question?
19        MS. CATERINE:  Yes.
20        MR. NOVIKOFF:  Note my objection to the
21        question.  You can answer, Mr. Thigpen.
22    A    I don't know.
23    Q    (BY MS. CATERINE)  Would it be more than a
24    thousand?
25        MR. NOVIKOFF:  Note my objection.



GARY THIGPEN                                                    March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.                          13–16

Page 13

1    A   It could be, yes, ma'am.
2    Q   (BY MS. CATERINE) And the majority of those
3   would be judgment accounts; correct?
4    A   Yes.
5        MR. NOVIKOFF:  Note my objection.
6    Q   (BY MS. CATERINE) And about what percent of
7   those judgments come from lawsuits that were filed by
8   Gutman Mintz?
9        MR. NOVIKOFF:  Note my objection.  You can
10       answer to the extent that you know, Mr. Thigpen.
11   A   I don't know.
12   Q   (BY MS. CATERINE) And what would be the
13  average amount of these judgments that you were seeking
14  to collect?
15       MR. NOVIKOFF:  I'm sorry, Emma, you went out
16       again towards the end.
17   Q   (BY MS. CATERINE) I said what would be the
18  average amount, dollar amount, of these judgments that
19  you were seeking to collect?
20       MR. NOVIKOFF:  Note my objection.
21   A   There is no way to determine the dollar
22  amount.  I don't know, ma'am.
23   Q   (BY MS. CATERINE) The judgment against
24  Mr. Crespo was a bit over $10,000.  Is that unusually
25  high?

Page 14

1        MR. NOVIKOFF:  Note my objection.
2    A   Actually, the principal was 4833.  So I
3   couldn't say whether it was averaging out a lot of
4   different numbers that we see.  So I don't know the
5   average number.
6    Q   (BY MS. CATERINE) Sure.  But I'm not asking
7   about the average anymore.  I'm just asking if this
8   amount would be unusual.
9        MR. NOVIKOFF:  Objection.
10   A   These numbers are not unusual to me.  No, it's
11  not unusual.
12   Q   (BY MS. CATERINE) And the clients that you are
13  collecting on behalf of are property management
14  companies; correct?
15       MR. NOVIKOFF:  Note my objection.  That one I
16       recall you asking before.  But you can answer,
17       Mr. Thigpen.
18   A   Landlords.  Yes, ma'am.
19   Q   (BY MS. CATERINE) And how often are you
20  interacting with these clients?
21       MR. NOVIKOFF:  Objection.  You can answer.
22   A   I don't interact with clients.
23   Q   (BY MS. CATERINE) So if you had a question
24  about an account you were collecting on, who would you
25  ask?

Page 15

1        MR. NOVIKOFF:  Objection.  Go ahead.
2    A   Eric Keilbach.
3    Q   (BY MS. CATERINE) And so does Eric Keilbach
4   handle the communications with the clients?
5        MR. NOVIKOFF:  Objection.
6    A   He does, but he has someone that does it for
7   him.  The manager of the firm.
8    Q   (BY MS. CATERINE) And who's the manager?
9    A   Brian Chiantella.
10   Q   And about how many collection letters do you
11  send out per year?
12   A   None.  I don't send out letters.
13   Q   Who at Gutman sends out the collection
14  letters?
15   A   Well, once they're signed by an attorney we
16  have someone in the mail room that does it.  Gail
17  Goldfine.
18   Q   So who actually drafts the collection letters
19  before they get sent to Gail to --
20       MR. NOVIKOFF:  Note my objection.
21   A   The attorneys.
22   Q   (BY MS. CATERINE) And so you're not involved
23  with the process of sending out collection letters at
24  all?
25   A   No.

Page 16

1    Q   And about how many calls do you make to
2   attempt to collect debts from consumers per year?
3        MR. NOVIKOFF:  Objection.  You can answer.
4    A   We can only call when we have a signed
5   stipulation so it's not many.  I would say a year, most
6   of my calls are incoming.  I don't know.
7    Q   (BY MS. CATERINE) And about how many of those
8   incoming calls do you receive on the average week?
9        MR. NOVIKOFF:  Objection.
10   A   It could change.  You know, I can get five and
11  a half hours, and I can take 25 calls a day, 50 calls a
12  day.  It depends.  Sometimes no calls a day if we're in
13  meetings.  So it changes every day.
14   Q   (BY MS. CATERINE) And consumers usually call
15  you when their bank account has been frozen; is that
16  correct?
17       MR. NOVIKOFF:  Objection.
18   A   Not all the time.
19   Q   (BY MS. CATERINE) Sure.  Not all the time, but
20  most of the time that's why they're calling; correct?
21       MR. NOVIKOFF:  Note my objection.
22   A   I can't say most of the time either, Counsel.
23  People call me just to pay a bill.  So they call for
24  that but not most of the time.
25   Q   (BY MS. CATERINE) So they might call you when



GARY THIGPEN
CRESPO vs G., M., B., AND S., LLP, ET AL.

March 22, 2023

17–20

Page 17

1 they receive collection letters, something like that; is
2 correct?
3       MR. NOVIKOFF: Objection.
4   A   Yes.
5   Q   (BY MS. CATERINE) Do you record phone calls?
6   A   Yes.
7   Q   And how are phone calls recorded at Gutman?
8   A   We have a new phone system, that's all I know.
9 We got a new phone system in 2017. I heard they had
10 access to that. So you'd have to talk to -- I don't
11 know exactly what. The phone system has a recording
12 system attached to it.
13   Q   Do you ever listen to recordings of phone
14 calls that you were on?
15   A   No.
16   Q   And how long are recordings of phone calls
17 kept?
18       MR. NOVIKOFF: Was the last word "kept?"
19       MS. CATERINE: Yes.
20       MR. NOVIKOFF: Note my objection.
21   A   I don't know.
22   Q   (BY MS. CATERINE) And do you know the name of
23 this new phone system from 2017?
24   A   No.
25   Q   So what are the typical steps that get taken

Page 18

1 in collecting a judgment from the time that you first
2 received the judgment for collection until you receive
3 payment?
4       MR. NOVIKOFF: Again, note my objection. To
5       the extent of this witness can answer this
6       question, go ahead.
7   A   Could you just -- what are you looking for?
8 What do you mean, "steps?"
9   Q   (BY MS. CATERINE) Sure. Let's say that Gutman
10 receives a new judgment for collection, what would be
11 the first step in attempting to collect on that
12 judgment?
13       MR. NOVIKOFF: Objection.
14   A   Well, it works a little differently. We send
15 out a demand letter. And if the demand -- we don't get
16 a dispute to the demand letter, there's a process that
17 happens after that where they get a summons and
18 complaint. We don't just give judgments. Some of the
19 judgments, we just get but most of the judgments we send
20 a demand letter.
21   Q   (BY MS. CATERINE) Sure.
22   A   I don't -- the process.
23       MR. NOVIKOFF: I'm sorry. I didn't catch that
24       answer. I don't know if the court reporter did
25       either. The last part.

Page 19

1   A   I said I'm not involved with that process.
2   Q   (BY MS. CATERINE) But once you have reduced
3 the debt to a judgment, after the lawsuit has been filed
4 and a judgment has been obtained, what is the first step
5 in attempting to collect on that judgment?
6       MR. NOVIKOFF: Note my objection. You can
7       answer.
8   A   The first step?
9   Q   (BY MS. CATERINE) Uh-huh.
10   A   I'm thinking there's a judgment letter that
11 goes out to the defendants.
12   Q   And what is this judgment letter?
13   A   Notifies them that a judgment was entered, the
14 day it was entered, the index number, the accord, and
15 the amount.
16   Q   And did you ever send out these judgment
17 ledgers?
18       MR. NOVIKOFF: Objection.
19   A   No.
20   Q   (BY MS. CATERINE) And does Gutman Mintz use
21 Omnibus electronic subpoenas?
22       MR. NOVIKOFF: Objection.
23   A   No.
24   Q   (BY MS. CATERINE) Do you ever make requests to
25 banks to determine if a consumer has an account by

Page 20

1 providing a name and Social Security number?
2       MR. NOVIKOFF: Note my objection.
3   A   No. We don't. The consumer tells me they
4 have an account there then I'll call the bank, but we
5 don't just call banks.
6   Q   (BY MS. CATERINE) So how did you find out
7 which bank you're going to send a bank restraint to?
8       MR. NOVIKOFF: Note my objection.
9   A   A lot of the information I get from the
10 client's file when they rent the apartment, they put the
11 bank information in the file.
12   Q   (BY MS. CATERINE) I see. And what would you
13 do if the bank information in the file, the bank tells
14 you the consumer doesn't have an account there anymore?
15       MR. NOVIKOFF: Objection.
16   A   If there's no account, there's nothing further
17 to do.
18   Q   (BY MS. CATERINE) And can you explain to me
19 what an information subpoena is?
20       MR. NOVIKOFF: Note my objection. You can
21       answer.
22   A   Information subpoena is when we send out to
23 verify employment.
24   Q   (BY MS. CATERINE) Do you ever send information
25 subpoenas to banks?



GARY THIGPEN                                           March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.                  21–24

Page 21

1      MR. NOVIKOFF:  Objection.  You can answer.
2      A    Only -- yes.
3      Q    (BY MS. CATERINE) And you usually send those
4  with the bank restraint; correct?
5      MR. NOVIKOFF:  Objection.
6      A    No.
7      Q    (BY MS. CATERINE) Are the information
8  subpoenas sent out before?
9      A    Yes.
10     Q    And what sort of information are you trying to
11  get when you send out an information subpoena?
12     MR. NOVIKOFF:  Objection.
13     A    Looking to verify employment.  Verify whether
14  they have an account.
15     Q    (BY MS. CATERINE) Anything else?
16     A    Might want to make sure the name is right, te
17  Social's correct, the address is on there, and stuff
18  like that.
19     Q    And about how many times will you send out
20  bank restraints for an account?
21     MR. NOVIKOFF:  Objection.
22     A    How many times do I send it out?
23     Q    (BY MS. CATERINE) Yes.
24     A    They're only sent once a year for most banks.
25     Q    What if you send one out to a bank and the

Page 22

1  bank tells you they can't restrain the account because
2  there's not enough money in it?
3      MR. NOVIKOFF:  Note my objection.
4      A    What do you mean, "what if?"
5      Q    (BY MS. CATERINE) What do you do in that
6  situation?
7      MR. NOVIKOFF:  Note my objection.
8      A    You can't do anything if, you know, if the
9  response comes back negative, it's negative.
10     Q    (BY MS. CATERINE) And how soon would you check
11  again to see if there was enough money in the account to
12  restrain it?
13     MR. NOVIKOFF:  Note my objection.
14     A    We can only do it once a year.
15     Q    (BY MS. CATERINE) And why can you only do it
16  once a year?
17     A    From what I remember, the CPLR says you can
18  only send one bank restraint per year -- calendar year
19  to these banks.
20     Q    Could you explain to me what an exemption
21  claim form is?
22     MR. NOVIKOFF:  Note my objection.
23     A    Exemption claim form is a document that the
24  bank sends out to one of their customers to let them
25  know that the funds in the account are exempt.  Such as

Page 23

1  Social Security disability, that sort of thing.
2      Q    (BY MS. CATERINE) And you don't ever send out
3  the exemption claim form to the consumers directly;
4  correct?
5      MR. NOVIKOFF:  Objection.
6      A    We do.  There is an exemption claim form
7  attached to every bank restraint that's printed.
8      Q    (BY MS. CATERINE) But that goes to the bank
9  and then the bank sends that to the consumer; correct?
10     MR. NOVIKOFF:  Note my objection.
11     Q    (BY MS. CATERINE) I'm sorry, I missed your
12  answer.
13     A    I think so, yes.
14     Q    Okay.  And do the banks ever fail to send out
15  the exemption claim forms like they're supposed to?
16     MR. NOVIKOFF:  Note my objection.
17     A    You've got to talk to the banks about that,
18  Counsel.
19     Q    (BY MS. CATERINE) Are you aware of any time
20  that the banks haven't sent out the exemption claim form
21  like they're supposed to?
22     MR. NOVIKOFF:  Note my objection.
23     A    No.
24     Q    (BY MS. CATERINE) About how many bank
25  restraints do you send out per year?

Page 24

1      MR. NOVIKOFF:  Note my objection.
2      A    I'm not exactly sure, Counselor.  It's
3  different every day.  Some days I don't send any at all.
4      Q    (BY MS. CATERINE) Did the number of bank
5  restraints that you were sending out slow down during
6  the COVID pandemic?
7      A    I was laid off during -- I was laid off during
8  that time.  I was laid off, like, eight months.  So,
9  yeah, I'm sure it slowed.  Everything slowed down, yes.
10     MR. NOVIKOFF:  Let's take -- let's take a
11  break.  You done with the question?
12     MS. CATERINE:  Yeah, sure.
13     MR. NOVIKOFF:  Let's take a ten-minute break.
14  And we'll go back at 11:40; okay?
15     MS. CATERINE:  Okay.
16     MR. NOVIKOFF:  Thanks.
17     (Break was taken at 11:31 a.m.)
18     Q    (BY MS. CATERINE) So you said that you were
19  furloughed during the COVID-19 pandemic for eight
20  months; is that correct?
21     A    I can't hear you.  Can you repeat that?
22     Q    You said that you were furloughed because of
23  the COVID-19 pandemic for eight months; is that correct?
24     A    Hold on.  I'm having trouble with my volume
25  here.  Okay.  Gotcha now.  Say that again, counselor.

GARY THIGPEN
CRESPO vs G., M., B., AND S., LLP, ET AL.

March 22, 2023
25–28

Page 25

1  Sorry.
2      Q    You were furloughed because of the COVID-19
3  pandemic for about eight months; is that correct?
4      A    Yes.  Six to eight months.
5      Q    And so would that be March to November about
6  of 2020?
7      A    Yes.
8      Q    And so you came back to work towards the end
9  of 2020 or beginning of 2021; is that correct?
10     A    Yes.
11     Q    And at the time that you came back to work,
12  were there any changes in the way that you performed
13  your task because of the COVID-19 pandemic?
14         MR. NOVIKOFF:  Objection.  Can you just repeat
15     that question, Court Reporter -- Madam Court
16     Reporter?
17     (Whereupon the requested portion was read back.)
18         MR. NOVIKOFF:  I'll withdraw the objection.
19     You can answer, Gary.
20     A    No.
21     Q    (BY MS. CATERINE) About how many conditional
22  releases do you send to consumers per year?
23         MR. NOVIKOFF:  Note my objection.
24     A    I don't know.
25     Q    (BY MS. CATERINE) Would you say more than a

Page 26

1  hundred per year?
2         MR. NOVIKOFF:  Note my objection.
3      A    I don't know.
4      Q    (BY MS. CATERINE) When do you typically
5  provide a consumer with a conditional release?
6         MR. NOVIKOFF:  Objection.
7      A    If they agree to repay the debt.
8      Q    (BY MS. CATERINE) And how would you learn
9  about that?
10         MR. NOVIKOFF:  Objection.
11     A    If they call in, the bank account is
12  restrained, and they agree to pay the debt.
13     Q    (BY MS. CATERINE) And you said those phone
14  calls would be recorded; correct?
15         MR. NOVIKOFF:  Objection.
16     A    Yes.  In the office.
17     Q    (BY MS. CATERINE) Do you ever use your cell
18  phone to speak with consumers?
19     A    Not while I'm in the office.  I work from home
20  now so, yes.
21     Q    And remind me, how long have you been working
22  from home?
23     A    Since February 2021.
24     Q    And have any of your phone calls been recorded
25  since you've been working at home?

Page 27

1         MR. NOVIKOFF:  Note my objection.  You can
2      answer.
3      A    No.
4      Q    (BY MS. CATERINE) Does anyone else at Gutman
5  work from home besides yourself?
6      A    Yes.
7      Q    And who's that?
8      A    I don't know.  I just know people work
9  remotely in the firm.
10     Q    Okay.  And most of the time you send a
11  conditional release to a consumer, they send it back to
12  you signed; correct?
13         MR. NOVIKOFF:  Objection.
14     A    No.  Most -- no.
15     Q    (BY MS. CATERINE) Why not?
16     A    Sometimes they change their mind and don't
17  want to pay it.
18     Q    But I thought you said you only send it to
19  consumers when they said they wanted to pay?
20         MR. NOVIKOFF:  Objection.
21     A    Yes.  And they change their mind after I send
22  it.
23     Q    (BY MS. CATERINE) I see.  And why would you
24  use a conditional release when you can just restrain a
25  person's bank account and take the money from it?

Page 28

1         MR. NOVIKOFF:  Objection.  You can answer.
2      A    It takes 30 days for the Marshal to execute on
3  the property execution.
4      Q    (BY MS. CATERINE) So the conditional releases,
5  it gets you the money quicker; is that right?
6         MR. NOVIKOFF:  Objection.
7      A    It gets the defendant's accounts released
8  quicker.
9      Q    (BY MS. CATERINE) Sure.  It does that.  But it
10  also gets you your money quicker; correct?
11         MR. NOVIKOFF:  Objection.
12     A    It's not my money.
13     Q    (BY MS. CATERINE) Sure.  Not your money.  But
14  the client's money.
15     A    Yes.  The client.
16     Q    Okay.  And when you are using conditional
17  releases, you don't have to deal with things like
18  whether or not the income is exempt in filling out
19  exemption claim forms and all that; correct?
20         MR. NOVIKOFF:  Objection.
21     A    No.
22     Q    (BY MS. CATERINE) How does that come up with
23  the conditional releases?
24         MR. NOVIKOFF:  Objection.
25     A    If someone tells me they have exempt funds I



Page 29
1  just send a conditional release.
2      Q   (BY MS. CATERINE) So if someone tells you that
3  they are unemployed, you're not going to send them a
4  conditional release?
5          MR. NOVIKOFF:  Objection.
6      A   No.  I'll send -- if someone tells me they're
7  unemployed, I'll send them a conditional release.
8      Q   (BY MS. CATERINE) But aren't unemployment
9  funds exempt?
10     A   Yes, but someone being unemployed doesn't mean
11 they're getting unemployment.
12     Q   Okay.  So someone telling you that they're
13 unemployed, you might send them a conditional release
14 because you don't know if the funds are exempt just
15 because they're unemployed; is that correct?
16     A   Yes.
17     Q   And when someone tells you that they're
18 unemployed, do you ask if they're receiving
19 unemployment?
20         MR. NOVIKOFF:  Objection.
21     A   Sometimes, yes.
22     Q   (BY MS. CATERINE) And if a consumer enters
23 into a conditional release and then after that says, oh,
24 I didn't realize my funds were exempt and the consumer
25 tells that to you, would you still move forward with the

Page 30
1  conditional release?
2          MR. NOVIKOFF:  Objection.
3      A   I would ask them for documentation/bank
4  statements to prove that the funds are exempt.
5      Q   (BY MS. CATERINE) And do you review bank
6  statements when consumers send them in?
7          MR. NOVIKOFF:  Note my objection.
8      A   Yes, but I have to have the attorney read them
9  as well.
10     Q   (BY MS. CATERINE) So you both review them and
11 then you discuss whether or not the bank statements show
12 that the funds are exempt; is that correct?
13         MR. NOVIKOFF:  Objection.
14     A   Yes.
15     Q   (BY MS. CATERINE) And how often do consumers
16 send you bank statements to show funds are exempt?
17         MR. NOVIKOFF:  Objection.
18     A   How often, I don't know.
19     Q   (BY MS. CATERINE) And how does that normally
20 get provided to you?  Is that by mail or e-mail?
21         MR. NOVIKOFF:  Objection.
22     A   E-mail, mail, certified mail.
23     Q   (BY MS. CATERINE) And so when you're looking
24 at these bank statements that a consumer sends in as
25 proof that their funds are exempt, what are you looking

Page 31
1  for?
2          MR. NOVIKOFF:  Note my objection.
3      A   Direct deposit of exempt funds.  Social
4  Security.  Unemployment.
5      Q   (BY MS. CATERINE) And if you see deposits like
6  that, is that -- is that the end of the analysis?  Does
7  that mean that you can't -- the funds are exempt and you
8  can't do anything?
9          MR. NOVIKOFF:  Note my objection.
10     A   I'll take the direction that I get from the
11 attorney.
12     Q   (BY MS. CATERINE) Is there anything else that
13 you would look for other than those deposits?
14         MR. NOVIKOFF:  Objection.
15     A   No.
16     Q   (BY MS. CATERINE) What if an account has both
17 exempt funds and non-exempt funds in it?
18         MR. NOVIKOFF:  Objection.
19     A   What do you mean, "what if?"  Are you
20 asking -- the attorney would have to make a
21 determination on that.
22     Q   (BY MS. CATERINE) But I would -- the attorney
23 might ask you what your opinion is of it; correct?
24         MR. NOVIKOFF:  Objection.
25     A   No.  No.

Page 32
1      Q   (BY MS. CATERINE) Fair enough.  And once a
2  consumer provides Gutman Mintz with money, how much of
3  that money winds up going to Gutman Mintz?
4          MR. NOVIKOFF:  Objection.  That was asked and
5      answered, actually, at the last deposition but you
6      can answer it again.
7      A   I don't know.
8      Q   (BY MS. CATERINE) Would it be about 30 percent
9  generally?
10         MR. NOVIKOFF:  Objection.
11     A   I don't know.
12     Q   (BY MS. CATERINE) Okay.
13         MR. NOVIKOFF:  Don't guess.  Know or don't
14     know.
15     Q   (BY MS. CATERINE) And how do the disbursements
16 to the clients work?
17         MR. NOVIKOFF:  Objection.
18     A   I'm not involved with that.  Any
19 disbursements.
20     Q   (BY MS. CATERINE) Who handles that side of
21 things?
22     A   I don't know.
23     Q   Does money go to the client as it comes in?
24 Or do you wait until you've collected the entire amount
25 before there are disbursements to the client?



Page 33

1      MR. NOVIKOFF: Objection.

2    A   Ma'am, I don't know. You're asking me a lot

3  of questions that don't have nothing to do with me.

4    Q   (BY MS. CATERINE) All right. And what is the

5  process when you receive an order to show cause from a

6  consumer?

7      MR. NOVIKOFF: Objection.

8    A   I don't receive orders so cause is received by

9  the attorneys in the office.

10   Q   (BY MS. CATERINE) But you're notified when

11  they've received an order to show cause; correct?

12      MR. NOVIKOFF: Objection.

13   A   I'm not notified personally, no.

14   Q   (BY MS. CATERINE) But you find out about it

15  through the account notes or something like that?

16      MR. NOVIKOFF: Objection.

17   A   Well, I can only see the cases that I work and

18  they change the code so you can't see those cases.

19   Q   (BY MS. CATERINE) I see. Okay. So once an

20  order to show cause has been received, you would no

21  longer be able to see the account; is that right?

22      MR. NOVIKOFF: Objection.

23   A   Yes.

24   Q   (BY MS. CATERINE) And what is your involvement

25  with orders to show cause?

Page 34

1      MR. NOVIKOFF: Objection.

2    A   I don't have any involvement with them. I'm

3  not a lawyer or anything like that.

4    Q   (BY MS. CATERINE) And if a judgment against a

5  consumer is vacated by an order to show cause, what

6  happens after that?

7      MR. NOVIKOFF: Objection.

8    A   I don't know.

9    Q   (BY MS. CATERINE) You're not involved in the

10  process when an order gets -- a judgment gets vacated?

11      MR. NOVIKOFF: Objection.

12   A   No.

13   Q   (BY MS. CATERINE) Do you ever return money to

14  consumers for any reason?

15      MR. NOVIKOFF: Hold on. Before you answer.

16      Objection. Are you asking him if Mr. Thigpen does

17      it individually or the firm?

18      MS. CATERINE: Mr. Thigpen, individually.

19      MR. NOVIKOFF: Okay. You now understand the

20      question. Note my objection. But the question is

21      clear now.

22   A   No.

23   Q   (BY MS. CATERINE) And what collection software

24  do you use at Gutman?

25   A   AS/400 and the ICollect system.

Page 35

1    Q   And how long have you been using those?

2    A   More than ten years now.

3    Q   More than ten years for both of them?

4    A   Yes.

5      MR. KESHAVARZ: I'm sorry. You said ICollect

6  and what was the other one?

7      THE WITNESS: AS/400.

8      MR. KESHAVARZ: AS/400?

9      THE WITNESS: Yes.

10      MR. KESHAVARZ: Thank you so much.

11   Q   (BY MS. CATERINE) And how often does that

12  software get updated?

13      MR. NOVIKOFF: Objection.

14   A   I don't know that.

15   Q   (BY MS. CATERINE) Does Gutman have, like, an

16  IT person or an IT department?

17   A   Yes.

18   Q   And who would you talk to if you were having

19  IT issues?

20   A   David Uythoven.

21   Q   And what is Mr. Uythoven's title?

22   A   He's just what you said. The IT person.

23   Q   And does the collection software pretty much

24  work the same way since you first started using it?

25      MR. NOVIKOFF: Objection.

Page 36

1    A   Yes.

2    Q   (BY MS. CATERINE) And how does -- you said

3  there's -- let's see. AS/400, did I get that right?

4    A   Yes.

5    Q   So what's that software used for?

6    A   We make notes about incoming calls.

7    Q   Is it used for anything else?

8      MR. NOVIKOFF: Objection.

9    A   No.

10   Q   (BY MS. CATERINE) And does that use SQL

11  coding?

12      MR. NOVIKOFF: Objection.

13   A   I don't know what that is.

14   Q   (BY MS. CATERINE) Okay. And for AS/400, do

15  you have your own login for that software?

16   A   Yes.

17   Q   And does everyone at the firm have their own

18  login for that software?

19      MR. NOVIKOFF: Objection.

20   A   I don't know.

21   Q   (BY MS. CATERINE) Does everyone have access to

22  the same information in AS/400?

23   A   Couldn't say everyone, Counselor. Some people

24  don't use their computers in there.

25   Q   Sure. But do you know if you have access to



GARY THIGPEN                                        March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.          37–40

Page 37

1 all the same information as, for example, Eric Keilbach
2 would?
3       MR. NOVIKOFF: Objection.
4    A  I don't know.
5    Q  (BY MS. CATERINE) Okay. So when you log into
6 AS/400 and you get a call from a consumer, do you pull
7 up that consumer's account in the software? How does
8 that work?
9       MR. NOVIKOFF: Objection.
10   A  Yeah. They call in, they give me the name, I
11 can bring it up by name.
12   Q  (BY MS. CATERINE) Is there any other way to
13 search besides name?
14   A  Yes, by Social, by telephone number, by text
15 number, by their file number.
16   Q  And there is another software besides AS/400.
17 I think it was ICollect; is that right?
18   A  Yes.
19   Q  And did you have your own login for ICollect?
20   A  Yes.
21   Q  And do you have the same access in ICollect as
22 Eric Keilbach for example?
23      MR. NOVIKOFF: Objection.
24   A  No.
25   Q  (BY MS. CATERINE) And what do you have access

Page 38

1 to in ICollect?
2    A  Just the cases that are in the judgment queue.
3    Q  And what do you use ICollect for?
4       MR. NOVIKOFF: Again, "you" meaning
5    Mr. Thigpen; right?
6       MS. CATERINE: You meaning Mr. Thigpen, yes.
7       MR. NOVIKOFF: Thank you.
8    A  The firm has ICollect set up so we can review
9 information and restraints through that system.
10      MS. CATERINE: I'm sorry. I didn't quite
11   catch all that answer. Could I have it read back,
12   please?
13   (Whereupon the requested portion was read back.)
14   Q  (BY MS. CATERINE) So I guess I'm a little --
15 I'm a little confused. How are you using ICollect in
16 regards to the bank restraints?
17      MR. NOVIKOFF: Note my objection.
18   A  You log into the system, you have to enter a
19 file number in ICollect in order to order the different
20 documents that you might need.
21   Q  (BY MS. CATERINE) I see. So if you need to
22 send a bank restraint on an account, you log into
23 ICollect, you bring up that account, and then you press
24 a button to generate the bank restraints? How does that
25 work?

Page 39

1       MR. NOVIKOFF: Note my objection.
2    A  The account comes up with the name, the index
3 number, the judgment information, and you can request a
4 document from the ICollect by doing that, yes.
5    Q  (BY MS. CATERINE) And what sort of information
6 do you need to provide for it to generate the bank
7 restraint?
8    A  The file number/index number.
9    Q  Anything else?
10   A  No.
11   Q  Do you use ICollect for anything else besides
12 bank restraints?
13   A  Conditional releases and information
14 subpoenas.
15   Q  Okay. Let's start with information subpoenas.
16 What do you use ICollect for in regards to information
17 subpoenas?
18   A  That system is the system that we can actually
19 order the document on. So we actually order the
20 document on the ICollect.
21   Q  Okay. And is that what you use it for in
22 regards to conditional releases too? You use it to
23 generate conditional releases?
24      MR. NOVIKOFF: Objection.
25   A  Yes.

Page 40

1    Q  (BY MS. CATERINE) Okay. Is the ICollect
2 searchable?
3    A  No.
4    Q  And you've mentioned before about your notes.
5 Where would your notes be kept?
6       MR. NOVIKOFF: Objection.
7    A  We input the notes on the AS/400 system.
8    Q  (BY MS. CATERINE) I see. And so besides
9 incoming calls, what else would you make notes about in
10 the AS/400 system?
11   A  Besides incoming calls? When documents are
12 requested on ICollect, that information is automatically
13 put into the AS/400.
14   Q  And the entries in the account notes are
15 timestamped. Are those timestamps manually entered or
16 are those automatic?
17   A  Those are automatic.
18   Q  And they're automatically generated based on
19 what time the note is made; correct?
20   A  Yes.
21   Q  And then the user listed for the account note
22 is based on who logged in and made it; correct?
23      MR. NOVIKOFF: Objection.
24   A  Repeat that again, Counselor.
25   Q  (BY MS. CATERINE) Sure. So if an account note



GARY THIGPEN

March 22, 2023

CRESPO vs G., M., B., AND S., LLP, ET AL.

41–44

Page 41

1 has your user name next to it, would that mean you made
2 the account note?
3    A   Yes.
4    Q   And so you talked about how ICollect would
5 automatically make notes in AS/400.  So if you would
6 generate a bank restraint with ICollect, that would show
7 up in AS/400; correct?
8       MR. NOVIKOFF:  Objection.
9    A   Yes.
10    Q   (BY MS. CATERINE) Okay.  Now, going to share
11 on your screen what's going to be marked as Exhibit A.
12       MR. NOVIKOFF:  Let me just make sure -- okay.
13 I see this and I see Mr. Thigpen so I'm good.
14       (Exhibit A was marked for identification.)
15       MS. CATERINE:  And I'll just represent for the
16    record, this is documents Bates stamped GM 687 to
17    735.
18    Q   (BY MS. CATERINE) And what is this document,
19 Mr. Thigpen?
20    A   I can't see it.  What's the top date?  What's
21 the date on the page you're looking at or the number of
22 the sequence number?
23    Q   Do you want me to zoom in?
24       MR. NOVIKOFF:  Mr. Thigpen, when you said you
25    can't see it --

Page 42

1       THE WITNESS:  Yeah, I can see it now.
2       MR. NOVIKOFF:  Okay.
3    A   Yeah, I can see it.  This is from the AS/400.
4    Q   (BY MS. CATERINE) Okay.  And it says at the
5 top, "Message File Maintenance."  What does that mean?
6       MR. NOVIKOFF:  Objection.
7    A   I don't know.
8    Q   (BY MS. CATERINE) And this is a printout from
9 the AS/400 system; correct?
10    A   Yes.
11    Q   And this isn't how it would look if you pulled
12 it up on your computer; correct?
13    A   Yes.
14    Q   How would it look different?
15    A   No, it looks pretty much the same.
16    Q   Okay.  Are there any differences?  Is there
17 any information you would be able to see on your
18 computer screen that wouldn't be shown on the printout?
19    A   It should be the same.
20       MR. KESHAVARZ:  I'm sorry.  Is this the AS/400
21    or the ICollect system?  I apologize.
22       MR. NOVIKOFF:  I believe, Ahmad, he said it
23    was the AS/400, but, Mr. Thigpen, you can answer
24    that question for Mr. Keshavarz.
25       THE WITNESS:  Yeah, this is from the AS/400.

Page 43

1       MR. KESHAVARZ:  Sorry for interrupting.
2       THE WITNESS:  No worries.
3    Q   (BY MS. CATERINE) So in the top right corner
4 is the code "LEG020FM."  What does that mean?
5       MR. NOVIKOFF:  Objection.
6    A   I don't know what that code means, LEG02 FM.
7    Q   (BY MS. CATERINE) Okay.  And at the bottom, we
8 have these command keys 13, 14, 15, and 16.  And those
9 would bring up different windows or screens for the
10 account with different information; correct?
11    A   Yes.
12    Q   So if you press 13, it will show you the bank
13 information for the account; correct?
14       MR. NOVIKOFF:  Objection.
15    A   No.
16    Q   (BY MS. CATERINE) What would it show if you
17 did the 13 command key?
18    A   You can't command 13 from this screen.
19    Q   I see.  So how would that -- how would that
20 work?  How would you pull up that bank information
21 screen?
22    A   You would be on -- you would have to F7 out of
23 this, go to command 1, go to the front screen where it
24 shows the name, the Social, and the address, and then
25 hit enter in order to see the bank information.  You

Page 44

1 can't see it from this screen.
2    Q   I see.
3       MS. CATERINE:  Okay.  So we're going to call
4    for the production of the bank information
5    employment information, litigation information, and
6    previous address transfer of Mr. Crespo.
7       MR. NOVIKOFF:  Just put it all in writing at
8    the conclusion of this deposition.
9       MS. CATERINE:  Yeah.
10       MR. NOVIKOFF:  And I'll take it under
11    advisement.
12    Q   (BY MS. CATERINE) Okay.  So I'm going to turn
13 to GM 714.
14       MR. NOVIKOFF:  I'm sorry.  What was that?  GM?
15       MS. CATERINE:  714.
16       MR. NOVIKOFF:  Thank you.
17    Q   (BY MS. CATERINE) And do you see the entries
18 here, Mr. Thigpen, for 2980 and 2990?
19    A   Yes.
20    Q   And what are these entries referring to?
21    A   I don't know.  That was 2018.  That was in
22 2018.  I don't know.
23       MR. NOVIKOFF:  And I will note for the record
24    that it doesn't appear to be Mr. Thigpen under the
25    username but continue.

GARY THIGPEN                                                    March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.                       45—48

Page 45

1    Q    (BY MS. CATERINE) And the first one of these
2    entries says, "via adam." Who is the Adam being
3    referred to here?
4          MR. NOVIKOFF: Objection.
5    A    He was an ex-employee.
6    Q    (BY MS. CATERINE) Okay. And what did he do
7    for Gutman?
8          MR. NOVIKOFF: Objection.
9    A    I can't remember.
10   Q    (BY MS. CATERINE) And do you know when he
11   stopped working for Gutman?
12   A    No.
13   Q    And these entries appear to be -- well, let's
14   just -- looking at the 2990 entry, it says, "ordered
15   files from archives." Why would Gutman need to order
16   the file for this judgment when it was the one that
17   obtained the judgment?
18         MR. NOVIKOFF: Objection. Only if you know,
19         Mr. Thigpen. Don't guess.
20   A    Yeah, I don't know. Yeah, I'm not going to
21   guess. I don't know.
22         MR. NOVIKOFF: I'll be a new document, Emma?
23         MS. CATERINE: Yes. I switched to a different
24         one.
25         MR. NOVIKOFF: Just so I can take something

Page 46

1    off of my screen, I had the deposition exhibits
2    that you had previously sent. So you're just going
3    to be showing what you want to show?
4          MS. CATERINE: Correct.
5          MR. NOVIKOFF: Okay. So I'm going to get that
6    out. Okay. Great. Thank you.
7          MS. CATERINE: Okay. And I'm now showing
8    Exhibit B, as in boy, which, for the record, is
9    document Bates stamped GM 348.
10         (Exhibit B was marked for identification.)
11   Q    (BY MS. CATERINE) And what is this document,
12   Mr. Thigpen?
13         MR. NOVIKOFF: Note my objection only
14         because -- just note my objection. I'm not going
15         to speak. Go ahead.
16   A    This is a printout from the AS/400 and it's a
17   different screen. And as you see, it's his name and
18   address is up top but other than that, I don't know who
19   wrote this on there or what it was all about.
20   Q    (BY MS. CATERINE) It says here -- do you see
21   where it says, "Move-out package provided?"
22         MR. NOVIKOFF: Wait a minute. Where are you?
23   Oh, you talking about --
24         MS. CATERINE: Towards the top.
25         MR. NOVIKOFF: Okay. I see it now. Thank

Page 47

1    you.
2    A    It says move out what? Move-out package
3    provided?
4          MR. NOVIKOFF: And then it's hyphen Y or N.
5    A    Yeah, that information on the screen that you
6    see there, I have never used it. I haven't seen anyone
7    ever use that.
8    Q    (BY MS. CATERINE) Okay. And under the Summons
9    header it says, "Service Type S 3215." What does
10   "Service Type S 3215" mean?
11   A    I don't know. The only time I look at that
12   screen is to see the judgment entered amount and the
13   date.
14         MR. NOVIKOFF: Mr. Thigpen, I'll just remind
15         you, just answer the questions that are asked.
16   Q    (BY MS. CATERINE) And so you would get to that
17   screen in the way that you had mentioned before by going
18   into the AS/400 system and using a command; is that
19   right?
20   A    No, you would just look at the screen and make
21   sure the amounts matched the amount on the judgment.
22   Q    Okay. I'm going to share on the street now
23   Exhibit C, as in cat. Bates stamped GM 547 to 548. And
24   what is this document?
25         (Exhibit C was marked for identification.)

Page 48

1          MR. NOVIKOFF: Can you just show him the
2    entire document?
3          MS. CATERINE: Sure.
4          MR. NOVIKOFF: And again, Mr. Thigpen, I don't
5    think you need to do so on this document, but if
6    you do -- you should, but if you need to read the
7    document in order to answer the question that you
8    just tell Ms. Caterine that you need to do that.
9          MS. CATERINE: Yes.
10   A    I'm going to read it. It's the Information
11   Subpoena with Restraining Notice.
12   Q    (BY MS. CATERINE) And is this the standard
13   form that Gutman uses for its information subpoenas with
14   restraining notices?
15         MR. NOVIKOFF: Note my objection.
16   A    Yes.
17   Q    (BY MS. CATERINE) And there's a stamp on here
18   on the first page that says, "No hold placed. Balance
19   does not exceed exempt amount." What does that refer
20   to?
21   A    I'm reading it here. By reading it says, "No
22   holds placed." That's from the bank. The bank put it
23   there.
24   Q    And what does that mean?
25         MR. NOVIKOFF: Objection.



Page 49

1    A  -- it means what it says.

2    Q    (BY MS. CATERINE) And this bank restraint has

3  the signature Eric Keilbach; correct?

4    A  Yes.

5    Q  And is that an e-signature?

6        MR. NOVIKOFF: Note my objection to the form

7    but you can answer.

8    A  I don't know.

9    Q    (BY MS. CATERINE) Do you ever use e-signatures

10  for Mr. Keilbach?

11        MR. NOVIKOFF: Objection to form. You can

12    answer.

13    A  Sometimes.

14    Q    (BY MS. CATERINE) And what sort of things

15  would you use an e-signature for him for?

16        MR. NOVIKOFF: Objection to the form again.

17    A  Like I said, sometimes we use it when he's not

18  in the office. He might sign a paid-in-full letter.

19    Q    (BY MS. CATERINE) So if he's not in the office

20  you might use an e-signature for him for a bank

21  restraint; is that correct?

22        MR. NOVIKOFF: Objection to the form.

23    A  Yes.

24    Q    (BY MS. CATERINE) Okay. And on the second

25  page of this document, all of this handwritten

Page 50

1  information is from the bank; correct?

2    A  Yes.

3    Q  And do you review information subpoena

4  responses as part of your duties at Gutman?

5    A  No.

6    Q  And who would review the information subpoena

7  responses?

8    A  You have either the manager or the supervisor.

9    Q  So that would be Brian Chiantella or Eric

10  Keilbach; is that right?

11    A  Yes.

12    Q  And we have this stamp here, again, of "No

13  hold placed. Balance does not exceed exempt amount."

14  What is the exempt amount being referred to here?

15        MR. NOVIKOFF: Note my objection. You can

16    answer.

17    A  I don't know which exempt amount they're

18  referring to in this instance.

19    Q    (BY MS. CATERINE) Okay. Do you know what a

20  standard exemption under IFA is?

21        MR. NOVIKOFF: Note my objection.

22    A  Yes.

23    Q    (BY MS. CATERINE) And what's your

24  understanding of what the standard exemption under IFA

25  is?

Page 51

1    A  $3600.

2    Q  What about $3600?

3        MR. NOVIKOFF: Objection to form.

4    A  It's the exemption amount.

5    Q    (BY MS. CATERINE) And when does that apply?

6    A  If the funds are, you know --

7        MR. NOVIKOFF: I'm sorry. Note my objection

8    to the question. You can answer, Mr. Thigpen.

9    A  When does the exception apply?

10    Q    (BY MS. CATERINE) Uh-huh.

11    A  It's more than $3600 in the account.

12    Q  Okay. I'm going to take us back to Exhibit A.

13  And we're now looking at the page Bates stamped 715.

14        MR. NOVIKOFF: I missed that one, Emma. What

15    was that?

16        MS. CATERINE: 715.

17        MR. NOVIKOFF: Okay. Thank you.

18    Q    (BY MS. CATERINE) And these entries here refer

19  to sending information subpoena to Mr. Crespo's employer

20  by fax and then Mr. Crespo's employer calls a couple of

21  days later. Is it common for you to get a call and

22  response to an information subpoena before you've

23  received the written response?

24        MR. NOVIKOFF: Objection. You can answer.

25    A  No.

Page 52

1    Q    (BY MS. CATERINE) Do you ever get calls from

2  banks or employers about information subpoenas?

3    A  No.

4    Q  And who would get those calls at Gutman?

5    A  Those calls would go to Michael Roberts.

6    Q  Okay. All right. I am now going to share on

7  your screen what I'm going to have marked as Exhibit D.

8    (Exhibit D was marked for identification.)

9        MS. CATERINE: For the record, it's Bates

10    stamped GM 221 to 320.

11        MR. NOVIKOFF: I'm sorry. GM?

12        MS. CATERINE: 221 through 320.

13        MR. NOVIKOFF: Okay.

14        MS. CATERINE: It's a lot of pages.

15    Q    (BY MS. CATERINE) So first off, what is this

16  document, Mr. Thigpen?

17        MR. NOVIKOFF: And just for the record, we're

18    looking at 221 right now; is that right?

19        MS. CATERINE: Correct.

20        MR. NOVIKOFF: Okay. Just scan down to the

21    end of the doc just so the record's clear that he

22    looked at it.

23        THE WITNESS: This is blacked out.

24        MR. NOVIKOFF: Well, not all of it is,

25    Mr. Thigpen. So just look at 221, the entirety of



Page 53

1    the page, and then answer Counsel's questions.
2        A    I can only see this as collection notification
3    for IE, income execution.
4        MR. NOVIKOFF:  Mr. Thigpen, the question is
5    pretty straightforward.  Do you -- and, Emma, tell
6    me if I'm rephrasing it incorrectly.  Do you
7    understand what this document is?
8        Is that correct, Emma?
9        Q    (BY MS. CATERINE) Yes.  What is it?
10       A    I don't know.
11       MR. NOVIKOFF:  Okay.
12       Q    (BY MS. CATERINE) You don't see documents like
13   this one in the regular course of your work at Gutman?
14       A    No.
15       Q    Do you know what program would have been used
16   to create this document?
17       A    No.
18       Q    And at the top here there's a category that
19   says, "Review DateCode;" do you see that?
20       A    Yes.
21       Q    And what does Review DateCode mean?
22       A    I don't know.
23       Q    Well, what does Hold DateCode mean?
24       MR. NOVIKOFF:  Note my objection.
25       A    I've never seen this document before so I

Page 54

1    don't know.
2        Q    (BY MS. CATERINE) And you are aware that money
3    was garnished from Mr. Crespo's wages; correct?
4        MR. NOVIKOFF:  Objection to the form.
5        A    I was not aware, no.
6        Q    (BY MS. CATERINE) Okay.  I am going to put
7    Exhibit A back on your screen.  And we are looking at
8    the page Bates stamped GM 723.
9        MR. NOVIKOFF:  Okay.
10       A    Yes.
11       Q    (BY MS. CATERINE) And the entries here in
12   February of 2020 refer to your firm learning that
13   Mr. Crespo had lost his job and thus your income
14   execution was returned; correct?
15       MR. NOVIKOFF:  Objection.  You can answer.
16       A    Yeah, I'm reading it here now.  Yes.
17       Q    (BY MS. CATERINE) And did you learn of
18   Mr. Crespo obtaining other employment after this date?
19       A    I didn't learn of it, no.  I wasn't involved
20   with that.
21       Q    And so when you find out that a person is no
22   longer employed somewhere and an income execution is
23   returned, you're going to switch to trying to garnish
24   money from a bank restraint; correct?
25       MR. NOVIKOFF:  Objection.

Page 55

1        A    No, it goes -- not necessarily.
2        Q    (BY MS. CATERINE) What do you mean by "not
3    necessarily?"
4        A    Just because he's not working don't mean we
5    automatically send out bank restraints.
6        Q    But you're going to continue to collect on the
7    account; correct?
8        MR. NOVIKOFF:  Objection.
9        A    Yes, we're always looking to collect on the
10   accounts.
11       Q    (BY MS. CATERINE) And if we go to --
12       MR. NOVIKOFF:  Going back to Exhibit A?
13       MS. CATERINE:  Yes.  Exhibit A, page 724.
14       MR. NOVIKOFF:  Okay.
15       Q    (BY MS. CATERINE) And these account notes show
16   that you sent a bank restraint for Mr. Crespo on
17   March -- sorry.  Gutman sent the bank restraint on March
18   17th, 2020; correct?
19       MR. NOVIKOFF:  Objection.  You can answer.
20       A    March 17.  Yes.
21       Q    (BY MS. CATERINE) And who is the user
22   associated with this account note entry?
23       A    Janine Zacchino.
24       Q    And who's Janine Zacchino?
25       A    Ex-employee.

Page 56

1        Q    And what was Janine Zacchino's title when she
2    was at Gutman?
3        A    She's an account representative.
4        Q    And was she fired?
5        MR. NOVIKOFF:  Objection.
6        A    No.
7        Q    (BY MS. CATERINE) And do you know when she
8    left Gutman?
9        A    I don't remember exactly.
10       Q    Do you remember what year?
11       A    No.
12       Q    Okay.  And COVID-19 was declared a national
13   emergency on March 13th.  And Gutman's sending out a
14   bank restraint on March 17th.  Why was Gutman still
15   sending out bank restraints after COVID-19 had been
16   declared a national emergency?
17       MR. NOVIKOFF:  Note my objection.  Only if you
18       know, Mr. Thigpen.
19       A    I don't know why.
20       MR. KESHAVARZ:  Ken, would you please stop
21       with the speaking objections?
22       MR. NOVIKOFF:  Come on.  If I have said more
23       than objection to two questions, it's been a lie.
24       But go on.  Continue.
25       Q    (BY MS. CATERINE) So this was around the time



Page 57

1  that you were furloughed; correct, Mr. Thigpen?

2      A   Yes, little bit after that time.  Yes.

3      Q   Okay.  And there's an account note entry here

4  for March 27th, 2020, which says, "Received e-mail

5  from Citibank, delay in response due to Coronavirus."

6  And did you personally -- did you, Mr. Thigpen, receive

7  any e-mails like this prior to being furloughed?

8      A   No.

9          MR. NOVIKOFF:  Wait.  Objection.  You can

10     answer.  Did you answer, Mr. Thigpen?

11         THE WITNESS:  Yes.  I said, "No."

12         MR. NOVIKOFF:  Okay.

13     Q   (BY MS. CATERINE) So now we're looking at the

14  page Bates stamped GM 727 for Exhibit A.  And this

15  appears to be when you first got involved with this

16  account, Mr. Thigpen; is that correct?

17         MR. NOVIKOFF:  Note my objection to the form.

18     A   Yes.

19     Q   (BY MS. CATERINE) And these entries refer to

20  your calls with Mr. Crespo on September 2nd, 2021;

21  correct?

22         MR. NOVIKOFF:  Note my objection.

23     A   Yes.

24     Q   (BY MS. CATERINE) And so why were you handling

25  these calls with Mr. Crespo when another account

Page 58

1  representative had been working the account?

2          MR. NOVIKOFF:  Objection.

3      A   The call came in.  I answered the call.

4      Q   (BY MS. CATERINE) So you'll just answer calls

5  as they come in rather than just answering the calls for

6  the accounts you're working on?

7          MR. NOVIKOFF:  Objection.

8      A   Yeah, I can answer the calls that just comes

9  in -- come in.  Yes.

10     Q   (BY MS. CATERINE) And were these calls on

11  September 2nd with Mr. Crespo recorded?

12         MR. NOVIKOFF:  Objection.

13     A   No.

14     Q   (BY MS. CATERINE) And there's an account note

15  entry here on August 26, 2021, by a user Robert.  Who is

16  the Robert being referred to here?

17     A   Yeah, Robert works with us in the collection

18  department.

19     Q   And what's Robert's title?

20     A   He's a supervisor.

21     Q   And this is -- is this Michael Roberts?

22     A   No.

23     Q   No.  What's his full name?

24     A   Robert Brust.

25     Q   Okay.  I'm now sharing on your screen what's

Page 59

1  going to be marked as Exhibit F.  Bates stamped GM 556

2  to 557.  And what is this document?

3          (Exhibit F was marked for identification.)

4          MR. NOVIKOFF:  Just give him an opportunity to

5          look at it if he needs it.

6          MS. CATERINE:  Yup.

7      Q   (BY MS. CATERINE) Let me know if you want me

8  to scroll down or go to the next page.

9      A   The information subpoena with restraining

10  notice from M&T Bank.

11     Q   And looking at the second page of this

12  document Bates stamped GM 557, could you tell me what

13  these handwritten notes are under question number 4?

14         MR. NOVIKOFF:  Note my objection.

15     A   Do you want me to read it?

16     Q   (BY MS. CATERINE) You don't need to read it,

17  just tell me what your understanding of it is.

18         MR. NOVIKOFF:  Of the question?  Of the

19         answer?  Or both?

20     Q   (BY MS. CATERINE) Of the answer to question

21  number 4.

22         MR. NOVIKOFF:  Fair enough.

23     A   It looks like something the bank wrote down

24  here.  And they abbreviated all of this so I don't, you

25  know, I don't know exactly what they mean so I'm going

Page 60

1  to say I don't know.

2      Q   (BY MS. CATERINE) You don't have any

3  understanding what NYS DOL UI could be referring to?

4          MR. NOVIKOFF:  Note my objection.

5      A   Well, I can speculate, but I'm done doing

6  that.  So I'm going to say I don't know.

7      Q   (BY MS. CATERINE) You mentioned that you

8  reviewed bank statements when consumers sent them in;

9  correct?

10         MR. NOVIKOFF:  Objection.

11     A   With the attorney.

12     Q   (BY MS. CATERINE) And have you ever seen, when

13  reviewing bank statements, deposits that have memos that

14  say NYS DOL UI?

15         MR. NOVIKOFF:  Note my objection.

16     A   On the bank statements from defendants, these

17  things are spelled out clearly.

18     Q   (BY MS. CATERINE) I see.  So you don't think

19  it's clear here what the handwritten response to

20  question number 4 is?

21         MR. NOVIKOFF:  Note my objection.

22     A   I mean, I don't know.  I just see NYS.  The

23  rest of the stuff, I don't know what it means.

24         MS. CATERINE:  I think it would be a good time

25         to take a lunch break now if we want to do that.



Page 61

1    MR. NOVIKOFF: Okay.  Let's see, what time is
2  it now?
3    MS. CATERINE: 12:51.
4    MR. NOVIKOFF: 12:50.  When do you want to
5  come back?
6    MS. CATERINE: In thirty minutes.
7    MR. NOVIKOFF: How about we do 40 minutes and
8  do it at 1:30?
9    MS. CATERINE: Sure.  That's fine.
10    (Break was taken at 12:51 p.m.)
11    Q    (BY MS. CATERINE) So, Mr. Thigpen, you don't
12  have any personal recollection of your September 2nd
13  calls with Mr. Crespo other than what you wrote in your
14  notes; correct?
15    MR. NOVIKOFF: Objection.
16    A  Yes.
17    Q    (BY MS. CATERINE) Okay.  Let's take a look at
18  those notes.  Putting Exhibit A --
19    MR. KESHAVARZ: Wait a minute.  Was that yes,
20  you do remember?  Or yes, you don't remember?
21    MR. NOVIKOFF: Hold on.  Ahmad, let's have one
22  questioner.  Emma asked that question.  I think it
23  was clear what the answer was, but, Emma, if you
24  want to rephrase the question and ask it again by
25  all means do so.  Let's not tagteam him.

Page 62

1    Q    (BY MS. CATERINE) So sharing Exhibit A, page
2  GM 727.  And let's start with this first entry at
3  9:18 a.m.
4    MR. NOVIKOFF: Well, it's two of them.  So
5  it's 4430?  The line?
6    MS. CATERINE: Yes, 4430 and 4440.
7    MR. NOVIKOFF: Got it.  Okay.
8    Q    (BY MS. CATERINE) That's all one entry;
9  correct, Mr. Thigpen?
10    A  Which one?
11    Q  4430 and 4440.
12    A  Yes.
13    Q  Okay.  And what does SD mean here when it
14  says, "José called SD?"
15    A  Said.
16    Q  Okay.  And it says here "claimed had $1100.
17  Told him [would] call bank and get back to him."  What
18  does this mean?
19    A  I needed to call the bank to verify there was
20  a hold and money was being held.
21    Q  And then the next account note entry 4450,
22  that is you, in fact, calling the bank and they tell you
23  that there's $1400 after exemption.  And that's
24  referring to the standard exemption; correct?
25    MR. NOVIKOFF: Objection.

Page 63

1    A  Yes.
2    Q    (BY MS. CATERINE) And then we have entries
3  4470 through 4510.  Could you just read those to
4  yourself and let me know when you're finished?
5    A  Yes.
6    Q  Okay.  So it says, "José refused TOMSETSD."
7  What does that mean?
8    MR. NOVIKOFF: Objection.
9    A  Refused to settle.
10    Q    (BY MS. CATERINE) I see.  And it says here "on
11  unemployment;" correct?  I'm reading that correctly?
12    A  Yes.
13    Q  And it says here, "If he does nothing, we will
14  be looking to EOJ in the future."  What does that mean?
15    MR. NOVIKOFF: Okay.  I'm going to object.  I
16    note that you skipped some language but go ahead.
17    Answer the question.
18    A  Execute on judgment.
19    Q    (BY MS. CATERINE) Weren't you already
20  executing on the judgment?
21    MR. NOVIKOFF: Objection.
22    A  He said he was going to fight it in court.
23  And if he does, then we're going to continue to execute
24  on judgment.  That's what I wrote down.
25    Q    (BY MS. CATERINE) I see.  And the last line

Page 64

1  4510 says, "e-mail CR $1200" and then an e-mail address.
2  What is that referring to?
3    A  E-mail conditional release for 1200 and that's
4  his e-mail address.
5    Q  Okay.  Why were you sending him a conditional
6  release?
7    A  He agreed to sign between -- while I was on
8  the phone with him, he agreed to sign for 1200.
9    Q  So I'm a bit confused here because you had
10  talked about earlier that you wouldn't ask a consumer to
11  enter into a conditional release if they told you they
12  had exempt funds.  And it seems like Mr. Crespo told you
13  that you was on exempt funds; isn't that correct?
14    MR. NOVIKOFF: Objection.  The testimony is
15    what it is.  Mr. Thigpen, you can answer the
16    question.
17    A  He never mentioned that exempt funds was in
18  that account.
19    Q    (BY MS. CATERINE) But doesn't that say here
20  "on unemployment?"
21    A  Yes.
22    MR. NOVIKOFF: Object to form.  Okay.  Go
23    ahead.
24    Q    (BY MS. CATERINE) I see.  So let me -- if I
25  understand you correctly, him saying you was on



Page 65

1  unemployment did not necessarily mean that the funds in
2  the account were exempt; is that correct?
3      A   Yes.
4      Q   I see.  So when someone tells you they're
5  receiving exempt income, that's not enough to tell you
6  that there are exempt funds in the account; is that
7  correct?
8          MR. NOVIKOFF:  Objection.
9      A   He had he told me that, that would have been
10 enough but he didn't say that.
11     Q   (BY MS. CATERINE) Well, he's told you that you
12 was on unemployment and it doesn't seem like you asked
13 him any follow-up questions to that; is that correct?
14         MR. NOVIKOFF:  Objection.
15     A   He never said the funds in that bank account
16 was exempt money to me.
17     Q   (BY MS. CATERINE) I'm not sure that was quite
18 responsive to my question.  Let me rephrase it.  Did you
19 ask --
20         MR. NOVIKOFF:  Counsel, I think it was, but
21     ask it again.
22         MS. CATERINE:  Ken, please.
23         MR. NOVIKOFF:  No.  You, please.  Ask whatever
24     question you want.
25     Q   (BY MS. CATERINE) So you didn't ask him --

Page 66

1  when he told you that he was on unemployment, you didn't
2  ask him if the funds in his account were unemployment;
3  correct?
4          MR. NOVIKOFF:  Objection.  You can answer.
5      A   Correct.
6      Q   (BY MS. CATERINE) Okay.  And going to the next
7  page Bates stamped GM 728.  And this reflects you
8  sending the signed conditional release to M&T Bank later
9  that day; correct?
10         MR. NOVIKOFF:  Wait.  Are you referring to a
11     specific line?
12         MS. CATERINE:  Sorry.  Entries 4520 and 4530.
13         MR. NOVIKOFF:  Thank you.
14     A   Yes, I sent them the conditional release and
15 received signed conditional release.
16     Q   (BY MS. CATERINE) And let's actually go back
17 to the phone call entries on 727.  Were these phone
18 calls made with your cell phone?
19     A   727?
20     Q   The phone calls on -- with Mr. Crespo on
21 September 2nd, 2021.
22     A   Yes.
23     Q   And how does that work?  How does Mr. Crespo's
24 call get routed to your cell phone?
25     A   They route it from the office.

Page 67

1      Q   And so Mr. Crespo would call the Gutman Mintz
2  office number and it would get automatically routed your
3  cell phone number; is that correct?
4      A   Yes.  It was transferred to my extension.
5      Q   I see.  So based on what the person is calling
6  about -- well, let me just ask you.  If Mr. Crespo calls
7  into Gutman Mintz, is there like an automatic message
8  that plays?  How does that work?  How does he wind up
9  getting transferred to you?
10         MR. NOVIKOFF:  Objection.
11     A   Yeah, there's an automatic message played that
12 says this is an attempt to collect a debt and any
13 information that we obtain we use for that purpose.  And
14 he can speak to the switchboard operator and let them
15 know that his account is restrained.  They can transfer
16 it to one of three people.
17     Q   (BY MS. CATERINE) And you're one of those
18 three people; correct?
19     A   Yes.
20     Q   And who are the others?
21     A   Michael Roberts and Robert Brust.
22     Q   And how does it get forwarded to your cell
23 phone?  Is there like some sort of program?  Or is it
24 just standard call forwarding?  How does that work?
25         MR. NOVIKOFF:  Note my objection.

Page 68

1      A   Standard call forwarding.
2      Q   (BY MS. CATERINE) So it's just set up with
3  your, I guess, what used to be your phone in the office,
4  you set up a call forwarding on that to your cell phone;
5  is that correct?
6      A   Yes.
7      Q   So if that's the case, I'm wondering, is it
8  possible that the recording of calls could record calls
9  with your cell phone if it is routed through your office
10 phone in this way?
11         MR. NOVIKOFF:  Objection.
12     A   I don't know.
13     Q   (BY MS. CATERINE) Okay.  Do you know if any of
14 your calls using your cell phone have been recorded?
15     A   I don't know.
16     Q   So I think you testified earlier something
17 along the lines of you send consumers a conditional
18 release when they're interested in settling; is that
19 correct?
20         MR. NOVIKOFF:  Objection.
21     A   Yes.
22     Q   (BY MS. CATERINE) But Mr. Crespo doesn't
23 really seem interested in settling here because you say
24 that this entry, this TOMSETSD, that referred to him
25 refusing to settle; correct?



Page 69

1       MR. NOVIKOFF: Objection.

2       A   He said he refused to settle and then said,

3   you know what, I'm just going to pay it.  I'll sign -- I

4   will sign and get him to sign for 1400.  I'll just pay

5   it.  I'll sign for 1200.

6       Q   (BY MS. CATERINE) And where do you see that in

7   the account notes that he changed his mind?

8       A   At the time I put the note in there where it

9   says plans to fight the judgment in the near future, he

10  told me he would send sign, but he plans to fight it in

11  the near future.

12      Q   And where in this account note does it talk

13  about that he's going to sign?  I see where it says that

14  he plans to fight it in the near future, but where does

15  it say that he's going to sign?

16      A   Well, I didn't put in that he said that but on

17  4430 is when you can verify.  Notes that say 4430.

18      Q   I'm sorry.  What about 4430?

19      A   That's the part that he confirmed that he

20  would sign it.

21      Q   Where it says --

22      A   "Received signed conditional release."

23      MR. NOVIKOFF: I think he's referring to the

24      next page.

25      Q   (BY MS. CATERINE) Oh, I'm sorry.

Page 70

1       A   4530.

2       Q   Oh, 4530.  I see.

3       A   4530.

4       Q   So you're saying because you received a signed

5   conditional release from him that means he had agreed to

6   sign it; is that right?

7       A   And he also told me he would do so.

8       Q   And you are assuming that he told you based on

9   that you e-mailed him his conditional release?

10      MR. NOVIKOFF: Objection.

11      A   No, not assuming anything.  He told me that.

12      Q   (BY MS. CATERINE) But I thought you told him

13  you didn't remember anything about this call other than

14  what was in your account notes; isn't that right?

15      MR. NOVIKOFF: Note my objection.

16      A   I can remember that if I'm speaking with

17  someone and I send a conditional release, he asked me to

18  send it.

19      Q   (BY MS. CATERINE) Right.  Right.  So if you

20  are sending someone a conditional release, you're going

21  to -- the reason why you would do that is because they

22  asked for it.  You're saying as a general matter.

23      A   They agreed to it, yes.

24      Q   Okay.  So we're looking now at page GM 728.

25  And it shows here that a restraint was sent on

Page 71

1   September 27, 2021; am I reading that correctly?

2       MR. NOVIKOFF: What line are referring to,

3   Counsel?

4       MS. CATERINE: 4550.

5       MR. NOVIKOFF: Thank you.

6       A   September 27.  Yes, you're reading that

7   correctly.

8       Q   (BY MS. CATERINE) So why was a restraint sent

9   out when the conditional release had been signed?

10      MR. NOVIKOFF: Note my objection.

11      A   The case was never paid and is still coded for

12  execute on judgment so the restraint went out.

13      Q   (BY MS. CATERINE) Okay.  And you had sent out

14  the previous restraint -- I'm just going back to

15  page 727 for the record.  You had sent out the previous

16  restraint on August 26, 2,021; correct?

17      MR. NOVIKOFF: Objection.  He or Gutman Mintz?

18      Q   (BY MS. CATERINE) Sorry.  Gutman Mintz sent

19  out the previous restraint on August 26, 2021; correct?

20      A   Yes.

21      Q   Okay.  And so I thought you said that there'd

22  only be one bank restraint but sent out per year; is

23  that right?

24      MR. NOVIKOFF: Note my objection.

25      A   Correct.

Page 72

1       Q   (BY MS. CATERINE) So why is there one bank

2   restraint being sent out on August 26th and another one

3   being sent on September 27th?

4       MR. NOVIKOFF: Note my objection.

5       A   There are more than one bank.  There are other

6   banks.

7       Q   (BY MS. CATERINE) Okay.  So it's one per year

8   per bank; is that correct?

9       A   Yes.

10      Q   Okay.  And so, generally, how many banks are

11  you going to send bank restraints to for an account?

12      A   I don't know.  I can't answer that.  It

13  depends on a lot of different things.

14      Q   What kind things would it depend on?  I know

15  you said what bank information was already in the file.

16  So we know about that.  What other kind of things would

17  it depend on?

18      A   It could depend on the bank that they live

19  that close to.

20      Q   And how do you find out what banks they're

21  close to?

22      A   The ZIP Code.

23      Q   Do you just have like a list of banks in that

24  ZIP Code?  Or how does that work?  Is it done

25  automatically?

Page 73

1    A    Google.  Usually google it.

2    Q    I see.  So you just google a consumer's
3  address and see what banks are in the nearby area; is
4  that correct?

5    A    That could sometimes, yes.

6    Q    And so going back to you.  You answered that
7  the restraint was sent out on September 27th, 2021,
8  because it was -- and I'm sorry if I'm misstating what
9  you said, but basically you said it was still coded for
10 execution because you hadn't received the money; is that
11 correct?

12       MR. NOVIKOFF:  Objection.

13   A    Yes.

14   Q    (BY MS. CATERINE) So if that conditional
15 release had been processed by M&T Bank, then that
16 restraint would not have gone out; is that correct?

17   A    Yes.

18   Q    All right.  So when you're sending out bank
19 restraints, do you look at anything in the account
20 before you do that?  Or do you just have a list of
21 accounts that are in this execution status and you just
22 send bank restraints for all of them?

23       MR. NOVIKOFF:  Objection to form.  You can
24    answer.

25   A    Yes, I look at things before I send them out.

Page 74

1    Q    (BY MS. CATERINE) Okay.  What sort of things
2  do you look at?

3    A    The index number, the date the judgment was
4  entered, the name, the Social.  The amount of the
5  judgment.

6    Q    And why do you look at those things?

7    A    You have to make sure you have a valid
8  judgment before you just send out a restraint.  You want
9  to make sure you have a valid judgment.

10   Q    Okay.  Would you look at the account notes?

11   A    Yes, sometimes.  Yes.  And the file.

12   Q    But based on this restraint being sent out
13 after a conditional release had been sent, is it
14 reasonable to assume that Robert hadn't looked at the
15 account notes before sending out those restraints?

16       MR. NOVIKOFF:  Objection.

17   A    You gotta ask Robert that.

18   Q    (BY MS. CATERINE) Okay.  You said you would
19 look at the account notes sometimes.  Is there something
20 in particular that would prompt you to look at the
21 account notes?

22   A    If it's an old case, there might be many notes
23 that you have to look at.  If it's a new case, there
24 aren't any notes.

25   Q    And this is a -- this would be something you

Page 75

1  would call an old case; right?  Because this has a lot
2  of -- quite a lot of account notes; correct?

3    A    Yes.

4    Q    And so with an old case, are you saying you
5  would look at the account notes for that?  Or you would
6  not look at the account notes for that?

7        MR. NOVIKOFF:  Objection.

8    A    I would.

9    Q    (BY MS. CATERINE) All right.  And you mean
10 just you yourself, Gary Thigpen, you would.  You don't
11 know what, for example, Robert would do; is that
12 correct?

13   A    Yeah, I can't answer for Robert.

14   Q    Sure.  Sure.  So let's look at this entry -- I
15 don't see in the account note entry --

16       MR. NOVIKOFF:  What page are you on, Counsel?

17   Q    (BY MS. CATERINE) Looking at 727.

18       MR. NOVIKOFF:  Thank you.

19   Q    (BY MS. CATERINE) And going onto 728.  You can
20 look at both.  But I don't see any account note entry
21 here referring to receiving an information subpoena
22 response from M&T Bank.  Am I reading that correctly?

23       MR. NOVIKOFF:  Just specifically to these two
24    pages?

25       MS. CATERINE:  Yes.

Page 76

1        MR. NOVIKOFF:  Okay.  You can answer.

2    A    I don't understand.  Why would I need an
3  information subpoena?

4        MR. NOVIKOFF:  That's not the question,
5    Mr. Thigpen.

6    Q    (BY MS. CATERINE) Is there anything in these
7  account notes that refers to receiving an information
8  subpoena response from M&T Bank?

9        MR. NOVIKOFF:  On these two specific pages.

10   Q    (BY MS. CATERINE) Yes.

11   A    No.

12       MR. NOVIKOFF:  Go ahead.

13   Q    And you said, "No;" correct?

14   A    Yes.

15   Q    And would information subpoena responses ever
16 be noted in the AS/400 system?

17       MR. NOVIKOFF:  Note my objection.

18   A    Yes.

19   Q    (BY MS. CATERINE) And in what circumstance
20 would that be noted in the AS/400 system?

21   A    You get back employment information.  They
22 might note it for that.

23   Q    How about for an information subpoena to a
24 bank?

25   A    Yeah --



GARY THIGPEN
March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.
77–80

Page 77

1    MR. NOVIKOFF: I'm sorry. I objected. You
2  can answer, Mr. Thigpen.
3    A   Yes, information subpoenas to banks, they
4  could put that in as well.
5    Q   (BY MS. CATERINE) And so why wasn't the
6  information subpoena response put in for the restraint
7  to M&T Bank here?
8       MR. NOVIKOFF: Objection.
9    A   I don't know.
10   Q   (BY MS. CATERINE) You said that the -- well,
11  frankly, I don't remember. Who refers -- who reviews
12  the information subpoena responses at Gutman?
13      MR. NOVIKOFF: Objection.
14   A   Mostly Michael Roberts and Robert Brust and
15  sometimes Eric and I go over them as well. But mostly
16  Michael Roberts and Robert Brust.
17   Q   (BY MS. CATERINE) Okay. And so if someone was
18  going to put in the information subpoena responses, it
19  would probably Michael Roberts or Robert Brust; is that
20  correct?
21      MR. NOVIKOFF: Objection.
22   A   Yes.
23   Q   (BY MS. CATERINE) And do Michael Roberts or
24  Robert Brust ever communicate to you what is said in an
25  information subpoena response?

Page 78

1       MR. NOVIKOFF: Objection.
2    A   Sometimes.
3    Q   (BY MS. CATERINE) And would that generally be
4  done just by putting in an account note in the AS/400
5  system? Or how would that work?
6       MR. NOVIKOFF: Objection.
7    A   Normally an e-mail or phone call.
8    Q   (BY MS. CATERINE) E-mail or phone call. Okay.
9  And would that e-mail or phone call be noted in the
10  AS/400 system?
11   A   Not necessarily. No.
12   Q   Okay. So going back to Exhibit F, as in
13  Frank. If Michael Roberts or Robert Brust -- well,
14  okay. Let me ask you a question. If Robert Brust sends
15  out an information subpoena, is he going to be the
16  person to review the response for the information
17  subpoena as well?
18      MR. NOVIKOFF: Objection.
19   A   No.
20   Q   (BY MS. CATERINE) Okay. And so looking at the
21  information subpoena response in Exhibit F and looking
22  at page 557 of the document -- well, let me ask you.
23  The questions here, why does Gutman ask these five
24  questions in the information subpoena?
25      MR. NOVIKOFF: Objection.

Page 79

1    A   I don't know, ma'am.
2    Q   (BY MS. CATERINE) Okay. And let's talk about
3  question number 4. Question number 4 says, "Does debtor
4  have automatic credit (paychecks, Social Security, et
5  cetera) deposited to any accounts? If, yes, from where
6  (including name and address)?" Why does Gutman ask that
7  question?
8       MR. NOVIKOFF: Note my objection.
9    A   I don't know.
10   Q   (BY MS. CATERINE) And I think you previously
11  testified that when you're reviewing bank statements
12  sent to you by a consumer to establish that they have
13  exempt funds in their account, that you would be looking
14  at the deposits; is that correct?
15      MR. NOVIKOFF: Objection to his prior answer.
16  You can answer.
17   A   Yeah, I review it with an attorney. Yes.
18   Q   (BY MS. CATERINE) And so the deposits that are
19  going to be noted in question 4 are going to be the same
20  sort of things you would look at in those bank
21  statements; is that correct?
22      MR. NOVIKOFF: Objection.
23   A   Yes.
24   Q   (BY MS. CATERINE) And so do you ever review
25  information subpoena responses to determine if funds are

Page 80

1  exempt in an account?
2       MR. NOVIKOFF: Objection.
3    A   It's not up to me, no.
4    Q   (BY MS. CATERINE) Well, I know that the
5  decision is not up to you but in terms of, you know, you
6  working with an attorney, would you ever look at the
7  information subpoena responses to determine if funds are
8  exempt?
9       MR. NOVIKOFF: Objection.
10   A   Yeah, I would look at them but not to make a
11  determination.
12   Q   (BY MS. CATERINE) Right. Right. And this
13  handwriting written answer to question number 4. This
14  is referring to unemployment insurance deposits;
15  correct?
16      MR. NOVIKOFF: Objection. Asked and answered.
17  You can answer it again.
18   A   I see NYS and a lot of stuff is abbreviated so
19  I don't know the abbreviations.
20   Q   (BY MS. CATERINE) Okay. And if Gutman gets an
21  information subpoena response showing deposits of exempt
22  funds, what does Gutman do in that situation?
23      MR. NOVIKOFF: Objection.
24   A   If we show deposit of exempt funds, we have to
25  release the funds.

Page 81

1     Q   (BY MS. CATERINE) Even if a consumer has
2   already signed a conditional release?
3         MR. NOVIKOFF:  Note my objection.
4     A   Yeah, you gotta release it.
5     Q   (BY MS. CATERINE) Okay.  Give me a second.
6   I'm going back to Exhibit A.  All right.  We're looking
7   at Exhibit A again.  The page Bates stamped 727.
8         MR. NOVIKOFF:  Okay.  That's the thing you
9   were just --
10        MS. CATERINE:  I'm sorry.  728.
11        MR. NOVIKOFF:  Okay.  You were there too.
12   Okay.
13    Q   (BY MS. CATERINE) And we have an entry on 4570
14   that says, "Called M&T.  We never got paid."  And that
15   was made by you.  What prompted you to call M&T on
16   October 208th, 2021?
17    A   I was just following up behind a conditional
18   release that he was on.  And I followed up that list and
19   I didn't see a payment.
20    Q   So you say that list, is that just a list of
21   consumers that have entered into conditional releases?
22    A   No, it's just a list that I keep when someone
23   signs a conditional release.  I might just write down
24   the file number to make a note.
25    Q   So, like a to-do list; is that right?

Page 82

1     A   Yes.
2     Q   And would you still have that to-do list?
3     A   Not from 2021, no.
4     Q   I didn't think so but, you know, worth asking.
5   And what would you look at to determine whether or not
6   you had gotten money from M&T Bank pursuant to the
7   conditional release?
8     A   Just a payment screen.
9     Q   So on October 28th, 2021, you're just
10   checking on the status of this account and you see on
11   the payment screen that you haven't gotten any money yet
12   and so you call M&T and they confirm with you that they
13   have not sent you any money; is that correct?
14    A   Yes.
15    Q   And did M&T say anything else during that call
16   other than they hadn't sent you money?
17    A   No.
18    Q   Did they confirm that they had received the
19   conditional release?
20    A   No.
21    Q   The next account note entry says, "Bank failed
22   to RECD fax Gail sent from office."  What is that
23   referring to?
24    A   Bank failed to receive the fax so we had to
25   fax the conditional release again because they told me

Page 83

1   they didn't get it.
2     Q   And so Gail had actually sent that fax, it's
3   just for some reason M&T hadn't received it; is that
4   correct?
5     A   Yes.
6     Q   And did you ever find out why they hadn't
7   received it?
8     A   No.
9     Q   And the account note entry 4590 says, "Sent
10   signed CR to Mike to refax to M&T Bank."  That's
11   referring to Michael Roberts; correct?
12    A   Yes.
13    Q   And so you sent him -- you e-mailed him the
14   signed conditional release; is that correct?
15    A   Yes.
16    Q   Now I'm going to share on the screen what's
17   going to be marked as Exhibit G, as in girl.  Bates
18   stamped pages GM 109 through 110 -- no, I'm sorry.
19   That's not right.  GM 1 -- I don't know why I have that
20   written down -- GM 1 through 220.
21        MR. NOVIKOFF:  Okay.
22        (Exhibit G was marked for identification.)
23    Q   (BY MS. CATERINE) We're going to determine two
24   pages Bates stamped 109 to 110.  Okay.  All right.
25   Mr. Thigpen, do you see the e-mails that I'm sharing on

Page 84

1   your screen right now?
2     A   Yes.
3     Q   Okay.  And so this first e-mail is from
4   10:15 a.m.  The e-mail on the bottom.  It's in, you
5   know, reverse chronological order.  This is an e-mail
6   from Eric Keilbach to you; correct?
7     A   Yes.
8     Q   And he says, "Let me know your thoughts."  And
9   under that is an e-mail from Susan Shin.  And can go
10   ahead and please read this e-mail and let me know when
11   you're finished.
12    A   Okay.
13    Q   And do you recall reviewing this e-mail from
14   Susan Shin when Mr. Keilbach forwarded it to you on
15   October 28th, 2021?
16    A   Yes.
17    Q   And reviewing these documents, does it appear
18   that this may have been what prompted you to call M&T
19   Bank as noted in the account notes that we were
20   reviewing earlier?
21        MR. NOVIKOFF:  Note my objection.
22    A   No.  I don't think so.  No.
23    Q   (BY MS. CATERINE) Okay.  And Mr. Keilbach
24   says, "Let me know your thoughts."  Why was Mr. Keilbach
25   asking for your opinion on this?



GARY THIGPEN                                          March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.                    85–88

Page 85

1        MR. NOVIKOFF:  Note my objection.

2    A   You've got to ask Mr. Keilbach that.

3    Q   (BY MS. CATERINE) Well, I can assume this

4   isn't the first time he's asked your opinion on

5   something; is that right?

6    A   He'll ask my opinion occasionally.

7    Q   Well, you've been working at Gutman quite a

8   long time.  You've got a lot of experience with debt

9   collection; is that right?

10   A   Yes.

11   Q   And you have a lot of experience with bank

12  restraints; correct?

13   A   Yes.

14   Q   I'm going to share on the screen what's going

15  to be marked as Exhibit H.  Bates stamped GM 350 to 371.

16  And I'll represent to you, Mr. Thigpen, that these were

17  the documents attached to the e-mail that Mr. Keilbach

18  forwarded to you.  Do you recall reviewing these

19  documents on October 21st?  Excuse me.  October

20  28th.

21       MR. NOVIKOFF:  How many documents are you

22      showing him?

23       MS. CATERINE:  We can go through all of

24      them --

25       MR. NOVIKOFF:  That's really your call.

Page 86

1        (Exhibit H was marked for identification.)

2    A   I just saw one page.

3    Q   (BY MS. CATERINE) Sure.  Well, let me put it

4   to you more generally.  Do you recall reviewing bank

5   statements that Susan Shin had sent to Gutman Mintz

6   regarding José Crespo?

7    A   Just the letter.  Not the bank statements.

8    Q   Okay.  So you don't recall reviewing bank

9   statements like the one Bates stamped GM 353 that I'm

10  sharing on your screen right now?

11       MR. NOVIKOFF:  Objection.  Asked and answered,

12      but you can answer again.

13   A   No.

14   Q   (BY MS. CATERINE) Okay.  And you see here

15  there are deposits that say NYS DOL UI.  And that's the

16  same entry that we saw on the information subpoena

17  response; correct?

18       MR. NOVIKOFF:  Objection.

19   A   Yes.

20   Q   (BY MS. CATERINE) And it's your testimony that

21  you do not have any idea what this means?

22       MR. NOVIKOFF:  Objection.  Are you talking

23      about what's on the document you're showing him

24      now?  Or the prior document that you showed him?

25       MS. CATERINE:  I'm talking about the --

Page 87

1        MR. NOVIKOFF:  Because he testified about the

2   prior document, but I don't think he testified

3   about this.

4        MS. CATERINE:  This one are here:  NYS DOL UI

5   DD UI DD.

6        MR. NOVIKOFF:  Okay.  So you're asking him

7   does he understand what that means on GM 00353;

8   right?

9        MS. CATERINE:  Correct.

10       MR. NOVIKOFF:  Okay.  Fair enough.

11   A   I know New York State, NYS.  A lot of the

12  other things are abbreviated and I'm not familiar with

13  the bank's abbreviations here.

14   Q   (BY MS. CATERINE) And on GM 371, we have a

15  breakdown here and a table.  And the last entry on this

16  table is for September 1st, 2021.  And you can see

17  here there's a column for nonexempt funds in the

18  account.  And it shows at the time the account was

19  restrained that there was $0 of nonexempt funds in the

20  account.

21       I know you didn't review this document at the

22  time, but based on what you know today, is it correct

23  that there were no exempt funds in Mr. Crespo's account

24  when it was restrained?

25       MR. NOVIKOFF:  Objection.

Page 88

1    A   It looks like there's no exempt funds, yes.

2    Q   (BY MS. CATERINE) Okay.  No nonexempt funds?

3    A   Yes.

4        MR. NOVIKOFF:  Objection.

5    Q   (BY MS. CATERINE) I'm sorry.  Was there an

6   answer there?  Did you mean nonexempt funds or exempt

7   funds?

8    A   It looks like there are no nonexempt funds in

9   this.

10   Q   Okay.  Doubtful negative.  It's a little

11  tricky.  Okay.  Going back to Exhibit G.  You responded

12  to Mr. Keilbach on October 28th at 11:33 a.m. and you

13  said, "Doesn't look good, but he signed and never

14  mentioned exempt funds."  What did you mean by "doesn't

15  look good?"

16   A   When I said that I mean we're gonna have to

17  give money back.

18   Q   But then you say, "he signed," and you're

19  referring to the conditional release there; correct?

20   A   Yes, because José never mentioned there were

21  any funds in there that was exempt.  And I wouldn't have

22  put that in the e-mail to Eric if it wasn't true.

23   Q   But he did tell you that he was on

24  unemployment; correct?

25       MR. NOVIKOFF:  Objection.



Page 89

1    A    He'd never mentioned that there were any funds
2  in that account that were exempt.  That's what he told
3  me.
4        MS. CATERINE:  Strike the nonresponsive answer
5  to the question.
6        MR. NOVIKOFF:  No --
7    Q    (BY MS. CATERINE) Did Mr. Crespo tell you that
8  he was on unemployment?
9        MR. NOVIKOFF:  Motion -- I'm sorry.
10      Objection, asked and answered repeatedly.  You can
11      answer again.
12    A    I answered that three times already.  He said
13  he was unemployed.
14    Q    (BY MS. CATERINE) No.  My question is:  Did he
15  say he was on unemployment?
16        MR. NOVIKOFF:  Objection, asked and answered.
17      Answer again.
18    A    He said he was unemployed.  He said he was on
19  unemployment, yes.
20    Q    (BY MS. CATERINE) Okay.  And so when you're
21  saying that he signed the conditional release and never
22  mentioned exempt funds, does that mean you were entitled
23  to the money that he had agreed to in the conditional
24  release?
25        MR. NOVIKOFF:  Objection to the form.  You can

Page 90

1  answer.
2    A    No, it just meant that my statement to Eric
3  wasn't true.
4    Q    (BY MS. CATERINE) I'm sorry.  I'm not
5  understanding.  What do you mean?
6        MR. NOVIKOFF:  Wait.  Hold on.  Is that the
7      question?  "What do you mean?"
8        MS. CATERINE:  Yes.
9        MR. NOVIKOFF:  Objection.  Answer.
10    A    I'm saying that when I replied to Eric, I was
11  telling him the truth.  He never mentioned anything in
12  the account was exempt -- any exempt funds in that
13  account.
14    Q    (BY MS. CATERINE) Sure.  But I guess I'm just
15  asking, you say "it doesn't look good" and you testify
16  right now that that meant that you would probably have
17  to give back -- actually, strike that.
18        MR. NOVIKOFF:  Okay.
19    Q    (BY MS. CATERINE) I guess I'm a little
20  confused.  Why did it matter that he had never mentioned
21  the exempt funds to you?
22        MR. NOVIKOFF:  Objection to the form of the
23      question.  Answer if you can.
24    A    It matters because I would have never took his
25  money.

Page 91

1    Q    (BY MS. CATERINE) So when you're saying that
2  to Mr. Keilbach, that was just your explanation for why
3  you had entered into the conditional release with him?
4        MR. NOVIKOFF:  Objection to the form of the
5      question.
6    A    That was 2021 in an e-mail between Eric and I.
7  And I was telling the truth.  I didn't know you guys
8  were going to subpoena these e-mails two years later.
9  That's what I put in the e-mails the truth.  He'd
10  never mentioned exempt funds.
11    Q    (BY MS. CATERINE) No, I understand that that's
12  your testimony.  My question is why were you saying that
13  to Eric?
14        MR. NOVIKOFF:  Objection.  You can answer.
15    A    Because money may have to be returned to
16  Mr. Crespo.
17    Q    (BY MS. CATERINE) I see.  Okay.  Still looking
18  at Exhibit G but we're going to turn to GM 5.  And this
19  is an e-mail from Brian Chiantella.  And could you just
20  read this e-mail and let me know when you're finished?
21    A    Where it says, "Yes, I see those other
22  deposits?"
23    Q    Yes.
24    A    "Yes, I see those other deposits and they are
25  from months ago.  If he still agrees to sign, great;

Page 92

1  otherwise I don't see us winning this case in front of a
2  judge at the moment."
3    Q    And what did Brian mean when he said, "If he
4  still agrees to sign, great?"
5        MR. NOVIKOFF:  Objection.
6    A    You've got to ask Brian that.
7    Q    (BY MS. CATERINE) You were still trying to
8  enforce the conditional release on October 28th;
9  correct?
10        MR. NOVIKOFF:  Objection.
11    A    I was still trying to get paid, yes.
12    Q    (BY MS. CATERINE) And that was even after you
13  had told Eric Keilbach that it did not look good;
14  correct?
15        MR. NOVIKOFF:  Note my objection.
16    A    This is 10:26 in the morning.  You've got a
17  look at the time of the e-mail I got.  My notes are at
18  10:26 in the morning.
19    Q    (BY MS. CATERINE) Okay.  So we're looking at
20  Exhibit A again, page GM 728.  And there's an account
21  note entry here, 4610.  And this is dated October
22  29th, 2021, and it says, "Called M&T Bank.  Nothing
23  has been processed yet."
24    A    Yes.
25    Q    And what is this referring to?



Page 93

1    A    The conditional release.  Nothing's been
2    processed as far as the conditional release.
3       Q    All right.  I'm now going to share on your
4    screen what is being marked as Exhibit I, as an ice
5    cream.  What is this document, Mr. Thigpen?
6       A    This is the conditional release.  M&T Bank.
7       (Exhibit I was marked for identification.)
8       Q    And is this the standard form that's used for
9    conditional releases?
10      A    Yes.
11      Q    And this would be generated with ICollect;
12   correct?
13         MR. NOVIKOFF:  Objection.
14      A    Yes.
15      Q    (BY MS. CATERINE) And you see a signature here
16   from Mr. Keilbach.  Was this signed by Mr. Keilbach
17   before or after it was signed by Mr. Crespo?
18      A    Before.
19      Q    And why was this signed by Mr. Keilbach rather
20   than you?
21         MR. NOVIKOFF:  Objection.
22      A    I'm not an attorney.  I don't sign any legal
23   documents.
24      Q    (BY MS. CATERINE) Are there documents you
25   would sign in your work at Gutman?

Page 94

1    A    No.
2       Q    Okay.  All right.  We're looking at Exhibit G
3    again.  That is page Bates stamped GM 9.  And this is an
4    e-mail from Eric Keilbach to Susan Shin and José Crespo.
5    And he says here that he's going to send over a release
6    to the bank forthwith without prejudice despite the fact
7    that the judgment debtor signed a conditional release
8    and never filed an exemption claim form.
9       Were you aware that Mr. Keilbach had come to
10   this decision to have a full release sent instead of a
11   conditional release?
12      A    I can't remember that.  He doesn't, you know,
13   even though I worked the case, he don't relay these
14   things to me.  If he made that determination.
15      Q    I'm sharing on your screen Exhibit J, as in
16   jolly.  Bates stamped GM 518.
17         MR. NOVIKOFF:  518?  Emma, 518?
18         MS. CATERINE:  Yes.
19         MR. NOVIKOFF:  Okay.  Thank you.
20      (Exhibit J was marked for identification.)
21      Q    (BY MS. CATERINE) And this is a transmission
22   verification report for the conditional release being
23   sent again correct?
24      A    Yes.
25      Q    So why was the conditional release being sent

Page 95

1    again when Mr. Keilbach had agreed to send a full
2    release for the account?
3         MR. NOVIKOFF:  Note my objection to the
4    question.  You can answer.
5       A    On 10/28 at 10 in the morning, no one put a
6    message in there that we were going to fully release
7    this account.  So it wasn't determined till later that
8    it was going to be released.
9       Q    (BY MS. CATERINE) Why wasn't there, you know,
10   why didn't you wait for a determination to be made?
11         MR. NOVIKOFF:  Objection.
12      A    I can't wait if I don't know that they're
13   agreeing to release him.
14      Q    (BY MS. CATERINE) Okay.  I'm going to share on
15   your screen what's being marked as Exhibit K, as in
16   kangaroo.  This one doesn't have a Bates stamp on it
17   because it is a native-format e-mail.  And this is an
18   e-mail from Mr. Keilbach to Brian Chiantella, Michael
19   Roberts, and to you dated October 29th, 2021, at
20   11:13 a.m.  And he says, "This is why we can't just do
21   this stuff."  Do you recall receiving this e-mail?
22      A    Yes.
23      (Exhibit K was marked for identification.)
24      Q    And what did you understand him to mean by
25   "this is why we can't just do the stuff?"

Page 96

1    A    I don't know.
2       Q    Did you ask him?
3       A    No.
4         MR. NOVIKOFF:  Wait a minute.  Hold on.  Gary?
5         THE WITNESS:  Yes.
6         MR. NOVIKOFF:  I don't see your face.
7         THE WITNESS:  I'm back.
8         MR. NOVIKOFF:  Okay.  Okay.
9       Q    (BY MS. CATERINE) And if you want a break at
10   any point, Mr. Thigpen, just let me know.
11         MR. NOVIKOFF:  Mr. Thigpen, do you need a
12   break?
13         THE WITNESS:  No, I'm good.
14         MR. NOVIKOFF:  Okay.
15      Q    (BY MS. CATERINE) Okay.  I'm now going to
16   share on your screen Exhibit A.  We'll be looking at the
17   page GM 729.
18         MR. NOVIKOFF:  I'm sorry.  I lost you on that
19   one.  Page what?
20         MS. CATERINE:  729.
21         MR. NOVIKOFF:  Thank you.
22      Q    (BY MS. CATERINE) And the account notes on
23   this page refer to the receipt of the order to show
24   cause; correct?
25         MR. NOVIKOFF:  Objection.



Page 97

1    A   Yes.

2    Q   (BY MS. CATERINE) And what was your role in

3    the opposition to Mr. Crespo's order to show cause?

4    A   I don't have any role.

5    Q   Did anybody ask you for information while they

6    were drafting the opposition to the order to show cause?

7    A   Yes.

8    Q   And who asked you for that information?

9    A   One of the attorneys at the firm, Hotan

10   Rohparvar.

11   Q   And what did they ask you about?

12       MR. NOVIKOFF:  You mean he?  Not the --

13   A   He sent me a statement to sign.

14   Q   (BY MS. CATERINE) Like an affidavit?  Or what

15   was it?

16   A   Yes.

17   Q   Okay.  All right.  Now sharing on your screen

18   Exhibit G, page GM 72.  And this is an e-mail from Hotan

19   Rohparvar.  I apologize if I'm mispronouncing that.

20   And --

21       MR. NOVIKOFF:  I'm sorry.  Emma, what's the

22       number?

23       MS. CATERINE:  72.

24       MR. NOVIKOFF:  Thank you.

25   Q   (BY MS. CATERINE) And this e-mail is sent to

Page 98

1    something that says "CivilConf."  Do you know what that

2    is?

3    A   No.

4    Q   Okay.  And Mr. Rohparvar says that he sent the

5    conditional release to the judge in this e-mail.  Whose

6    decision was it to have the conditional release sent to

7    the judge?

8    A   I don't know.  While all this was going on I

9    didn't have any deals with the case any longer.

10   Q   Other than signing the affidavit that you

11   mentioned before?

12   A   Yes.

13   Q   And we're now looking at Exhibit A, page GM

14   729 -- excuse me, 733.  And looking at the entry

15   starting with entry 5150 and the following two entries.

16   It says that "all money collected to be returned within

17   30 days."  Am I reading that correctly?

18   A   Yes.

19   Q   And generally when Gutman receives a court

20   order to return money that it has collected, whose job

21   is it to make sure that that money gets returned?

22       MR. NOVIKOFF:  Objection.

23   A   Accounting and Eric Keilbach.

24   Q   (BY MS. CATERINE) Do you have any involvement

25   in the return of money?

Page 99

1    A   No.

2    Q   Okay.  I'm now going to share on the screen

3    what's being marked on the screen is what's been marked

4    as Exhibit L, as in Larry.  Bates stamped GM 375 to 378.

5    And, Mr. Thigpen, did you ever review this order?

6        MR. NOVIKOFF:  Do you need to review the whole

7        document, Mr. Thigpen?

8        THE WITNESS:  No, I don't need to review that

9        whole document.

10   A   I've never reviewed this order.

11   (Exhibit L was marked for identification.)

12   Q   (BY MS. CATERINE) Gutman was planning on

13   fighting this order; correct?

14       MR. NOVIKOFF:  Objection.

15   A   I never reviewed it.  How can I tell you that?

16   I don't know.

17   Q   (BY MS. CATERINE) Fair enough.  Fair enough.

18   We're looking at Exhibit G, Bates stamped GM 40.

19   There's an e-mail here from Hotan Rohparvar --

20       MR. NOVIKOFF:  I'm sorry.  Are we still on

21       Exhibit A?

22       MS. CATERINE:  No, this is Exhibit G.

23       MR. NOVIKOFF:  Exhibit G?

24       MS. CATERINE:  Yes, G as in girl.

25       MR. NOVIKOFF:  Got it.  It's G and Gutman

Page 100

1    Mintz 40.  Got it.

2    Q   (BY MS. CATERINE) And this e-mail refers to an

3    order to show cause that Gutman had filed on the basis

4    of the conditional release.  Were you involved in the

5    process of drafting that order to show cause?

6        MR. NOVIKOFF:  Objection to the form of the

7        question for multiple reasons.  But you can answer.

8    A   Ma'am, I don't draft documents.  I'm not a

9    lawyer.  I don't sign anything.  I don't draft

10   documents.  I'm an account representative.

11   Q   (BY MS. CATERINE) All right.  I'm going to

12   share on your screen what's being marked as Exhibit M,

13   as in Mary.  Bates stamped GM 372.  And what is this --

14       MR. NOVIKOFF:  Wait.  Wait.  Wait.  GM what?

15       MS. CATERINE:  372.

16       MR. NOVIKOFF:  And this is Exhibit M?

17       MS. CATERINE:  M, yes.

18       MR. NOVIKOFF:  As in Mary.  Okay.  Thank you.

19   (Exhibit M was marked for identification.)

20   Q   (BY MS. CATERINE) And what is this document?

21       MR. NOVIKOFF:  Note my objection.

22   A   Cash inquiry.  List of payments.

23   Q   (BY MS. CATERINE) And what program was used to

24   create this document?

25   A   AS/400.



GARY THIGPEN
CRESPO vs G., M., B., AND S., LLP, ET AL.

March 22, 2023
101–104

Page 101

1    Q    And why would you create a document like this
2    one?
3        MR. NOVIKOFF:  When you're asking "you," are
4    you asking Mr. Thigpen or Gutman?
5        MS. CATERINE:  You, Mr. Thigpen.
6        MR. NOVIKOFF:  Okay.  Then I'm going to object
7    to the form of the question.
8    A    Yeah, I don't create these documents.  This is
9    in the AS/400 system.
10   Q    (BY MS. CATERINE) I see.  So this already --
11   this isn't a document is created, it already exists in
12   the AS/400 system and this is just a printout of it; is
13   that correct?
14   A    Yes.
15   Q    Okay.  And in the regular course of your work,
16   would you ever look at this cash inquiry screen?
17   A    Yes.
18   Q    And why would you?
19       MR. NOVIKOFF:  Counsel, you're saying in
20   general or for Crespo in particular?
21       MS. CATERINE:  In general.
22       MR. NOVIKOFF:  Then there's no objection.  Go
23   ahead.
24   A    To see if the payments were voluntary or
25   involuntary.

Page 102

1    Q    (BY MS. CATERINE) And how would you determine
2    that?
3    A    There's a pay type next to the date.
4    Q    And I see the pay-type on this printout
5    there's MAQ and then REF.  I assumed REF is an
6    abbreviation for refund; correct?
7    A    Yes.
8    Q    And what does MAQ mean?
9    A    Marshal payment.
10   Q    So MAG refers to payments obtained by the
11   Marshal garnishing from a consumer's paycheck; correct?
12       MR. NOVIKOFF:  Objection.
13   A    Yeah, the judgment debtor's paycheck.  Yes.
14   Q    (BY MS. CATERINE) I'm now going to share my
15   screen wants being marked as Exhibit N --
16       MR. NOVIKOFF:  As in Nancy; right?
17   Q    (BY MS. CATERINE) -- Nancy.  Bates stamped GM
18   595 to 601.  And what is this document, Mr. Thigpen?
19   Specifically, the second page that I'm sharing on your
20   screen right now.
21       (Exhibit N was marked for identification.)
22       MR. NOVIKOFF:  All right.  I don't see the
23   second page.
24       MS. CATERINE:  This is the second page.
25       MR. NOVIKOFF:  Oh, this is the second page.

Page 103

1    596?
2        MS. CATERINE:  Yes.
3        MR. NOVIKOFF:  Okay.  And is the question what
4    is this document?
5        MS. CATERINE:  Yes.
6        MR. NOVIKOFF:  Okay.  Note my objection.  You
7    can answer.
8    A    It looks like they're refunding money back to
9    Mr. Crespo for 6944.
10   Q    (BY MS. CATERINE) And would you ever send a
11   fax to a marshal like this to obtain a refund?
12       MR. NOVIKOFF:  Objection for various reasons,
13   but just for clarification, are you asking Mr.--
14       MS. CATERINE:  Mr. Thigpen.
15       MR. NOVIKOFF:  Okay.  I'm still objecting.
16   A    No.
17       MS. CATERINE:  Let's take a ten-minute break,
18   please.
19       MR. NOVIKOFF:  Okay.  It's 3:05 now.  We'll
20   get back at 3:15?
21       MS. CATERINE:  Yes.
22       MR. NOVIKOFF:  Once again, only for planning
23   purposes, do you have any estimate?
24       MS. CATERINE:  I think we'll be done fairly
25   soon.  Probably in about an hour.

Page 104

1        MR. NOVIKOFF:  All right.  Thank you.
2        MS. CATERINE:  I mean, I don't know if you
3    have any questions.
4        MR. NOVIKOFF:  We'll find out after.
5        (Break was taken at 3:05 p.m.)
6    Q    (BY MS. CATERINE) Okay.  Mr. Thigpen, I'm just
7    going to ask a few follow-up questions.  If at any point
8    you want me to put up any of the documents we've looked
9    at back on the screen just let me know; okay?
10   A    Okay.
11   Q    All right.  So starting with the recordings of
12   the phone calls, are those phone calls automatically
13   recorded from the beginning of the phone call?  Or is
14   there like a button you push to start the recording?  Or
15   how does that work?
16       MR. NOVIKOFF:  Objection.
17   A    I don't know how it works.  When the new phone
18   system went in I just heard they had the capability, but
19   I don't how it works.
20       MR. NOVIKOFF:  Wait a minute.  Hold on.  I'm
21   sorry.  Can you just read that answer back?
22       THE WITNESS:  I don't know how the phone --
23       MR. NOVIKOFF:  No, no, no.  Not you,
24   Mr. Thigpen, the court reporter.
25       (Whereupon the requested portion was read back.)



GARY THIGPEN                                                    March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.                       105–108

Page 105

1        MR. NOVIKOFF:  Okay.

2    Q    (BY MS. CATERINE)  All right.  And we were

3    talking earlier about how you said that Mr. Crespo

4    telling you that he was on unemployment didn't mean that

5    the funds in his account were exempt.  But if he's on

6    unemployment, then where else would his unemployment be

7    going other than his bank account?

8        MR. NOVIKOFF:  Note my objection to the

9    question.  You can answer.

10   A    He could have multiple accounts.  It might not

11   be in that account.

12   Q    (BY MS. CATERINE) But you didn't ask him?

13       MR. NOVIKOFF:  Objection.  Asked and answered.

14   Go ahead.

15   A    No.

16   Q    (BY MS. CATERINE) And did you make any attempt

17   to recall the conditional release after the decision was

18   made to fully release the account on October 28th?

19       MR. NOVIKOFF:  Objection.  This one -- is the

20   question does he recall?

21       MS. CATERINE:  Yes.

22       MR. NOVIKOFF:  Okay.  I still have an

23   objection but the way it was phrased.  He can

24   answer.

25   A    No.

Page 106

1    Q    (BY MS. CATERINE) Okay.

2        MR. NOVIKOFF:  Just so we're clear, the answer

3    was no, he doesn't recall.  I leave it to you,

4    Emma, to show him anything you want.

5    Q    (BY MS. CATERINE) Does Gutman always scan

6    copies of responses to information subpoenas it

7    receives?

8        MR. NOVIKOFF:  Note my objection.

9    A    I don't know.

10   Q    (BY MS. CATERINE) I don't recall seeing in the

11   account notes -- and I'll bring them up in a second, but

12   I don't recall seeing in any of the account note entries

13   any entry by Eric Keilbach or any of the other

14   attorneys.  Do attorneys make entries in the AS/400

15   system?

16       MR. NOVIKOFF:  Note my objection to the form

17   of the question.  You can answer.

18   A    Yes.

19   Q    (BY MS. CATERINE) So if there aren't any

20   entries from attorneys in the account notes, is it

21   reasonable to assume that they were not involved with

22   the account at that time?

23       MR. NOVIKOFF:  Objection.

24   A    No.

25   Q    (BY MS. CATERINE) And why not?

Page 107

1        MR. NOVIKOFF:  Wait.  Hold on, Emma.  Was the

2    answer, "no?"  I didn't hear the answer.

3        THE WITNESS:  Yes.  No.

4        MR. NOVIKOFF:  Okay.

5        MS. CATERINE:  The answer was, "no."

6        MR. NOVIKOFF:  Okay.  Fair enough.  I just

7    didn't hear it.

8        MS. CATERINE:  Now I forgot what my follow-up

9    question was.  Can you read --

10       MR. NOVIKOFF:  That wasn't what I was trying

11   to do.

12       MS. CATERINE:  -- my follow-up question,

13   please?

14   (Whereupon the requested portion was read back.)

15       MS. CATERINE:  There we go.  Nice and simple.

16       MR. NOVIKOFF:  And note my objection.

17   A    You're asking me why the attorneys don't put

18   messages in?  I don't know.  They may have forgotten.

19   Q    (BY MS. CATERINE)  Well, so for example, when

20   they get the information subpoena response back from M&T

21   Bank, there aren't any account note entries about that.

22   Does that mean that the information subpoena response

23   was not reviewed?  Or there just wasn't an entry made?

24   What does that mean?

25       MR. NOVIKOFF:  Objection.

Page 108

1    A    I don't know.

2    Q    (BY MS. CATERINE) Okay.  And I know we've

3    looked at the account notes from AS/400.  None of the

4    documents we've looked at today have been screened from

5    ICollect; correct?

6        MR. NOVIKOFF:  Objection.

7    A    Incorrect.

8    Q    (BY MS. CATERINE) And what did we look at from

9    ICollect?

10   A    The information subpoena with restraining

11   notice.

12   Q    So I know that would be generated by ICollect,

13   but are you saying that a copy of it would also be in

14   ICollect once it's been generated?  What do you mean?

15       MR. NOVIKOFF:  Objection.

16   A    I mean it was generated by ICollect.

17   Q    (BY MS. CATERINE) Okay.  But in terms of like

18   a printout of a screen from ICollect, we haven't looked

19   at any of those today; correct?

20       MR. NOVIKOFF:  Objection.

21   A    Correct.

22       MS. CATERINE:  Okay.  Then we just call for

23   the production of any ICollect screens related to

24   José Crespo.

25       MR. NOVIKOFF:  Put it in writing.  Take it



GARY THIGPEN                                            March 22, 2023
CRESPO vs G., M., B., AND S., LLP, ET AL.              109—112

Page 109

1    under advisement.
2        Q    (BY MS. CATERINE) And I had asked you earlier
3    about why you would send a conditional release rather
4    than just executing on the bank account and you stated
5    it takes 30 days for the sheriff to get the money from
6    the account. Are there any other reasons why a
7    conditional release would be preferable to garnishing
8    the bank account?
9        MR. NOVIKOFF:  Objection. You can answer.
10       A    No.
11       Q    (BY MS. CATERINE) Okay. And you testified
12   that you -- you're not aware of how the recording starts
13   with the new system. With the old system for recording
14   phone calls before 2017, was that an automatic recording
15   of phone calls?
16       MR. NOVIKOFF:  Objection.
17       A    No. We didn't have an old system recording
18   phone calls.
19       Q    (BY MS. CATERINE) I see. So when you say the
20   new system in 2017, that was the first system for
21   recording phone calls; is that correct?
22       MR. NOVIKOFF:  Note my objection.
23       A    I'm going to have to say I don't know.
24       Q    (BY MS. CATERINE) Okay. And that is all the
25   questions I have at this time. Your attorney may have

Page 110

1    some -- yes. Your attorney may have some questions for
2    you though.
3        MR. NOVIKOFF:  No. I will exercise my right
4    not to ask any questions.
5        MS. CATERINE:  Okay. Great. Well, thank you
6    very much for your time, Mr. Thigpen. Have a good
7    day.
8        (The deponent was explained his right to read
9    and sign the transcript of the deposition and chose
10   to exercise that right.)
11       (The deposition concluded at 3:35 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 111

1                    C E R T I F I C A T E
2
3        I, KAITLIN A. GUERTIN, a Stenomask Reporter
4    and notary public, within and for the State of South
5    Carolina, do hereby certify:
6        That GARY THIGPEN, the witness whose
7    examination is hereinbefore set forth, was first duly
8    sworn by me and that this transcript of said testimony
9    is a true record of the testimony given by said witness.
10       I further certify that I am not related to any
11   of the parties to this action by blood or marriage, and
12   that I am in no way interested in the outcome of this
13   matter.
14
15       IN WITNESS WHEREOF, I have hereunto set my
16   hand this 2nd day of April, 2023.
17
18
19
20
21       _____
22              Kaitlin A. Guertin, CVR
23
24
25   My Notary Commission Expires: November 6, 2030

Page 112

1                    DEPOSITION ERRATA SHEET
2    Case Caption: JOSE CRESPO V. GUTMAN, MINTZ, BAKER &
     SONNENFELDT LLP, ET AL
3    Case No.: 1:22-CV-06599-JPO
4    Deposition of: Gary Thigpen
5    Date Taken: March 22, 2023
6    Taken Before: Kaitlin A. Guertin
7    Attorneys: Emma Caterine; Ken Novikoff
8        I declare under penalty of perjury that I have read
9    the entire transcript of my deposition taken in the
10   above-captioned matter or the same has been read to me
11   and the same is true and accurate, save and except for
12   the changes and/or corrections, if any, as indicated by
13   me on the DEPOSITION ERRATA SHEET hereof, with the
14   understanding that I offer these changes as if still
15   under oath.  Signed on the ___ day of _____,
16   20__.
17
18
19
20   _____
21   GARY THIGPEN
22
23
24
25



GARY THIGPEN
CRESPO vs G., M., B., AND S., LLP, ET AL.

March 22, 2023
113–114

Page 113

```
 1              DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
25              GARY THIGPEN                  J9462565
```

Page 114

```
 1              DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
25              GARY THIGPEN                  J9462565
```

