UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JOSE CRESPO,

Case No.: 1:22-cv- 06599-JPO

Plaintiff,

-against-

GUTMAN, MINTZ, BAKER & SONNENFELDT, LLP,
GARY THIGPEN, ERIC KEILBACH,
1511 SHERIDAN LLC, and
HILLTOP MANAGEMENT GROUP LLC

Defendants.

------------------------------------------------------------------------X

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN
OPPOSITION TO GUTMAN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF HIS CROSS-MOTION FOR SUMMARY JUDGMENT**

**GUTMAN DEFENDANTS RULE 56.1 STATEMENT AND PLAINTIFF'S RESPONSE.**

1.  In 1999 Plaintiff rented an apartment located at 1521 Sheridan Ave., Bronx, NY, from

1511 Sheridan LLC. (*See* EBT of Jose Crespo at Ex.1 "B", p. 29).

**RESPONSE:  Admitted.**

2.  Beginning in February 2002, Plaintiff stopped making payments on his rent, and on

October 2, 2002, 1511 Sheridan LLC commenced a lawsuit against Plaintiff for rental arrears in

Bronx Civil Court, index number 83929/2002. ("First Lawsuit"). (*See* Petition in First Lawsuit at

Ex. "C").

> **RESPONSE: Admit the filing of the lawsuit. Dispute that Crespo owed some
> or all of the debt sought to be collected on the lawsuit. (see below).**

3.  On August 4, 2003, Plaintiff voluntarily agreed to vacate the premises pursuant to a So-

Ordered Stipulation of Settlement. (*See* August 4, 2003 So-Ordered Stipulation of Settlement at

Ex. "D").

> **RESPONSE: Admit that Plaintiff signed the attached**

4.  On January 21, 2005, 1511 Sheridan LLC commenced a second lawsuit against Plaintiff

seeking $4,078.98 based upon allegations of unpaid rent from February 1, 2003, through October

31, 2003, in Bronx Civil Court, index number 2890/2005. ("Second Lawsuit"). (*See* Complaint

in Second Lawsuit at Ex. "E").

> **RESPONSE: Admit that was the allegation. Deny that the allegation is**

---

1 All Exhibits ("Ex.") referenced herein are attached to the Declaration of Kenneth A. Novikoff, dated August  28,
2024.

**correct.**

5.   In the Second Lawsuit, an affidavit of service was filed stating that Plaintiff was served pursuant to CPLR § 308(4) by affixing a copy of the Complaint to Plaintiff's residence and by mailing him a copy. (See Affidavit of Service at Ex. "F").

> **RESPONSE: Admit**

6.   Plaintiff never answered the Complaint in the Second Lawsuit and on April 7, 2005, a judgment was entered against him in the amount of $4,873.91. (*See* April 7, 2005, judgment at Ex. "G").

> **RESPONSE: Admit**

7.   On December 11, 2018, based upon the judgment in the Second Lawsuit, GMBS caused an income execution for $11,873.91 to be issued by the Erie County Sheriff's office. (*See* Income Execution at Ex. "H").

> **RESPONSE: Admit**

8.   Between January 21, 2019, until November 10, 2019, Plaintiff had $1,458.30 garnished from his wages as the result of the income execution. (*See* Amended Complaint at Ex. "A" ¶ 58).

> **RESPONSE: Admit**

9.   In 2019, Plaintiff did not take any action to challenge or dispute the income execution. (Ex. "B" at pp. 78-80).

> **RESPONSE: Admit that Crespo did not file an Order to Show cause in 2019 to stay collections, vacate the judgment, and dismiss the case, but that he successfully did so in 2022**

10. On August 26, 2021, GMBS issued an information subpoena with a restraining notice on M&T Bank based upon the debt Plaintiff owed to 1511 Sheridan LLC. (*See* Information Subpoena and Restraining Notice at Ex. "H").

**RESPONSE: Admit that it was based on the judgment.**

11. The restraint served by GMBS on M&T Bank states in bold and all caps, **"ACCOUNTS CONTAINING SOLELY EXEMPT FUNDS SHOULD NOT BE RESTRAINED."** (*See* Information Subpoena and Restraining Notice at Ex. "I").

**RESPONSE: Admit, as required by statute.**

12. On or about September 3, 2021, M&T Bank responded to the information subpoena and provided a response that listed Plaintiff's place of business as Install's LLC and indicated that he had $5,081.99 in his account. (*See* M&T Bank's response to the information subpoena at Ex. "J")

> **RESPONSE: Admit that is what is stated. However, On February 13, 2020, GMBS learned that Mr. Crespo had lost his employment at Innstalls LLC, and that the income execution for that business was being terminated. *See Keshavarz Decl.* [Exhibit _, *Crespo* Keilbach Depo. Trans. 86:13-22]; [Exhibit_(Account Notes, entry 404 at GM-00723)].**
>
> **GMBS was not aware of any other employment obtained by Mr. Crespo after February 13, 2020. *See Keshavarz Decl.* [Exhibit_Crespo Keilbach Depo. Trans. 86:22-25].**

13. On September 2, 2021, and prior to the date M&T Bank responded to the information subpoena, Plaintiff called GMBS and spoke with Gary Thigpen regarding the restrained account. (*See* Ex. "B" at p. 173-174).

4

**RESPONSE: Admit. GMBS received the response to the information subpoena on September 3, 2021 which indicated the last two direct deposits into his account were from NYS Department of Labor Unemployment Direct Deposit Insurance.**

14. On September 2, 2021, GMBS made a partial settlement demand of $1,200 in return for releasing Plaintiff's M&T Bank account. (*See* Stipulation of Conditional Release at Ex. "K").

**RESPONSE: Admit that Crespo signed the document.**

15. Plaintiff agreed to pay 1511 Sheridan $1,200 from his M&T Bank account as a partial settlement of the debt he owed and executed a stipulation of conditional release memorializing the same. (*See* Stipulation of Conditional Release at Ex. "K").

**RESPONSE: Admit that is a true copy of the release. Deny this was an ":agreement" as much as a document GMBS pressured and deceived Mr. Crespo into signing by, inter alia, stating it was the only way he could obtain his money.**

16. The release executed by Plaintiff states, "I Acknowledge the Judgment entered on 4/7/2005 under the instant index number. It is my intention to satisfy the judgment and do herby authorize the withdrawal of the amount shown above as partial payment towards satisfying the judgment." (*See* Stipulation of Conditional Release at Ex. "K").

5

**RESPONSE: Admit that is what the form says.**

17. On September 2, 2021, GMBS faxed M&T Bank the executed stipulation of conditional release. (*See* EBT of Gary Thigpen at Ex. "L," p. 66, 82-83).

**RESPONSE: Deny. Thigpen wrote in his account notes the document was faxed on that date, but it was not actually faxed to the correct fax number until October 28, 2021. That is the date on the fax confirmation sheet for the September 2, 2021. There is no fax confirmation sheet for September 2, 2021. And the emails between the collectors on October 28, 2021 state that the fax number on the stipulation was not the correct fax number for M&T Bank. It was then faxed to M&T Bank at the correct fax number for the first time on October 28, 2021, immediately after receiving the email from attorney Susan Shin documenting the funds in the account were exempt.**

**There is no fax confirmation sheet in the records produced by GMBS for the fax on September 2, 2021 while fax confirmation sheets were produced when GMBS faxed the Conditional Release to M&T Bank on October 28, 2021, as well as for other fax sent by GMBS in this case. For example GMBS has produced the fax confirmation sheet for a document it faxed to the Sherriff. [Exhibit_**(Fax Confirmation to Sheriff, May 3, 2022).

6

**GMBS collector Brian Chiantella sent an email on October 28, 2021 to Gloria Coker, who works at GMBS, stating that the fax number on for M&T Bank on the September 2, 2021 Conditional Release was the wrong number for M&T bank and, he believed, that is why it was not previously processed. *See Keshavarz Decl.* [Exhibit _ (Chiantella Email 10/28/2021 at 10:39 am)].**

18. Plaintiff testified that he contacted M&T Bank 1-2 times a week from September through November regarding the release of his account (Ex. "B" p 187).

**RESPONSE: Admit**

19. Plaintiff testified that on or about September 20, 2021, he was advised by M&T Bank that M&T Bank needed GMBS to send it the conditional release. (Ex. B p. 188).

**RESPONSE: Admit that was his testimony.**

20. Plaintiff never advised GMBS that they needed to resend the conditional release to M&T Bank. (Ex. "B" at p. 188-189).

**RESPONSE: Admit except that GMBS never faxed the Conditional Release to the correct fax number for M&T Bank until October 28, 2021, so the term "resend" is inaccurate. Further, a job responsibility of Thigpen was to follow up on stipulations and conditional releases sent to banks.**

**However, there is no fax confirmation sheet in the records produced by GMBS for the fax on September 2, 2021 while fax confirmation sheets were produced when GMBS faxed the Conditional Release to M&T Bank on October 28, 2021, as well as for other fax sent by GMBS in this case, such as to the Sheriff.**

7

**GMBS collector Brian Chiantella sent an email on October 28, 2021 to Gloria Coker, who works at GMBS, stating that the fax number on for M&T Bank on the September 2, 2021 Conditional Release was the wrong number for M&T bank and, he believed, that is why it was not previously processed.** *See Keshavarz Decl.* **[Exhibit _ (Chiantella Email 10/28/2021 at 10:39 am)].**

21. Plaintiff testified that he received but never filed an exemption claim form. (Ex. "B," p. 189).

**RESPONSE: Admit that was his testimony.**

22. Plaintiff also testified that prior to October 27, 2021, he never sent GMBS any documentation concerning the money in his bank account being exempt. (Ex. "B," p. 189).

**RESPONSE: Admit except that by September 3, 2022 GMBS received a response from the Information Subpoena. In response to question 4 as to direct deposit payments, the bank indicated, in the one inch space provided for its response, that the last two deposits direct deposits into the account were for unemployment insurance benefits from the NYS Department of Labor, and the amount of each deposit, $188 and $300, respectively.**

23. Plaintiff testified that he retained counsel at least one or two weeks before October 27, 2021 (Ex. "B" at p. 207, ln 24-25).

**RESPONSE: Admit except it was a limited scope of representation for the purpose of sending the emails from October 27-29, 2021 to obtain the release of his exempt unemployment funds and confirm that $1,200 would not be seized from the account, as indicated in the emails themselves; and for assisting in the drafting Mr. Crespo's November 5, 2021** *pro se* **Order to Show Cause, as indicated in the footer of the document itself.  That was the full scope of the representation. Mr. Crespo was not represented by counsel at any point in the collection lawsuit itself beyond the assistance in the drafting of the OSC. No attorney filed a notice of appearance in the case for Mr. Crespo. No attorney went with Mr. Crespo to any of the court hearings.**

24. On October 27, 2021, counsel for Plaintiff emailed GMBS requesting that the funds from Plaintiff's M&T Bank account be released on the grounds that they were comprised solely of exempt funds. (*See* October 27, 2021, email chain at Ex. "M").

**RESPONSE: Admit that the limited scope attorney from New Economy Project did so.**

25. On October 27, 2021, Plaintiff's counsel provided GMBS for the first time with a copy of Plaintiff's M&T Bank account statements showing that all or at least most of the deposits made into the account were from exempt funds. (*See* October 27, 2021, email chain at Ex. "M").

**RESPONSE: Admit that Ms. Shin provided that email.  However, GMBS had since September 3, 2021 the bank's response to the information subpoena stating the last two direct deposits into the bank account was from the NYS Department of Labor for unemployment insurance payments.**

26. In addition to the documentation, Plaintiff's counsel provided GMBS with a comprehensive analysis of Plaintiff's restrained bank account.  (*See* October 27, 2021, email chain at Ex. "M").

RESPONSE: Admit

27. On October 28, 2021, Eric Keilbach wrote to M&T Bank and requested that Plaintiff's

account be released immediately without any garnishment. (*See* October 28, 2021, letter at Ex. "N").

> **RESPONSE: Admit he eventually did that after Thigpen, Chiantella (the manager of the collection department, and Robert Brust) received the email from Ms. Shin with the analysis and statements and immediately faxed to the bank the September 2, 2021 Conditional Release to seize his unemployment money.**

28. On November 4, 2021, Plaintiff filed an order to show cause to vacate the default judgment in the Second Lawsuit. (See Plaintiff's Order to Show Cause at Ex. "N").

> **RESPONSE: Admit**

29. The November 4, 2021, order to show cause was drafted with the assistance of counsel. (See Amended Complaint at Ex. "A" ¶ 90).

> **RESPONSE: Admit**

30. On March 11, 2022, an order was entered that vacated the judgment on the grounds that service of process was improper. (*See* March 11, 2022, Order at Ex. "O").

> **RESPONSE: Admit that is a true and correct copy of the March 8, 2022 Order and that part of the ruling vacated the default judgment.**

31. 1511 Sheridan LLC is the only defendant to the present action that was a party to the Second Lawsuit. (*See* March 11, 2022, Order at Ex. "O").

**RESPONSE: Admit that 1511 Sheridan LLC was listed as the Plaintiff in the Second Lawsuit.**

32. The March 11, 2022, Order was served with notice of entry on March 17, 2022. (*See* March 11, 2022, Order at Ex. "O").

**RESPONSE: Deny in part and admit in part. The order was March 8, 2022, not March 11, 2022. GMBS received a copy of the order the morning of March 10, 2022 as indicated in its account notes; the notes also summarized the order, including that all monies collected were ordered to be returned within 30 days. Admit there was a Notice of Entry filed by Crespo related to the March 8, 2022 order.**

## PLAINTIFF'S RULE 56.1 STATEMENT[2]

### *Background on GMBS Law Firm and Employees*

33.     Defendant Gutman, Mintz, Baker & Sonnenfeldt, LLP, ("GMBS") is a New York debt collection law firm that engages in business in New York. This suit arose out of said Defendant's business in New York. *See Keshavarz Decl.* **[Exhibit A**, *Crespo* Response to RFA #1].

34.     Eric Keilbach is, and was at all relevant times, a senior partner of GMBS. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Deposition Transcript 14:02-06].

35.     As a senior partner, he has the ability to hire and fire employees in the collections department, but only with sign-off of the managing partner Howard Menetsky. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 14:23-15:05].

36.     On April 21, 2023, this Court so-ordered an agreed stipulation between the parties that the depositions in *Fadlevich v. JD 34th Street Realty, LLC,* No. 1:19-cv-04227-DG-MMH "may be used in the instant action as if taken in the instant action." Dkt. No. 93; *see Keshavarz Decl.* [**Exhibits C,** *Crespo* February 2, 2023 Deposition Transcript of Gary Thigpen ("Thigpen I")]; [**Exhibits D,** *Crespo* March 22, 2023 Deposition Transcript of Gary Thigpen ("Thigpen II")]; [**Exhibits B,** *Crespo* Deposition Transcript of Eric Keilbach]; [**Exhibits E,** *Crespo* Adalex Deposition Transcript)].

37.     GMBS had "a little less than" 100 employees around the time of the conduct at issue. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 17:25-18:11].

---

2 All Exhibits referenced in Plaintiff's Rule 56.1 Statement or in Response to Defendants' 56.1 Statement are attached to the Declaration of Ahmad Keshavarz dated September 19, 2024.

38.     There are 15 employees in the GMBS judgment collection department. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 26:11-17].

39.     In October of 2021, the attorneys working in the collections department at GMBS included Hotan Rohparvar, Eric Keilbach and some housing court attorneys who occasionally helped with collections. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 27:11-20].

40.     Gary Thigpen is an account representative at GMBS. His primary responsibilities are, "I answer incoming phone calls, I speak with sheriffs, marshals, I issue income executions and restraining notices, speak with banks, I review files and work – I work the judgments." *See Keshavarz Decl.* [**Exhibit C**, *Crespo* Thigpen I Depo. Trans. 13:18-14:04].

41.     Mr. Thigpen's job responsibilities includes following up on stipulations and conditional releases. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 37:02-07].

42.     Thigpen has worked in the collection industry for about 30 years. *See Keshavarz Decl.* [**Exhibit C**, *Crespo* Thigpen I Depo. Trans. 12:15-19].

43.     Thigpen estimates that the number of accounts he collects on per year may be more than a thousand. *See Keshavarz Decl.* [**Exhibit D**, *Crespo* Thigpen II Depo. Trans. 12:15-13:01].

44.     Thigpen receives as many as 50 calls from consumers in a day. *See Keshavarz Decl.* [**Exhibit D**, *Crespo* Thigpen II Depo. Trans. 16:01-13].

45.     Thigpen testified that it is "not unusual" for him to be collecting on judgments for more than $10,000. *See Keshavarz Decl.* [**Exhibit D**, *Crespo* Thigpen II Depo. Trans. 13:23-14:11].

46.     Robert Brust is Mr. Thigpen's supervisor at GMBS and is "in charge of the collection

department." *See Keshavarz Decl.* [**Exhibit C**, *Crespo* Thigpen I Depo. Trans. 20:12-21:04; **Exhibit B**, *Crespo* Keilbach Depo. Trans. 36:19-25; 37:17-21].

47.     GMBS does not have standard training materials for the new employees of the collections department, instead relying on "on-the-job training." *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 35:23-36:05].

48.     GMBS primarily collects on rental arrears that have been reduced to a judgment, and about 80 percent of the GMBS accounts are judgment accounts. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 15:17-16:19].

49.     Rental arrears counts for roughly 99% of the judgments that GMBS collects on. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 40:19-25].

50.     GMBS typically receives 33% of what is collected from the judgments. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 59:07-15].

51.     Judgments higher than $10,000 are not unusual among GMBS's accounts. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 42:09-12].

52.     Most of those judgments are for residential rental arrears. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 41:07-13].

53.     While the judgment creditors are landlords, the accounts are usually referred to GMBS for collection by property management companies, as opposed to the LLCs that owns the property. *See Keshavarz Decl.* [**Exhibit I,** GMBS Cover Sheet for New Cases]; [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 41:23-42:08].

54.     For all practical purposes, the landlords engage with GMBS through the property

management companies. *See Keshavarz Decl.* [**Exhibit I,** GMBS Cover Sheet for New Cases]; [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 41:23-42:08].

55.    GMBS had not received any new cases from the management company in this case—Hilltop—in a long time. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 44:09-15].

56.    When making subpoenas to banks, GMBS provides a list of names and social security numbers to the bank to determine if a consumer has an account there. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 45:03-07].

57.    GMBS sends EIPA Exemption Claim forms directly to the banks as opposed to the consumers. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 46:03-08]

### *Gutman Practice of Using Conditional Releases to Obtain Exempt Funds*

58.    If a consumer enters a conditional release, GMBS believes that it is legal entitled to those monies even if the funds are exempt from restraint. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 50:04-11].

59.    According to Mr. Keilbach, the benefit to GMBS of using a conditional release as opposed to a restraint is that GMBS could procure exempt income. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 176:9-18.

60.    Most of the conditional releases that GMBS sends to consumers are entered into. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 51:14-19].

61.    When a consumer has entered into a conditional release for a bank restraint, the GMBS employee who handled the conditional release is supposed to follow up to make sure that the bank, in fact, releases the account. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo.

Trans. 56:08-16].

62.     At GMBS, the employees who handle the conditional release would either be debt collectors or paralegals. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 56:24-57:02].

63.     When a consumer tells GMBS that their bank funds are exempt, the collector is supposed to ask the consumer for proof of the exemption, such as bank statements. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 57:03-09].

64.     However, when a consumer states that they are "on unemployment," GMBS would not necessarily ask whether there were exempt funds in the consumer's account. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 176:19-177:6].

65.     When a consumer states that they are "on unemployment," GMBS would not necessarily ask them for bank statements either, because, in their view, being on UI does not necessarily mean they don't have a lot of other non-exempt money in the account. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 57:10-21]

66.     Consumers regularly provide GMBS with bank statements to prove that their funds are exempt. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 57:22-58:02].

67.     When GMBS receives money that it has collected, they distribute to the client monthly whatever they received that is the client's share from the previous month. *See Keshavarz Decl.* [**Exhibits B,** *Crespo* Keilbach Depo. Trans. 59:16-25].

### *GMBS' First Lawsuit Against Mr. Crespo*

68.     On October 2, 2002, the Landlord, by and through its attorneys GMBS, initiated an action for rental arrears and possession of Mr. Crespo's residence, captioned *1511 Sheridan LLC v. Jose Crespo*, LT-83929-02/BX in the Civil Court of the City of New York, County of Bronx. *See*

*Keshavarz Decl.* [**Exhibit K,** Landlord-Tenant Suit "LT Suit", Index No. 83929-02].

69.     Landlord 1511 Sheridan LLC sought $4,279.97 in arrears and fees, including rent from February 2002 through October 2002. *See Keshavarz Decl.* [**Exhibit K,** (LT Suit, Index No. 83929-02)].

70.     Mr. Crespo had meritorious defenses to the lawsuit, including that he withheld rent from Plaintiff because Plaintiff failed to make critical repairs to his apartment as ordered by the court in a 2002 lawsuit filed by the landlord.  *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of Order to Show Cause "OSC" ¶ 3b, Nov. 4, 2021)].

71.     Mr. Crespo had been withholding his rent from the Landlord due to deplorable conditions in the apartment. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 44(a) & (c), Nov. 4, 2021].

72.     Around June 2002, there was a big leak two floors above him leading down into his kitchen and living room. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 7, Nov. 4, 2021)].

73.     The leak was so bad that he would fill buckets full of water from it. [**Exhibit M,** (Crespo Declaration ¶ 2].

74.     The leak caused the ceiling over his kitchen to fall apart, and the remaining hole allowed for cockroaches, dust, and sand to fall constantly over his sink, stove, and refrigerator. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 3]; [**Exhibit N,** *Crespo* Jose Crespo Deposition Transcript 415:12-18].

75.     Mr. Crespo has asthma, so he was worried about inhaling the dust and sand. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 1, Nov. 4, 2021)]; [**Exhibit M,** Crespo Declaration ¶ 4].

76.     He told the manager of the building about the leak, as did the tenant who lived above him, but nothing was done. *See Keshavarz Decl..* [**Exhibit L**, Affidavit in Support of OSC ¶ 1, Nov. 4, 2021]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 30:02-09].

77.     On October 10, 2002, Mr. Crespo filed an Answer in the LT Lawsuit. *See Keshavarz Decl.* [**Exhibit O,** LT Answer In Person & Notice of Appearance, Oct. 10, 2002].

78.     Mr. Crespo denied 1511 Sheridan's claims and alleged that there were conditions in the apartment which needed to be repaired and/or services which they had not provided. *See Keshavarz Decl.* [**Exhibit O,** (LT Answer In Person & Notice of Appearance, Oct. 10, 2002)].

79.     On October 21, 2002, Mr. Crespo and the Landlord entered a stipulation for Mr. Crespo to pay the arrears and for the Landlord to make repairs. *See Keshavarz Decl.* [**Exhibit P,** First Stipulation Agreement, Oct. 21, 2002].

80.     A judgment was also entered against Mr. Crespo on October 21, 2002 for $3,996.97. *See Keshavarz Decl.* [**Exhibit Q,** Decision and Judgment of Possession, October 21, 2002].

81.     On December 12, 2002, the Landlord's attorney, Gutman, Mintz, Baker & Sonnenfeldt ("GMBS"), filed an affirmation alleging that Mr. Crespo had failed to make payments per the stipulation entered into on October 21, 2002. *See Keshavarz Decl.* [**Exhibit R,** Affirmation for Warrant, December 12, 2002)].

82.     On January 7, 2003, a warrant was issued for possession of the apartment. *See Keshavarz Decl.* [**Exhibit S,** Warrant for Nonpayment, January 7, 2003].

83.     On February 5, 2003, Mr. Crespo appeared in court and explained why he was withholding his rent. Accordingly, the parties entered into a stipulation of settlement that required (1) Mr. Crespo to pay the amount he had withheld over 18 months and (2) the Landlord to make repairs starting on either February 26, 27, or 28, 2003, and to substantially complete

them within 30 days of first accessing the apartment. *See Keshavarz Decl*. [**Exhibit T,** Second Stipulation Agreement, February 5, 2003].

84.    Mr. Crespo made his required payment on February 10, 2003, but February 26, 27, and 28, 2003 came and went and the Landlord did not access the apartment, much less make substantial repairs. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 5].

85.    Accordingly, Mr. Crespo stopped making payments on the stipulation that the Landlord had breached. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 6)].

86.    On August 4, 2003, a judgment of possession was entered against Mr. Crespo, along with a money judgment of $2,574.98. *See Keshavarz Decl.* [**Exhibit U,** Decision and Judgment of Possession, August 4, 2003].

87.    The August 4 judgment included a stipulation which settled all the alleged debt up until that date. *See Keshavarz Decl.* [**Exhibit V,** Third Stipulation, August 4, 2003].

88.    The stipulation stated that the Landlord would waive $1,000 of the outstanding arrears, thus leaving a judgment of $2,574.98. *See Keshavarz Decl.* [**Exhibit V,** Third Stipulation, August 4, 2003].

89.    Mr. Crespo vacated the apartment accordingly. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 44(e), Nov. 4, 2021].

### *GMBS' Second Lawsuit Against Mr. Crespo*

90.    Unbeknownst to Mr. Crespo, the Landlord retained Defendant GMBS to file another lawsuit on January 21, 2005, captioned *1511 Sheridan LLC v. Jose Crespo*, Index No. CV-002890-05/BX in the Civil Court of the City of New York, County of Bronx.  *See Keshavarz Decl*. [**Exhibit W**, Collection Lawsuit, Index No. CV-002890-05/BX)]; [**Exhibit M,** Crespo Declaration ¶ 7].

91.     The Collection Lawsuit sought a money judgment of $4,078.98 for rental arrears from months prior to August 2003, February 2003 through October 2003. *See Keshavarz Decl.* [**Exhibit W,** Collection Lawsuit, Index No. CV-002890-05/BX].

92.     The $4,078.98 alleged in the Collection Lawsuit represents an inflated amount of money that was not owed by Mr. Crespo.

93.     The Collection Lawsuit was suing for several months of rent that had already been settled by the August 4, 2003 judgment from the LT Lawsuit. *See Keshavarz Decl.* [**Exhibit W,** Collection Lawsuit, Index No. CV-002890-05/BX]; *See Keshavarz Decl.* [**Exhibit V,** Third Stipulation, August 4, 2003].

94.     The court entered a default judgment against him on April 7, 2005 for $4,833.91, which included the alleged arrears as well as interest and fees. *See Keshavarz Decl.* [**Exhibit Y,** Default Judgment, April 7, 2005];

95.     GMBS collected twice on some of the same debts by obtaining a judgment on rental arrears that had already been settled in the LT Lawsuit and seeking an amount higher than what was agreed to be owed in the LT Lawsuit. *See Keshavarz Decl.* [**Exhibit W,** Collection Lawsuit, Index No. CV-002890-05/BX]; *See Keshavarz Decl.* [**Exhibit V,** Third Stipulation, August 4, 2003].

96.     In the Collection Lawsuit, Mr. Crespo was never served with the Summons and Complaint. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 3(a), Nov. 4, 2021].

97.     The Affidavit of Service claims that Mr. Crespo was served on January 11, 2005 at 1229 Franklin Ave., Apt. BB, Bronx, NY 10456. *See Keshavarz Decl.* [**Exhibit Z,** Affidavit of Service, Index No. CV-002890-05/BX].

98.     The Affidavit of Service is false: Mr. Crespo never lived at this address; rather, it was the

address of someone Mr. Crespo worked with doing window repair work for various landlords, including the Landlord. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 25, Nov. 4, 2021]**.**

99.    Mr. Crespo had moved to 523 Fifth Ave., Apt. 284, Pelham, NY 10803 after leaving the Sheridan Avenue apartment in 2003; in around January 2005 moved from the 523 Fifth Ave. apartment to a new apartment at 2420 Webster Ave., Apt. B3, Bronx, NY 10457; and then on September 1, 2006, moved from the 2420 Webster Ave. apartment to 6 Schley Ave., New Rochelle, NY 10801. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 26, Nov. 4, 2021].

100.    Mr. Crespo was never informed by the actual resident of Apt. BB at the 1229 Franklin Ave. address that any papers were received for him, by mail or otherwise, and he was never given a copy of the Summons and Complaint by this resident. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 27, Nov. 4, 2021].

101.    Notably, the Affidavit of Service claims to have served Mr. Crespo on January 11, 2005, ten days before the Collection Lawsuit was even commenced on January 21, 2005. *See Keshavarz Decl.* [**Exhibit Z,** Affidavit of Service, Index No. CV-002890-05/BX]; [**Exhibit W**, Collection Lawsuit, Index No. CV-002890-05/BX]; [**Exhibit L**, Affidavit in Support of OSC ¶ 3a, Nov. 4, 2021)].

102.    The process server, Ricardo Diaz, was fined $500 and enter into a consent order with the New York City Department of Consumer Affairs (now the New York City Department of Consumer and Worker Protection) in 2013 for violations of the Rules of the City of New York, specifically for failing to attempt to learn the result of traverse hearings scheduled in matters for which he was alleged to have served process despite having received notice of the hearings, and

failing to timely report the result of the hearings or that he attempted to learn the results of the hearings. *See Keshavarz Decl.* [**Exhibit AA,** DCA Consent Order, April 7, 2013].

103.    Because Mr. Crespo had no notice of the lawsuit, he did not answer or appear in court. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 3(b), Nov. 4, 2021].

104.    Mr. Crespo did not know that a judgment had been entered against him, and he never received a copy of the Default Judgment or notice of entry in the mail. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 37, Nov. 4, 2021].

105.    On or around December 11, 2018, the Erie County Sheriff's Office served Mr. Crespo with an Income Execution for $11,515.16 based on the Default Judgment. *See Keshavarz Decl.* [**Exhibit BB,** Erie County Sheriff Income Execution, December 11, 2018].

106.    Around the end of January 2019, the human resources department at Mr. Crespo's job notified him of the Income Execution. This was Mr. Crespo's first notice that there was a default judgment against him. *See Keshavarz Decl. See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 42, Nov. 4, 2021]; [**Exhibit M,** Crespo Declaration ¶ 8].

107.    At this time, Mr. Crespo was living in Buffalo, New York, attending Buffalo State College full-time and working 20-30 hours a week to support himself. *See Keshavarz Decl..* **Exhibit L,** Affidavit in Support of OSC ¶ 6, Nov. 4, 2021].

108.    Mr. Crespo recognized Plaintiff's name on the income execution. In the early 2000s, he took Plaintiff, his former landlord, to housing court because Plaintiff would not repair his ceiling, big chunks of which had fallen off because of a leak in the apartment above. *See Keshavarz Decl.* **Exhibit L**, Affidavit in Support of OSC ¶ 7, Nov. 4, 2021].

109.    As he recalls, a housing court judge ordered Plaintiff to make the necessary repairs, but Plaintiff repeatedly failed to show up to his apartment on the dates scheduled by the judge over

the course of multiple court appearances. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 7, Nov. 4, 2021].

110.    Because of Plaintiff's repeated no-shows and failure to make repairs, Mr. Crespo began withholding his rent from Plaintiff and was finally forced by the apartment's condition to leave the apartment. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 7, Nov. 4, 2021].

111.    After Mr. Crespo received the income execution, he called the housing court clerk's office to ask if there was a judgment against him. The clerk said no, but said there was a non-housing Civil Court judgment against him. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 8, Nov. 4, 2021].

112.    The clerk told him how to request that court file, and his sister, who was living in New York City, went and obtained copies. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 8, Nov. 4, 2021].

113.    When he saw the court file, he realized that Plaintiff must have sued him for the rent he had withheld because of Plaintiff's failure to make the court-ordered repairs to his old apartment. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 8, Nov. 4, 2021].

114.    Mr. Crespo had already missed a few weeks of school when he had to have quadruple bypass surgery. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 9, Nov. 4, 2021].

115.    He could not afford to take more time off from school or from his part-time job in Buffalo to travel to New York City in order to challenge the default judgment and garnishment. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 9, Nov. 4, 2021].

116.    Nor could Mr. Crespo afford to hire an attorney to represent him. *See Keshavarz Decl.* **Exhibit L,** Affidavit in Support of OSC ¶ 9, Nov. 4, 2021].

117.    From January 21, 2019 to November 10, 2019, a total of $1,458.30 was garnished from Mr. Crespo's wages. *See Keshavarz Decl*. [**Exhibit L,** Affidavit in Support of OSC ¶ 49, Nov. 4, 2021].

### *Mr. Crespo's emotional distress during time of bank restraint*

118.    Around November 2019, Mr. Crespo lost his job in Buffalo. For a few months, he tried unsuccessfully to find another job in Buffalo. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 10, Nov. 4, 2021]; [**Exhibit M,** Crespo Declaration ¶ 19].

119.    Because his mother's apartment was overcrowded, he had to rely on friends as well, sleeping on their couches. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 20].

120.    Even though he was homeless, Mr. Crespo had managed to stay on top of his bills until Defendants restrained his bank account. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 26].

121.    During the time GMBS restrained his bank account, Mr. Crespo felt worried and overwhelmed about not being able to pay his bills. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 22)].

122.    Without access to his unemployment benefits he could no longer afford to pay for the haircut and shave he would need to get before a job interview, or for public transportation to get to any job interviews. *See Keshavarz Decl*. [**Exhibit L,** Affidavit in Support of OSC ¶ 41, Nov. 4, 2021].

123.    The stress gave him chest pains, shortness of breath, sharp pains on his sides and arms, dizziness, and anxiety, which was very troubling given his history of heart problems as well as his diabetes and asthma. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 23].

124.    His ECG and stress test yielded normal results, so his doctor believed that his symptoms

were caused by stress rather than his heart. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 24)].

### Events Leading Up to The Present Action

125.    Around the beginning of March 2020, he moved back to his hometown of New York City because his unemployment benefits application had not yet been approved and he could no longer afford his rent. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 10, Nov. 4, 2021].

126.    At first, he stayed with his sister, but in June 2020 she lost her apartment and had to move into their mother's one-bedroom apartment, where two other relatives also reside. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 10, Nov. 4, 2021].

127.    In March 2021, he had to cash out his 401(k). *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 10, Nov. 4, 2021].

128.    The loss of his job and housing, his multiple health issues, his financial hardship, and the COVID-19 pandemic prevented Mr. Crespo from challenging the Default Judgment even after he had returned to New York City. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 11, Nov. 4, 2021].

129.    On February 13, 2020, GMBS learned that Mr. Crespo had lost his employment, and that the income execution was being terminated. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 86:13-22]; [**Exhibit J,** Account Notes, entry 4040 at GM-00723].

130.    GMBS was not aware of any other employment obtained by Mr. Crespo after February 13, 2020. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 86:22-25].

### GMBS's Restraints of Mr. Crespo's Account

131.    On or around August 26, 2021, Defendants used the Default Judgment to restrain his

M&T Bank account. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry #4420 at GM-00727].

132.    Mr. Crespo found out about the bank restraint on or around August 30, 2021. *See Keshavarz Decl.* [**Exhibit**, Affidavit in Support of OSC ¶ 12, Nov. 4, 2021].

133.    All of the funds in Mr. Crespo's bank account were exempt from restraint. *See Keshavarz Decl.* [**Exhibit CC,** Email from NEP to GMBS with Bank Statements].

134.    At least the first $3,000 of the $5,191.99 in Mr. Crespo's bank account should have been exempt. The Exempt Income Protection Act mandates that the first $3,000 of any account into which statutorily exempt payments are made electronically or by direct deposit are exempt from execution, C.P.L.R. §§ 5205(l), 5222(h), and that the first $3,600 of any other individual account are exempt from execution, C.P.L.R. § 5222(i).

135.    All of the $5,191.99 was from unemployment insurance payments made by direct deposit to Mr. Crespo's bank account. *See Keshavarz Decl.* [**Exhibit CC,** Email from NEP to GMBS with Bank Statements].

136.    He urgently needed this money released so he could pay his bills, which he did through autopay, including for his phone, storage unit, student loans, personal loans (which he had taken out to help cover his college tuition), and credit cards. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 12, Nov. 4, 2021)].

137.    When Mr. Crespo learned about the restraint, he became very anxious because he had bills for his phone, storage unit, student loans, personal loans, and credit cards set up to debit automatically from his restrained bank account, and he was scared about missing payments on these bills due to the restraint. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 12 & 21, Nov. 4, 2021].

138.    On or around September 2, 2021, Mr. Crespo called his bank, which provided him with the contact information for GMBS, and told Crespo to call them. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 13, Nov. 4, 2021]; [**Exhibit J,** Account Notes, entry #4430 at GM-00727].

### *Contact with GMBS Collector Gary Thigpen & Conditional Release*

139.    On September 2, 2021 Mr. Crespo called GMBS and spoke to Defendant Gary Thigpen. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 14, Nov. 4, 2021]; [**Exhibit J,** Account Notes, entry #4430-4440 at GM-00727].

140.    Mr. Crespo told Mr. Thigpen that all the money in Mr. Crespo's bank account was COVID-19 stimulus funds and unemployment benefits. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 14, Nov. 4, 2021)]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 178:11-17; 180:13-20].

141.    Mr. Thigpen told Mr. Crespo that GMBS would call M&T Bank to find out how much money was in the account, see how much they would be willing to take to release the account, and then call him back. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 14, Nov. 4, 2021)]; [**Exhibit J,** Account Notes, entry #4430-4440 at GM-00727].

142.    M&T told Mr. Thigpen that there was $1400 after the exemption, which was the standard exemption. *See Keshavarz Decl.* [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 62:21-63:01]; *see also* [**Exhibit J,** Account Notes, entry #4450 at GM-00727].

143.    Mr. Thigpen called Mr. Crespo back and told him that they would release his account in exchange for a payment of $1,200 from his account. *See Keshavarz Decl.* [**Exhibit** L, Affidavit in Support of OSC ¶ 15, Nov. 4, 2021)]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 180: 25-181:08; 391:06-15)].

"He said that he would take $1,200, and that he -- that they would take an initial payment of $1,200; that he would set up monthly payments for me to continue paying, and that they would release the account as soon as I signed and returned the paper notarized, which I did on the same day." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 180: 25-181:08].

"But when he first said this, I says, 'You know, this is unemployment money. I don't think, you know, that you're allowed to do this.' And he didn't care. He didn't go into this explaining, like, 'Oh, wow, I didn't know.' No. He was, like, 'Well, the only way you're going to get your money released is if you sign this-- this agreement.'  And he hung up, called me back, and said, 'Oh, we'll take $1,200.'" [**Exhibit N,** *Crespo* Crespo Depo. Trans. 391:06-15].

144.    Mr. Crespo had read online that COVID-19 stimulus funds and unemployment benefits were exempt from debt collection, and so he again told Mr. Thigpen that the money in his account was COVID-19 stimulus funds and unemployment benefits and therefore exempt. *See Keshavarz Decl.* [**Exhibit** L, Affidavit in Support of OSC ¶ 15, Nov. 4, 2021].

145.    Mr. Crespo again told Mr. Thigpen that the money in the account was unemployment money and that they had no right to garnish it to relieve the debt. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 180: 13-20; 391:06-15].

"I explained to him, again, that it was unemployment money and stimulus money. And I told him that I verified it online that they had no right to take that money to relieve the debt. Any -- any debt collection was a no-go with the stimulus and the unemployment money. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 180: 13-20)]."

146.    Mr. Thigpen acknowledges that Mr. Crespo told him that he was "on unemployment" insurance. *See Keshavarz Decl.* [**Exhibit D,** *Crespo Thigpen* Depo. II Trans. 89:07-19].

147.    The New York Department of Labor pays unemployment benefits through direct deposit into the bank account of the recipient. *See Keshavarz Decl.* [**Exhibit DD,** NYS Department of Labor Website].

148.    Upon reviewing Mr. Crespo's bank statements, which showed deposits labeled "NYS

DOL UI," Mr. Thigpen stated in his deposition that it looks like there were no nonexempt funds in the statements. *See Keshavarz Decl.* [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 87:14-88:09].

149.    During their September 2 conversation, Mr. Thigpen told Mr. Crespo that they could get him on a payment plan so that in the future, as the unemployment gets deposited, his accounted wouldn't be frozen again. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 391:25 – 392:08].

> "…Cause his -- his idea was 'Let me get you on a payment plan so in the future, as your unemployment money gets deposited, your account won't get frozen again…' which would have been the outcome; right? If they took the 1,200. At -- at some point, it would've gotten back to the amount where they could freeze it again." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 391:25 – 392:08)].

150.    Mr. Crespo felt that Mr. Thigpen came off as a predator. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 393:14-15; 396:21-25].

> "He came across as a predator, 'cause that's what he is." [**Exhibit N** *Crespo* Crespo Depo. Trans. 393:14-15)].

> "But, you know, frustration on top of frustration, you know what I'm saying? There -- there-- he's a predator. He's a liar, you know what I'm saying?" [**Exhibit N,** *Crespo* Crespo Depo. Trans. 396:21-25].

151.    Mr. Thigpen stated that if a consumer tells him they're unemployed, he will send them a conditional release. *See Keshavarz Decl.* [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 29:02-07].

152.    During the September 2, 2021 call, Mr. Crespo informed Mr. Thigpen that he would not settle and that he planned to fight the judgment in court. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry #4470-4480]; [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 63:06-24]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 183:12-21].

> "And I told him, 'No;' that he wasn't going to do any of that, 'cause, again, the money was

not to be used to collect debts. And then I explained to him that I was going to go fight this 'cause he wasn't entitled to my money." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 183:15-21].

153.    Even after Mr. Crespo informed GMBS that his account contained exempt funds, GMBS planned to execute on the judgment ("EOJ") in the near future. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry #4490-4500 at GM00727].

154.    Mr. Thigpen was very forceful over the phone, and Mr. Crespo felt like he was being hammered. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 238:05-10; 239:20-240:03].

> "The feeling hammered was 'cause he -- he didn't want to listen to the fact that I kept telling him that it was unemployment money and stimulus money. All he cared about was me signing the paper, sending it back to him so that I could -- so he could release my money, which he didn't do." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 239:20-240:03].

155.    Mr. Crespo felt that the GMBS Defendants were so confrontational toward him because he knew what his rights were and had told them that his funds were exempt. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 28].

156.    On September 2, 2021, Mr. Thigpen sent Mr. Crespo a Conditional Release whereby Mr. Crespo would agree to pay GMBS $1,200 from his account in exchange for the release of his account. *See Keshavarz Decl.* [**Exhibit EE,** Thigpen Email with Conditional Release]; [**Exhibit J,** Account Notes, entry #4510 at GM -00727)]; [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 64:01-04].

157.    The Conditional Release was signed by Eric Keilbach. *See Keshavarz Decl.* [**Exhibit EE,** Thigpen Email with Conditional Release].

158.    The Conditional Release form signed by Mr. Crespo is the standard form that GMBS uses for conditional releases sent to banks. *See Keshavarz Decl* [**Exhibit B,** *Crespo* Keilbach

Depo. Trans. 126:10-13].

159.    The Conditional Release form generated by GMBS would automatically contain Mr.

Keilbach's e-signature. *See Keshavarz Decl* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 126:14-

17].

160.    Mr. Crespo signed the agreement and returned it to GMBS the same day, September 2,

2021. *See Keshavarz Decl*. [**Exhibit L,** Affidavit in Support of OSC ¶ 17, Nov. 4, 2021)];

[**Exhibit FF,** Conditional Release Signed by Crespo].

161.    Mr. Crespo signed the Conditional Release because Mr. Thigpen was strong-arming him

and told him that the only way he would get access to his money was by signing the agreement.

*See Keshavarz Decl.* [**Exhibit N,** Crespo Depo. Trans. 238:05-10; 394:22-395:08].

> "Well, he was very forceful in that he wanted me to sign that paper; that was the
> only way I was going to get access to my money." [**Exhibit N,** *Crespo* Depo.
> Trans. 238:05-10].
>
> "'Cause at that point, we're not, really, having a cordial conversation; right? I'm
> somewhat animated 'cause I have no money and he knows he has the upper hand
> 'cause he's the one that has my money frozen. So it's not like we're on an even
> playing field." [**Exhibit N,** *Crespo* Depo. Trans. 390:21-391:02].
>
> "I felt that calling him would be adverse to my health, to my peace of mind, to the
> trip that I was going to go take. And this gentleman, who I don't know, who's
> supposedly supposed to be representing some firm that I owe money to,
> misrepresented himself. From the beginning of the conversation he said...'The
> only way you're going to get access to your money is by signing the agreement,
> getting it notarized, returning it, and I will unfreeze your account.' It never
> happened. It never happened. So why would I call him again? To get lied to
> further? To get more frustrated?" [**Exhibit N,** Crespo Depo. Trans. 394:22-
> 395:08].

162.    In addition, Mr. Crespo signed the conditional release because he felt anxious about not

having access to his account for his upcoming trip. *See Keshavarz Decl.* [**Exhibit N,** Crespo

Depo. Trans. 170:14-24].

163.    On September 2, 2021, Mr. Crespo's other checking account at Citizens Bank had a balance of $53.22. *See Keshavarz Decl.* [**Exhibit GG,** Citizens Bank Statement, Sept. 15, 2021].

164.    Mr. Thigpen told Mr. Crespo that he would unfreeze the bank account that day or the next. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 174:09-22].

> "…Cause he said, 'Sign this and I'll release it today…At the latest, the next day. At the latest, the next day.' He said, 'It all depends on how fast you get this back to me.'" [**Exhibit N,** *Crespo* Crespo Depo. Trans. 396:24-397:08].

165.    On September 3, 2021, GMBS received a response to their information subpoena from M&T Bank. *See Keshavarz Decl.* [**Exhibit QQQ,** M&T Answers to Information Subpoena].

166.    The responses state that the balance in Mr. Crespo's M&T account at the time was $5,081.99. *See Keshavarz Decl.* [**Exhibit QQQ,** M&T Answers to Information Subpoena].

167.    The responses state that the last two direct deposits into his account were from NYS Department of Labor Unemployment Direct Deposit Insurance. *See Keshavarz Decl.* [**Exhibit QQQ,** M&T Answers to Information Subpoena].

Notably the meaning of the abbreviation ("NYS DOL UI DD UI DD") on the bank statements were clear to GMBS on October 28. 202. *See Keshavarz Decl.* [**Exhibit CC**, October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents]; [**Exhibit KK** Chiantella October 28 Email at 10:22 am]. They understood this abbreviation to mean deposits made by NYS Department of Labor Unemployment Insurance Direct Deposit for $300.00 as shown here:

| 03/09/2021 | NYS DOL UI DD UI DD | | $300.00 |

This is the exact same abbreviation noted by M&T Bank in their Information Subpoena Response to question no. four, which GMBS received on September 4, 2021 ("NYS DOL UI DD UI DD $300.00") as shown below. These were the last two direct deposits into the account, all that the bank could fill into the one-inch space GMBS allowed for a response.

Q. No. 4  Does debtor have automatic credits (paychecks, social security, etc.) deposited to any accounts.  If yes from where (including name and address)

Nys Dol WI DD UI DD $188.ºº
Nys Dol WI DD UI DD $ 300.ºº

Q. No. 5  What is debtor's home address and home telephone number?

168.    On or around September 4. 2021, Mr. Crespo had still not regained access to his account prior to his trip, so he had to loan $1,000 from Anthony Cartagena, a friend who was accompanying him on the trip. *See Keshavarz Decl.* [**Exhibit N,** Crespo Depo. Trans. 170:14-24].

> "The only reason he loaned me the money is 'cause he was going on the trip, and if I didn't have access to my money, I would have had to cancel my trip. So it wasn't that I went borrowing the money, you know what I'm saying? It was something that he offered to do so that I could still take my trip and not have the anxiety that I was going through while I was there." [**Exhibit N**, Crespo Depo. Trans. 170:14-24].

169.    Mr. Crespo had booked the trip months prior, in June of 2021. It was a trip with friends and was intended to celebrate his graduation. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 165:14-166:17].

170.    He spent roughly $460-480 on airfare and $1,100 for a two-week stay at an all-inclusive resort. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 166:7-12; 169:15-18].

171.    Mr. Crespo paid Mr. Cartagena the $1000 back in early December 2021, after his M&T Bank account was unfrozen. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 171:4-11].

172.    GMBS attempted to send the conditional release to M&T bank on September 2, 2021. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry #4520-4540 at GM-00728].

173.    However, there is no fax confirmation sheet in the records produced by GMBS for the fax on September 2, 2021 while fax confirmation sheets were produced when GMBS faxed the Conditional Release to M&T Bank on October 28, 2021, as well as for other fax sent by GMBS in this case, such as to the Sheriff.

174.    GMBS collector Brian Chiantella sent an email on October 28, 2021 to Gloria Coker, who works at GMBS, stating that the fax number on for M&T Bank on the September 2, 2021 Conditional Release was the wrong number for M&T bank and, he believed, that is why it was not previously processed. *See Keshavarz Decl.* [**Exhibit HH,** Chiantella Email Oct. 28 at 10:39 am].

### Mr. Crespo's Account Remains Restrained for Months

175.    For nearly two more months, GMBS did not take the $1,200 from Mr. Crespo's bank account or release his account. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 18, Nov. 4, 2021)]; [**Exhibit II,** Order Vacating Judgment, March 8, 2022)].

176.    Between September 2, 2021 and the end of September, Mr. Crespo attempted to transfer

funds from another bank account (ending in 0717) to his restrained M&T account (4700)

multiple times to see if he could access those funds. However, all of the transfers were rejected.

*See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 137:11-25; 138:03-08].

> "'Cause I tried -- 'Cause I tried at the beginning of September; I tried at the
> beginning of October; I tried at the beginning of November; and I'm guessing that
> I also tried it in between those, you know, September 1st and October 1st."
> [**Exhibit N,** *Crespo* Crespo Depo. Trans. 138:03-08].

177.    Mr. Crespo attempted to make these transfers in order to see if his account had been

released, as Mr. Thigpen had told him. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo.

Trans. 137:15-20].

178.    Mr. Crespo called his bank several times and confirmed each time that his bank had still

not received the Conditional Release from GMBS. *See Keshavarz Decl. See Keshavarz Decl.*

[**Exhibit L,** Affidavit in Support of OSC ¶ 18, Nov. 4, 2021].

179.    Mr. Crespo offered to send the Conditional Release to the bank himself, but his bank told

him that it needed to receive the Conditional Release directly from GMBS. *See Keshavarz Decl.*

*See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 18, Nov. 4, 2021].

180.    He had already spoken to GMBS several times, which was very stressful for him because

they were very aggressive. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 18,

Nov. 4, 2021)]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 394:15-395:03].

181.    He did not want to go through that again, so he did not call them again to ask about the

agreement. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 18, Nov. 4, 2021];

[**Exhibit N,** *Crespo* Crespo Depo. Trans. 395:04-12].

182.    On or around September 12, 2021, the bank sent documents to Mr. Crespo's mom's

apartment, including an Exemption Claim Form and a letter stating that he could withdraw up to $3,600 from his bank account. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 19, Nov. 4, 2021].

183.    Mr. Crespo did not see these documents until September 19, 2021, when he returned from the Dominican Republic. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 191:5-21].

184.    Mr. Crespo called his bank to ask about these documents, and he was told that filling out the Exemption Claim Form would "not make any difference" and that he could withdraw $3,600 but would then forfeit the remaining amount of money in his account. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 19, Nov. 4, 2021].

185.    Mr. Crespo did not want to forfeit the remaining amount of money in his bank account. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 20, Nov. 4, 2021)]; [**Exhibit N,** *Crespo* Crespo Depo. Trans. 192:02-15].

186.    He also did not want to withdraw the $3,600 because he was homeless and did not want to keep that much cash on his person. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 20, Nov. 4, 2021].

187.    He therefore decided that he had better not withdraw the $3,600 from his bank account. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 20, Nov. 4, 2021].

188.    Two weeks after Mr. Crespo had signed the conditional release, he realized his bank account was still restrained when he tried to use his debit card to get home from the airport. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 395:21-396:06].

> "As soon as I got back. As soon as I landed at JFK 'cause I went to see if I had to take out money -- not take out money but use the money that I had on me to get home or was I able to use my – my debit card." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 395:21-396:06].

189.    On September 12, 2021, M&T Bank sent a letter and exemption claim form to Mr. Crespo's mother's apartment. He did not see this letter and form until September 19, 2021 when he returned from the Dominican Republic. [**Exhibit N,** *Crespo* Crespo Depo. Trans. 191:5-21)].

190.    Another restraint was sent on Mr. Crespo's bank account on September 27, 2021. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry #4550 at GM-00728)].

191.    According to Mr. Thigpen, the second restraint was sent because, although a conditional release had been signed, the case had still not been paid. *See Keshavarz Decl.* [**Exhibit J,** (Account Notes, entry #4550 at GM-00728)]; [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 70:24-71:12].

192.    Mr. Thigpen also stated that restraints were sent on August 26, 2021 and September 27, 2021 because Mr. Crespo had more than one bank. *See Keshavarz Decl.* [**Exhibit D,** *Crespo* Thigpen Depo. II Trans. 72:01-06].

### *Impact of Bank Restraint on Mr. Crespo*

193.    Mr. Crespo did not have access to his M&T Bank account from September 1, 2021 through the end of November 2021. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 139:08-140:02].

> "Not only could I not access it or transfer it, but I couldn't pay any bills with it either…all -- all my bills…Phone bill, credit card bills, storage. I couldn't access money to go get food. I couldn't access money to g oget a haircut or shave if I had an interview. You know, those kind of things." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 139:14-140:02].

194.    Having his bank restrained for months despite having signed the conditional release was stressful, frustrating and made him feel helpless. *See Keshavarz Decl.* [**Exhibit N,** *Crespo* Crespo Depo. Trans. 396:21-397:02; 397:21-398:24].

> "…it's, like, if you're going through another heart attack. I mean, you don't feel the elephant sitting on you, but you feel the tingling on the – between the

shoulder and your elbow on the back side of your arm, on the side – on the side of your – of the ribs, the shortness of breath, the – the anxiety; it feels like your shirt is choking you." [**Exhibit N,** *Crespo* Crespo Depo. Trans. 407:10-18].

"I mean, I want to say helpless, you know what I'm saying? 'Cause here -- here you have some money that the government is giving you, right, 'cause of you having worked and lost your job. Having been through what the entire country is going through, and then having someone who knows better; right? 'Cause he should know better no matter what. That is what his job is; right? And it says clearly, none of this money, whether unemployment, stimulus is not to cover debt, 'cause it was something that was -- that came out at the same time; right? So when the pandemic hit – I don't know if it was Senator Warren or something who made this a priority so that this would not happen; so that, you know, predators like this guy or like these people wouldn't come out and -- and do what they did. 'Cause imagine, they did that to me with all these safeguards. Imagine what they've been doing to people all these years…" [**Exhibit N,** *Crespo* Crespo Depo. Trans. 396:21-397:02; 397:21-398:24].

195.    Because of the restraint on his account, Mr. Crespo was unable to pay his bills for his phone, storage unit, credit cards, and personal loans, incurring multiple late fees. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 21, Nov. 4, 2021); [**Exhibit N,** *Crespo* Crespo Depo. Trans. 139:17-140: 05].

196.    He had also been applying for jobs, but he could no longer afford to pay for the haircut and shave he would need to get before a job interview; nor could he have afforded public transportation to get to any job interviews. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 21, Nov. 4, 2021].

197.    His mother helps him out with meals when she can, but she also has serious health issues, does not earn much money, and is the primary caretaker for several family members. *See Keshavarz Decl.* [**Exhibit L**, Affidavit in Support of OSC ¶ 21, Nov. 4, 2021].

**198.**    With his bank account still restrained and his bills piling up, Mr. Crespo went to the clerk's office at the Civil Court of the City of New York, County of Bronx, to see if there was

anything else he could do, and was given a list of free legal services he could reach out to. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC ¶ 22, Nov. 4, 2021].

### *Communication Between GMBS and New Economy Project*

199.    Mr. Crespo got into contact with the nonprofit organization New Economy Project ("NEP") through their NYC Financial Justice Hotline, which provided him with free limited-scope legal assistance to try to help him get his exempt funds released and vacate the sewer service judgment against him.  *See Keshavarz Decl.* [**Exhibit** L, Affidavit in Support of OSC ¶ 23, Nov. 4, 2021].

200.    Attorney Susan Shin from NEP agreed to provide Mr. Crespo with limited legal assistance in order to facilitate the release of his bank account.  *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents)].

201.    NEP never filed a notice of appearance in this case. *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 Email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents].

202.    On October 27, 2021 at 9:34pm, Ms. Shin, on behalf of Mr. Crespo, emailed Keilbach to seek the release of the exempt funds. *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents].

203.    Ms. Shin made clear to GMBS that she was providing only "limited legal assistance" in relation to seeking to have GMBS agree to release the money.  *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents].

204.    Indeed, Ms. Shin wrote "Mr. Crespo is cc'ed on this email and … you may also respond only to Mr. Crespo if you prefer *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents].

205.    In the October 27 email Ms. Shin attached emailed GMBS, attaching an extensive breakdown, along with supporting documentation, showing that all the money in the bank account at the time of GMBS's restraint was exempt unemployment benefits (by this time Mr. Crespo's COVID-19 stimulus funds had been spent down) and demanding that the account be released immediately. *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements, proof of retirement funds transfer, and analysis of documents)].

206.    In the October 27 email Ms. Shin also documented that the account also included exempt retirement funds, expressly that, "Also attached is a copy of documentation showing that the March 4, 2021 transfer of $1007.42 into Mr. Crespo's MyWay account was from his 401(k) account; these 401(k) funds are exempt under CPLR 5205(c)(2)." *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements)].

207.    The supporting documentation included bank statements from January 5, 2021 to September 3, 2021 for Mr. Crespo's restrained account. *See Keshavarz Decl.* [**Exhibit CC,** October 27, 2021 email from Shin to Keilbach with Bank Statements].

208.    On October 28, at 10:15am, Mr. Keilbach forwarded Susan Shin's email to both Michael Roberts and Brian Chiantella, and moments later also to Thigpen, saying, "let me know your thoughts." *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry 4570 at GM-00727)]; [**Exhibit JJ,** Keilbach Emails October 28 at 10:15am)] .

209.    Brian Chiantella is the Collection Department Manager. *See Keshavarz Decl.* [**Exhibit**

40

**KK,** Chiantella October 28 Email at 10:22am]. (signature block identifying Brian Chiantella as the Collection Department Manager).

210.    Michael Roberts is an account representative and paralegal who helps collect judgments at GMBS. *See Keshavarz Decl.* [**Exhibit C,** *Crespo* Thigpen I Depo. Trans. 22:03-04]; [**Exhibit B.** *Crespo* Keilbach Depo. Trans. 34:24-35:02]. .

211.    In response, Mr. Chiantella asked whether Mr. Crespo was receiving unemployment insurance or getting payments from a retirement account. *See Keshavarz Decl.* [**Exhibit KK,** Chiantella October 28 Email at 10:22am].

212.    Within 7 minutes of receiving Ms. Shin's email and attached documents, Mr. Chiantella was able to determine, and stated in a response email to Roberts and Thigpen that "it does look like 90% of the deposits came from unemployment. I don't want to go in front of a judge on this." *See Keshavarz Decl.* [**Exhibit KK** Chiantella October 28 Email at 10:22am].

213.    In response to the 10:15am email, Mr. Roberts responded saying that Mr. Crespo had signed a conditional release on 9/2/21 but that they never got paid.  *See Keshavarz Decl.* [**Exhibit LL,** Roberts Email Oct. 28 at 10:24 am].

214.    Mr. Chiantella responded to Mr. Roberts at 10:28am saying that those deposits were from months ago and that "if he still agrees to sign great, otherwise I don't see us winning this case in front of a judge at the moment." *See Keshavarz Decl.* [**Exhibit MM,** Chiantella Email Oct. 28 at 10:28 am)].

215.    On October 28, at around 10:25 am, Mr. Thigpen called M&T bank because he noticed that GMBS had not received payment, according to his account notes. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry 4570 at GM-00727].

216.    At 10:35 am, Mr. Thigpen forwarded the signed conditional release to Mr. Chiantella and

Mr. Roberts. *See Keshavarz Decl* [**Exhibit NN,** Thigpen Email Oct. 28 at 10:35 am].

217.    At 10:39 am, Mr. Chiantella asked Gloria Coker, who works in the GMBS collection department, to fax the conditional release to M&T Bank because it was not properly sent in September. *See Keshavarz Decl.* [**Exhibit HH**, Chiantella Email Oct. 28 at 10:39 am].

218.    At 10:57 am, Ms. Coker responded to Mr. Chiantella confirming that she had faxed the Conditional Release and scanned it to their hard drive. *See Keshavarz Decl.* [**Exhibit PP,** Coker Email Oct. 28 at 10:58 am].

219.    At 11:00 am, Mr. Chiantella forwarded Ms. Coker's email to Mr. Roberts and Mr. Thigpen and said "CR has been faxed to M&T, see below. "  The email forwarded from Ms. Corker attached the September 2 conditional release with the October 28 fax confirmation sheet for its sending. *See Keshavarz Decl.* [**Exhibit QQ,** Chiantella Email Oct. 28 at 11:00 am]; [**Exhibit J,** Account Notes, entry 4600-4620 at GM-00728)]

220.    At 11:33 am, Mr. Thigpen responded to Mr. Keilbach's 10:15 am email regarding Ms. Shin's email demanding immediate release of Mr. Crespo's bank account. His response said, "doesn't look good but he signed and never mentioned exempt funds." *See Keshavarz Decl.* [**Exhibit RR,** Thigpen Email Oct. 28 at 11:33 am)].

221.    Mr. Keilbach knew that the conditional release was sent again to Mr. Crespo's bank and believed that, legally, they were entitled to the money. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 132:20-25].

222.    Mr. Keilbach believed that, even though Mr. Crespo's funds were later determined to be exempt, because he had signed the conditional release, he had agreed to pay over the exempt funds. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 133:10-16].

223.    Mr. Keilbach stated that because Mr. Crespo did not file an exemption claim form in the

proscribed time and had signed a conditional release, GMBS had a legal right to obtain his exempt unemployment funds. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 133:10-19].

224.    On October 28, 2021 at 11:42am, Eric Keilbach at GMBS responded via email to Susan Shin at the New Economy Project, stating, "I just wanted to make sure you are aware that Mr. Crespo signed a conditional release for $1200 that we are following up with the bank about. He also apparently never filed an exemption claim with the bank." *See Keshavarz Decl.* [**Exhibit SS,** Keilbach Email Oct. 28 at 11:42 am]

225.    Mr. Keilbach believed that after he spoke with Susan Shin from New Economy Project ("NEP"), she was going to get him a settlement offer, and they would work out an agreement on Mr. Crespo's judgment. In other words, they would be able to extract money from Mr. Crespo in any event. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 86:13-22]

226.    At 12:51 pm on October 28th, Mr. Keilbach emailed Ms. Shin informing her that, after review of the documentation, they would be contacting the bank and telling them to release Mr. Crespo's money "without prejudice." *See Keshavarz Decl.* [**Exhibit TT,** Keilbach Email Oct. 28 at 12:51 pm].

227.    At 12:55pm, Mr. Chiantella emailed Mr. Roberts and told him that they need to release Mr. Crespo's account. *See Keshavarz Decl.* [**Exhibit UU,** Chiantella Email Oct. 28 at 12:55 pm].

228.    At 12:57 pm, Mr. Chiantella emailed Mr. Keilbach and told him that he had just emailed Mr. Roberts for a release. *See Keshavarz Decl.* [**Exhibit VV,** Chiantella Email Oct. 28 at 12:57 pm].

229.    At 1:12 pm, Ms. Coker sent a scan of a bank release letter to Mr. Chiantella, Mr. Roberts, Mr. Keilbach and Mr. Thigpen. The letter, which was signed by Mr. Keilbach, requested the

immediate release of Mr. Crespo's M&T account. *See Keshavarz Decl.* [**Exhibit WW,** Coker Email Oct. 28 at 1:12 pm].

230.    When Mr. Crespo contacted his bank on October 29, 2021, he was told that GMBS had sent the Conditional Release and that $1,200 had been taken from his account. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 30]; [**Exhibit XX,** Shin Email Oct. 29 at 10:32 am].

231.    On October 29, 2021, Ms. Shin emailed Mr. Keilbach again to ask why the money had not been released from Mr. Crespo's account. *See Keshavarz Decl.* [**Exhibit XX,** Shin Email at 10:32 am].

232.    Mr. Keilbach forwarded Ms. Shin's email to Mr. Chiantella, Mr. Roberts and Mr. Thigpen with the message, "This is why we can't just do this stuff." [**Exhibit ZZ,** Keilbach Email Oct. 29 at 11:13 am].

233.    On October 29, 2021 at 11:17 am, Mr. Keilbach stated in a reply email to Ms. Shin and Mr. Crespo that if a check for the $1,200 was being sent to their office, they would send it to Mr. Crespo. *See Keshavarz Decl.* [**Exhibit YY,** Keilbach Email Oct. 29 at 11:17 am]

234.    On October 29, 2021 at 11:33 am, Mr. Thigpen sent a full release for Mr. Crespo to M&T Bank. *See Keshavarz Decl.* [**Exhibit AAA,** Thigpen Email Oct. 29 at 11:33 am)]

235.    At 11:35 am, M&T's legal document processing account sent a response email confirming their receipt of the release. *See Keshavarz Decl.* [**Exhibit BBB,** M&T Email Oct. 29 at 11:35 am)]

236.    At 2:32 pm, Mr. Keilbach emailed Ms. Shin and Mr. Crespo informing them that the bank was not going to process the conditional release and would fully release Mr. Crespo's account. *See Keshavarz Decl.* [**Exhibit CCC,** Keilbach Email Oct. 29 at 2:32 pm].

*GMBS's position is that it can take exempt funds from a consumer's bank account so long as*

*the consumer signed the conditional release or did not submitted an executed Exemption Claim Form with supporting documents*

237.    Mr. Keilbach believes that, as a legal matter, GMBS should have received the $1,200 of Mr. Crespo's unemployment funds pursuant to the conditional release. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 181:14-182:02].

238.    Mr. Keilbach testified he did not need to look at the documents Ms. Shin closely to determine if the funds in the account was exempt, but when pressed he could not point to anything in the documents that indicated the funds were anything but exempt. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 184:11-21].

239.    GMBS does not believe that GMBS did anything wrong with respect to Mr. Crespo. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 184:22-25].

### Mr. Crespo's Order to Show Cause

240.    On November 4, 2021, with the assistance of New Economy Project, Mr. Crespo filed a pro se Order to Show Cause in the Civil Court of the City of New York, County of Bronx, to vacate the Default Judgment against him, order restitution of all funds levied and/or garnished, and dismiss the Collection Lawsuit for lack of personal jurisdiction. *See Keshavarz Decl.* [**Exhibit L,** Affidavit in Support of OSC, 1 n.*, Nov. 4, 2021].; [**Exhibit DDD,** Order to Show Cause, Nov. 4, 2021).

241.    Mr. Crespo was *pro se* throughout the case and at all court hearings in this matter. *See Keshavarz Decl.* [**Exhibit EEE,** Case Summary].

242.    On November 17, 2021, there was an appearance in Bronx Civil Court. *See Keshavarz Decl* [**Exhibit DDD,** Order to Show Cause)].

243.    The date of the hearing for Crespo's OSC was calendared in GMBS's Account Notes

system. *Keshavarz Decl.* [**Exhibit J,** Account Notes, entries 4640-4650 at GM-00729].

244. GMBS did not put in any papers on the Landlord's behalf opposing Mr. Crespo's *pro se* Order to Show Cause and did not appear for the November 17 hearing on the Crespo Order to Show Cause. *See Keshavarz Decl* [**Exhibit FFF,** Decision and Order, November 22, 2021].

245. Mr. Crespo appeared *pro se* at the November 17 hearing on his OSC. *See Keshavarz Decl* [**Exhibit M,** Crespo Declaration ¶ 31].

246. GMBS did not have a basis to oppose Mr. Crespo's Order to Show Cause, and thus did not appear for the hearing, but still made Mr. Crespo have to attend the hearing rather than stipulating to vacate the judgment and return his money. *See Keshavarz Decl* [**Exhibit FFF,** Decision and Order, November 22, 2021].

247. As a result, the court marked the Order to Show Cause as "Submitted – No Opposition" on the November 17, 2021 return date. *See Keshavarz Decl* [**Exhibit FFF,** Decision and Order, November 22, 2021].

248. On November 22, 2021, the court issued a decision on Mr. Crespo's Order to Show Cause ordering a traverse hearing for February 14, 2022. *See Keshavarz Decl* [**Exhibit FFF,** Decision and Order, November 22, 2021].

249. GMBS appeared at the February 18th hearing and raised the issue of the Conditional Release, arguing that Mr. Crespo had agreed to liability. *See Keshavarz Decl.* [**Exhibit EEE,** Case Summary]; [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

250. Mr. Crespo appeared *pro se* at the February 18 hearing. [**Exhibit M,** Crespo Declaration ¶ 32)].

251. On February 18, 2022, GMBS sent the Conditional Release to the judge, who told them they could have appeared and submitted it at the motion stage. *See Keshavarz Decl.* [**Exhibit**

**GGG,** GMBS Email Re Traverse Hearing Feb 18, 2022)]; [**Exhibit J,** Account Notes, entries 4790-4870 at GM-00730-00731].

252.    During the February 18, 2022 hearing, the judge found that Mr. Crespo felt under duress in signing the Conditional Release. *See Keshavarz Decl.* [**Exhibit GGG,** Email from GMBS Re Traverse Hearing Feb. 18, 2022]; [**Exhibit J,** Account Notes, entries 4790-4870 at GM-00730-00731)].

253.    GMBS asked for a week to file an Order to Show Cause to vacate their default in appearing. *See Keshavarz Decl.* [**Exhibit** Amended Order Vacating Judgment, March 8, 2022)]; [**Exhibit** _ (Email from GMBS Re Traverse Hearing Feb 19, 2022)].

### *GMBS Opposition to Crespo's OSC*

254.    The court granted GMBS' request to adjourn the hearing to February 25 so that Plaintiff could file an Order to Show cause to vacate the prior OSC granting Mr. Crespo a traverse hearing.  file papers attaching the Conditional Release, and the February 18th traverse hearing was adjourned to February 25, 2022. *See Keshavarz Decl.* [**Exhibit II,**Amended Order Vacating Judgment, March 8, 2022)]; [**Exhibit GGG**, Email from GMBS Re Traverse Hearing Feb. 18, 2022].

255.    On February 23, 2022, GMBS filed an OSC but did not present it to the judge to sign. *See Keshavarz Decl.* [**Exhibit HHH,** GMBS Unsigned OSC].

256.    GMBS opposed Mr. Crespo's order to show cause on the basis that he had signed the conditional release, and that Mr. Crespo never challenged the income execution that occurred in 2019. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 135:15- 136:02].

257.    This is one of the arguments that the Court expressly considered and rejected in its Order vacating the default judgment, releasing restraints, and ordering monies previously collected

from Mr. Crespo returned within 30 days. *See Keshavarz Decl.* [**Exhibit, II** Amended Order Vacating Judgment, March 8, 2022].

258.    Mr. Keilbach believed that Mr. Rohparvar sent the court the conditional release and file an order to show cause because he would be able to settle the case, or at least vacate the default hearing. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 152:06-10].

259.    Because GMBS did not submit an order for the court's signature by February 25, 2022, the court did not consider the Conditional Release further. *See Keshavarz Decl.* [**Exhibit EEE,** Case Summary]; [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

260.    GMBS has argued that, because Mr. Crespo signed a Conditional Release, he waived his right to sue and that the default against GMBS on his order to show cause should be vacated. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022]; [**Exhibit _** Email from GMBS Re Traverse Hearing Feb 18, 2022].

261.    GMBS has attempted to use the Conditional Release, which was signed under duress, in order prevent Mr. Crespo from vacating the judgment and releasing his bank account. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022]; [**Exhibit GGG,** Email from GMBS Re Traverse Hearing].

262.    GMBS sought and obtained an adjournment of Mr. Crespo's traverse hearing for the purpose of dragging out the proceedings, hoping to wear him down by making him to come to court for an additional appearance. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022]; [**Exhibit GGG,** Email from GMBS Re Traverse Hearing]; [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 152:06-10) (filed to get settlement)].

### The Court Vacates Judgment Against Mr. Crespo

263.    In the absence of any written opposition from Defendants, the court entered an order on

March 8, 2022 that the Default Judgment be vacated and all monies collected be returned to Mr. Crespo within 30 days. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022)]. *Note: this document is titled "Amended Order Vacating Judgment," however there was no initial order that this order amended.

264.    In its Order, the Court considered and rejected the argument's that GMBS made in their order to show cause.  [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022)].

265.    The Court noted that the Plaintiff did not produce either the process server or his records at the traverse hearing. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

266.    Instead, Plaintiff offered the stipulation of conditional release in support of their case, alluding to the fact that a defect in personal jurisdiction may be waived where a party submits to the court's jurisdiction. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

267.    The Court held that Crespo did not submit to the court's jurisdiction, nor did he offer to tender payment in partial satisfaction of the judgment, but only sought to regain access of his bank account. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

268.    The Court held that the funds in the account were a combination of unemployment benefits and emergency stimulus payments, both exempt from restraint, garnishment, and levy under New York law. *CPLR Article 52 et seq. See Keshavarz Decl.* [**Exhibit II**, Amended Order Vacating Judgment, March 8, 2022)].

269.    The Court held that Crespo only became aware of the default judgment when his bank account was levied upon, not when the judgment was entered. *See Keshavarz Decl.* [**Exhibit II,**

Amended Order Vacating Judgment, March 8, 2022].

270.    The Court also ruled that, along with Mr. Crespo's uncontroverted testimony that he never lived at the purported service address,  the January 2005 service was inadequate because it occurred 10 days before the filing of the summons and complaint. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

271.    The Court credited Mr. Crespo's explanation for the 19-month delay in becoming aware of the default judgment—that he experienced economic hardship and serious medical issues. *See Keshavarz Decl.* [**Exhibit II,** Amended Order Vacating Judgment, March 8, 2022].

272.    On March 17, 2022, Mr. Crespo filed the order with notice of entry for Judge Powell's amended decision and order. *See Keshavarz Decl.* [**Exhibit III,** Notice of Entry].

273.    Mr. Crespo incurred expenses of $15.75 to mail a copy of the order and notice of entry via certified mail and return receipt to GMBS. *See Keshavarz Decl.* [**Exhibit JJJ,** USPS Receipts - March 18, 2022].

274.    On March 10, 2022 at 8:27 am, GMBS received notice of the order vacating judgment and ordering them to return Mr. Crespo's money. This is reflected in their internal account notes. [**Exhibit J,** Account Notes, entries 5150-5170 at GM-00733].

### *Events After Judgment Was Vacated*

275.    As of March 10, 2022, at 8:28am, GMBS received the judge's decision and was aware that it had been ordered to return all the money collected from Mr. Crespo within 30 days. *See Keshavarz Decl.* [**Exhibit J,** Collections Notes, entries 5150-5170 at GM-00733].

276.    Per the Order Vacating Judgment, GMBS should have returned the money by April 11, 2022. *See Keshavarz Decl.* [**Exhibit II,** mended Order Vacating Judgment, March 8, 2022].

277.    However, by April 11, 2022, Mr. Crespo still had not received any of the money. *See*

*Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 33].

278.    After receiving the order from the court dismissing the case with prejudice on or around March 10, 2022, GMBS was still waiting for the OSC to be signed and considering how to proceed. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 155:05-16].

279.    After receiving the March 10 order, GMBS believed it was too early to determine whether that had to return the money immediately because they still thought that their OSC would be signed. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 156:2-17].

280.    On or around April 21, 2022, GMBS issued Mr. Crespo a check for $1,378.86, which he received on or around April 25, 2022. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 34)].

281.    These funds did not fully refund Mr. Crespo: $1,458.30 of his wages that had been garnished by Defendants in 2019, so there was a deficit of $79.44. *See Keshavarz Decl.* [**Exhibit KKK,** Emails between GMBS and Crespo, April 28 - May 25, 2022].

282.    Of the $1,458.30 that GMBS garnished from Mr. Crespo's wages, only $206.02 went to their client. *See Keshavarz Decl.* [**Exhibit B,** *Crespo* Keilbach Depo. Trans. 61:25-62:05].

283.    GMBS did not make any attempts to obtain the $206 from their client that GMBS ultimately returned to Mr. Crespo.  their client the share  that was refunded to Mr. Crespo. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 178:14- 179:11].

284.    GMBS did not make any attempts to obtain the $206 from their client that GMBS ultimately returned to Mr. Crespo because Mr. Keilbach felt that, since they missed the court date, it was inappropriate to ask for the money bac54k since they should not have missed the court date. *See Keshavarz Decl.* [**Exhibit B**, *Crespo* Keilbach Depo. Trans. 178:14- 179:11].

285.    It is not clear whether GMBS even told their client there was an order to return the

money it previously garnished from Mr. Crespo. *See* Keshavarz Decl. [**Exhibit B**, *Crespo Keilbach Depo. Trans.* 177:7-11 ("it would be inappropriate to ask for the money back" from the client since GMBS missed the OSC hearing date and they should not have); and *Id.* Trans: 63:13-20 (GMBS only "At times" informs their client that there is an outstanding order to show cause).

### *Mr. Crespo Follows Up Regarding GMBS Failure to Return All Money*

286.    On April 28, 2022, Mr. Crespo, *pro se*, sent Eric Keilbach at GMBS an email explaining the deficiency and demanding that GMBS refund him the remaining $79.44. *See Keshavarz Decl.* [**Exhibit KKK**, Emails between GMBS and Crespo, April 28 - May 25, 2022)].

287.    On April 29, 2022, Mr. Keilbach responded to Mr. Crespo telling him that GMBS was following up with the Sheriff about "if they are sending back the difference." *See Keshavarz Decl.* [**Exhibit KKK**, Emails between GMBS and Crespo, April 28 - May 25, 2022)].

288.    But amount that the sheriff had taken for poundage was only $69.44, leaving and unexplained missing balance of $10. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry 5240-5270 at GM-00734)]; [**Exhibit_**(Fax Confirmation to Sheriff, May 3, 2022).

289.    On May 3, 2022, GMBS faxed the Erie County Sheriff's requesting a refund for the poundage. *See Keshavarz Decl.* [**Exhibit J,** Account Notes, entry 5240-5270 at GM-00734)]; . [**Exhibit LLL,** Fax Confirmation to Sheriff, May 3, 2022].

290.    GMBS believed that it had to reimburse Mr. Crespo for the poundage cost because the Sheriff hadn't. *See Keshavarz Decl.* [**Exhibit MMM,** GMBS Email Chain April 28, 2022]; [**Exhibit NNN,** Chiantella Email June 8, 2022].

291.    On May 9, 2022, Mr. Crespo emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS did not respond. *See Keshavarz Decl.* [**Exhibit KKK,**

Emails between GMBS and Crespo, April 28 - May 25, 2022].

292.    On May 25, 2022, Mr. Crespo again emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS again did not respond. *See Keshavarz Decl.* **[Exhibit KKK**, Emails between GMBS and Crespo, April 28 - May 25, 2022)].

293.    Ms. Shin from NEP was not sent corresponding copies of any of these communications. *See Keshavarz Decl.* **[Exhibit KKK**, Emails between GMBS and Crespo, April 28 - May 25, 2022)].

294.    As of this filing, Mr. Crespo has not been returned the remaining $79.44. He has also never been reimbursed for the $110 legal processing fee that his bank charged due to Defendants' restraint of his exempt funds. *See Keshavarz Decl.* [**Exhibit M,** Crespo Declaration ¶ 35].

### *GMBS's Conduct in the Arias Case*

295.    The following facts are drawn from the Arias decision, which is incorporated by reference. *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP,* 875 F.3d 128 (2d Cir. 2017). *See Keshavarz Decl.* [**Exhibit OOO_***Arias Decision*].

296.    GMBS restrained Mr. Arias' bank account. All the funds in Mr. Arias's bank account were entirely exempt, except that Mr. Arias's funds consisted entirely of Social Security retirement benefits.

297.    The same day the funds were restrained, Mr. Arias faxed GMBS bank statements showing that his account contained only exempt Social Security retirement benefits, and also called GMBS to tell them that he had faxed the bank statements, and his restrained funds were exempt Social Security benefits.

298.    As with Mr. Crespo, GMBS, despite being told that the funds were exempt, told Mr.

Arias that they would remove the restraint only if Mr. Arias sent them a payment

299.    GMBS later doubled down on this improper conduct by requesting a hearing and filing an

objection to Mr. Arias's exemption claim, despite having no good faith basis for doing so.

300.    This deceptive and unfair litigation conduct is similar to GMBS's unduly delaying the

traverse hearing in Mr. Crespo's case on the basis of the fraudulently obtained Conditional

Release.

### *GMBS' Nine Month Restraint of Social Security Disability Funds of Mark Fadlevich*

301.    Attached and incorporate by reference is the First Amended Complaint in FDCPA

lawsuit was brought against GMBS in 2019, captioned *Fadlevich v. JD 34th Street Realty LLC,*

*Gutman, Mintz, Baker & Sonnenfeldt, LLP, and Eric Keilbach*, Case No. 1:19-cv-04227-AMD-

CLP (EDNY). *See Keshavarz Decl.* [**Exhibit PPP**, Fadlevich First Amended Complaint].

302.    GMBS has admitted liability for violating the Fair Debt Collection Practices Act

(FDCPA), 15 U.S.C. § 1692e, in the *Fadlevich v. JD 34th Street Realty LLC et al* case, Case

1:19-cv-04227-NRM-MMH (ED NY), Dkt. No. 50.

303.    The following is drafting from the First Amended Complaint in Fadlevich.

304.    On or about August 19, 2016, the Landlord Defendant obtained a default judgment for

$13,785.00 against Mr. Fadlevich. *See* **Exhibit A** (Civil Court Default Judgment).

305.    More than two years later, on or about November 16, 2018, GMBS executed on the

judgment on behalf of the Landlord Defendant by issuing an "Information Subpoena With

Restraining Notice" ("the restraint"), to Wells Fargo where Mr. Fadlevich had a checking

account ("the account") for $16,550.97. *See* **Exhibit B** (Information Subpoena and Restraint).

306.    The Information Subpoena was executed by Mr. Keilbach, and includes an affirmation of

meaningful review by Mr. Keilbach. *See* **Exhibit B.**[3]

### *The Restrained Account Was Entirely Exempt Social Security Disability For The Disability That Had Caused Mr. Fadlevich To Return To Alabama*

307.    Around the time of the lawsuit, Mr. Fadlevich had a brain aneurysm unexpectedly that led to a seizure.

308.    Since then, Mr. Fadlevich has had chronic migraines, back pain, and seizures that are debilitating enough to require frequent visits to multiple doctors and have made Mr. Fadlevich unable to hold down a steady job.

309.    Due to his condition, Mr. Fadlevich moved back to his mother's home in Alabama.

310.    On January 29, 2014, Mr. Fadlevich filed for Disability Insurance benefits and on January 6, 2015, he filed for Supplemental Security Income.

311.    Unfortunately Mr. Fadlevich fell through the cracks in the social safety net, having his benefits denied on April 28, 2015 despite the extreme nature of his condition.

312.    Mr. Fadlevich appealed this decision and, on December 28, 2016, the Honorable Roslynn R. Mauskopf filed an Order in *Fadlevich v. Commissioner of Social Security*, No. 1:15-cv-06943 (RRM) in the Eastern District of New York reversing the denial and remanding the claims for further administrative proceedings. *See* **Exhibit C** (Order in Fadlevich v. Commissioner of Social Security).

313.    Finally, on August 21, 2018, more than three years after he first filed, the Social Security Administration wrote Mr. Fadlevich to give him notice that it determined that Mr. Fadlevich was entitled to around $750 a month, and thus was owed $33,626.00 for having been denied benefits

---

3 In full: "I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES, AND SECTION 601 OF THE GENERAL BUSINESS LAW, AND THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT."

from July 2014 to June 2018. *See* **Exhibit D** (Social Security Award).

314.    Earlier, on August 3, 2019, the Social Security Administration deposited $33,626.00 into Mr. Fadlevich's Wells Fargo checking account. *See* **Exhibit E** (Wells Fargo Bank Statement).

315.    The payment appears on the statement with the description "SSA Treas 310 Xxsoc Sec 080318 xxxxx2900A SSA Mark Hayward Fadlevich."  *See* **Exhibit E**.

316.    After years of battling both his medical condition and the federal bureaucracy as a pro se litigant, it seemed like Mr. Fadlevich would finally receive the money he was owed.

317.    Unfortunately, a few months later on November 16, 2018, GMBS issued its bank restraint to Wells Fargo and on November 21, 2018 garnished $23,839.89 from Mr. Fadlevich's account.

318.    All of the money in Mr. Fadlevich' Wells Fargo account is SSD directly deposited by the Social Security Administration.

319.    As such, all of the funds in the account were entirely exempt from restraint and garnishment.

320.    The Social Security Act, 42 U.S.C. 407 (the "SSA"), states that no money paid or payable under the Act "shall be subject to execution, levy, attachment, garnishment, or other legal process."

321.    Further, the United States Department of the Treasury introduced regulations ("the regulations") that went into effect on May 1, 2011, providing that a financial institution must allow an account holder access to a "protected amount", which is the lesser of the sum of all benefit payments posted to the account in the last two months, or the balance in an account when the account review is performed. 31 CFR 212.3.

322.    However, the "protected amount" does not limit an individual's right to assert further exemptions from garnishment or restraint. 31 CFR 212.8(a).

323.    The regulations also do not preempt State laws governing garnishment practices, allowing States to further protect federal benefit payments from freezes or garnishments. 31 CFR 212.9(b).

324.    Moreover, in 2008, New York State enacted the Exempt Income Protection Act ("EIPA"), to prevent widespread problems involving the restraint of bank accounts containing exempt funds.

325.    EIPA protects statutorily exempt income from restraint, "freeze", or levy.

326.    EIPA also expedites and standardizes the process for the release of restrained exempt funds.

327.    Under EIPA, when a judgment debtor's bank account is restrained pursuant to a New York restraining notice, the judgment debtor may claim that the funds in the restrained account are exempt by completing an Exemption Claim Form.

328.    Under EIPA, a judgment creditor must provide such an Exemption Claim Form to the judgment debtor's banking institution along with any restraining notice.

329.    An Exemption Claim Form must be mailed to the judgment debtor by her banking institution within two days of the banking institution's receipt of the restraining notice from the judgment creditor.

330.    To facilitate the prompt release of an account containing exempt funds, the Exemption Claim Form instructs judgment debtors to submit "proof" that the funds in their account are exempt. N.Y. CPLR 5222a(b)(2).

331.    Proof of an exemption can "include an award letter from the government, an annual statement from your pension, pay stubs, copies of checks, bank records showing the last two months of account activity, or other papers showing that the money in your bank account is

exempt". *Id.*

332.  When a judgment debtor sends a judgment creditor an Exemption Claim Form accompanied by such "information demonstrating that all funds in the account are exempt", the restraint is deemed void and the judgment creditor must instruct the banking institution to release the account within seven days of the postmark on the envelope containing the Exemption Claim Form. N.Y. CPLR 5222a(c)(4).

333.  If the judgment creditor fails to act accordingly, the judgment creditor shall be deemed to have acted in bad faith.

334.  All of the money in Mr. Fadlevich's bank account was exempt social security with, perhaps, the exception of a few hundred dollars.

335.  All of the money in Mr. Fadlevich' Wells Fargo account came from exempt Social Security payments, with the exception of, perhaps a few hundred dollars.[4]

336.  If a judgment debtor submits an Exemption Claim Form demonstrating that a restrained account contains exempt funds and the judgment creditor still fails to properly release the account or exempt funds, "the judgment creditor shall be deemed to have acted in bad faith and the judgment debtor may seek a court award of the damages, costs, fees and penalties" as provided for. N.Y. CPLR 5222a(c)(4).

337.  On December 4, 2018, Mr. Fadlevich emailed GMBS, giving notice that the money was exempt Social Security and providing screenshots of the corresponding deposits.

338.  On December 7, 2018, Mr. Fadlevich completed and signed an Exemption Claim Form stating, under penalty of perjury, that the money in the Wells Fargo checking account was from

---

4 Even for the few hundred dollars, the first dollar out of the account is assumed to have been the non-exempt funds.

Social Security and was thus exempt and mailed it along with bank statements showing that the funds were exempt Social Security to Wells Fargo. *See* **Exhibit F** (Exemption Claim Form).

339.    On December 11, 2018, an additional $952.19 of exempt funds were garnished.

*Mr. Fadlevich Sends An Astonishing Four Letters Over Five Months;*
*GMBS Ignored Every Single One,*
*And Then Garnished The Account An Additional Two Times.*

340.    On or around December 14, 2018, Mr. Fadlevich sent a letter to Wells Fargo, GMBS, and Marshal Ronald Moses, giving the parties notice that all the money garnished by GMBS was exempt Social Security deposits, that Mr. Fadlevich had filled out and send an exemption claim form, and that he had repeatedly emailed GMBS that the money was exempt. *See* **Exhibit G** (First Letter Noticing Exemption). The letter to GMBS was addressed "ATTN: Eric Keilbach, Esq." *Id.*

341.    On December 24, 2018, Wells Fargo sent Mr. Fadlevich a boilerplate response to this letter. *See* **Exhibit H** (First Wells Fargo Letter).

342.    Only Marshal Moses responded to the notice properly by reversing the portion in his control to be refunded to Mr. Fadlevich's account: $17,522.40. That left a remaining balance of $7519.68, so on or around January 24, 2019, Mr. Fadlevich sent a second letter giving notice of the remaining exempt funds that had not been returned. *See* **Exhibit I** (Second Letter Noticing Exemption). The letter to GMBS was addressed "ATTN: Eric Keilbach, Esq." *Id.*

343.    Meanwhile, on or around January 8, 2019, Wells Fargo sent a second letter to Mr. Fadlevich, stating that it had "identified one or more federal benefit payments" but, rather than holding all of these exempt, "establish a 'protected amount' in the amount of $1,562.00 that remained available." *See* **Exhibit J** (Second Wells Fargo Letter). Wells Fargo did outline that it had sent a check for $16,570.21 to Marshal Ronald Moses on December 13, 2018. *Id.* The

remaining funds were held, and Wells Fargo directed Mr. Fadlevich to contact GMBS to have them released. *Id.*

344.    At this point, GMBS had garnished exempt Social Security funds and had ignored two demands with clear evidence that it had violated the law and had no right to the money it continued to hold.

345.    But rather than attempt to remedy its wrongdoing, GMBS doubled down.

346.    On March 14, 2019, Wells Fargo received a second garnishment order from GMBS for $16,941.74. *See* **Exhibit K** (Third Wells Fargo Letter). Because only $13,347.44 was remaining from the first illegal garnishment, $8,016.44 was restrained. *Id.*

347.    On April 19, 2019, Wells Fargo sent another letter, repeating what was stated in its second letter (**Exhibit L**) and also addressing the March 14, 2019 garnishment order. *See* **Exhibit L** (Fourth Wells Fargo Letter). Again, Wells Fargo directed Mr. Fadlevich to contact GMBS in order to have the funds released. *Id.*

348.    On April 24, 2019, Mr. Fadlevich sent a third letter giving notice that this second garnishment was, once again, taking exempt Social Security funds. *See* **Exhibit M** (Third Letter Noticing Exemption). The letter to GMBS was addressed "ATTN: Eric Keilbach, Esq." *Id.* Mr. Fadlevich demanded the immediate release and return of, at that point, the total $15,661.12. *Id.*

349.    On May 22, 2019, Mr. Fadlevich sent a fourth and final letter giving notice that the funds were exempt Social Security and to release and return all $15,661.12 as well as any bank fees. *See* **Exhibit N** (Fourth Letter Noticing Exemption). The letter to GMBS was addressed "ATTN: Eric Keilbach, Esq." *Id.*

350.    All these letters were received by GMBS. *See* **Exhibit O** (Return Receipts for Plaintiff's Letters). GMBS has yet to give any response to Plaintiff, let alone return the funds it has illegally

taken. Upon information and belief, given that all four letters (**Exhibits G, I, M, N**) are addressed to him and that he executed the information subpoena (**Exhibit B**), Mr. Keilbach has been given notice that he caused tens of thousands of dollars in exempt Social Security to be garnished, and has done nothing to remedy this violation.

351. On May 31, 2019, 190 days after it had been garnished, GMBS had Wells Fargo release the $7,269.68 it was holding from the first restraint. The March 14 garnishment however was not reversed, and thus Defendants continued to restrain $8,391.44 of Mr. Fadelvich's exempt funds.

352. Shockingly, even after receiving all these letters, GMBS restrained an *additional* $2,055.67 on July 15, 2019. *See* **Exhibit P** (Screenshot of July 15, 2019 withdrawal).

353. On July 17, 2019, Defendants released $2,055.67 and $8,016.44.

354. In sum, From November 21, 2018 to July 15, 2019 (236 days), Defendants restrained anywhere from $7,519.68 to $25,042.08 of his exempt funds restrained despite his four written notices that the money being restrained was exempt. Even after the return of part of the first restraint ($17,522.40) by Marshal Moses on December 20, 2018, GMBS was restraining between $7,519.68 and $15,661.12 for 209 days until finally releasing the money on July 17, 2019.

355. Mr. Fadlevich is still short of $500 in exempt funds due to the bank fees caused by Defendants' illegal restraints.

### These Gross Violations Of Protected Social Security Funds Exacerbated Mr. Fadlevich's Already Difficult Financial And Health Condition

356. Prior to the garnishments, Mr. Fadlevich's condition had slowly been improving.

357. Mr. Fadlevich's seizures are controlled by medication, but also through managing his emotions and stress. When the outlook for receiving his overdue Social Security funds improved, Mr. Fadlevich was able to go nine months without having a seizure.

358. However, the stress due to these garnishments and the repeated unanswered efforts to get

back his hard-earned Social Security funds brought back the seizures.

359.    As of this date, Mr. Fadlevich has had three seizures since the stress of the garnishments began.

360.    The seizures physically feel like falling down a flight of stairs.

361.    They mostly come while Mr. Fadlevich is asleep. While sleep can be a refuge for many, it is not so for Mr. Fadlevich.

362.    He has woken up to blood on his pillow from biting his tongue or cheek while having a seizure. The seizures also make him wet the bed.

363.    For days after the seizure happens, Mr. Fadlevich will see streaks of light and his brain will feel in a fog.

364.    The stress-induced seizures create a feedback loop as the lack of sleep increases the likelihood of having more seizures.

365.    Mr. Fadlevich's condition gives him chronic migraines, generally three per week.

366.    However, the additional stress from the garnishments has given him an additional persistent headache that builds up to migraines.

367.    Mr. Fadlevich's only source of income is the Social Security payments, so he worried about how he would financially handle any unexpected costs with his medical condition or with his mother.


Dated: Brooklyn, New York
        September 19, 2024

Respectfully submitted,
/s/
_____

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
ATTORNEY FOR PLAINTIFF
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: Ahmad@newyorkconsumerattorney.com

cc: All counsel (via ECF)