**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
JOSE CRESPO,

                                                      Case No. 1:22-cv-6599-JPO

                             Plaintiff,

        -against-

GUTMAN, MINTZ, BAKER & SONNENFELDT, LLP,
GARY THIGPEN, ERIC KEILBACH,
1511 SHERIDAN LLC, and
 HILLTOP MANAGEMENT GROUP LLC

                             Defendants.
-------------------------------------------------------------------------X


**OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF GUTMAN
DEFENDANTS AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
AS TO GUTMAN DEFENDANTS PURSUANT TO FED. R. CIV. P. 56**

Table of Contents

**I.    PRELIMINARY STATEMENT** ..............................................Error! Bookmark not defined.

**II.    STATEMENT OF FACTS** ....................................................................... **1**

**III.   THE RULE 56 STANDARD FOR SUMMARY JUDGMENT** ....................................... **25**

**IV.   ARGUMENT** ........................................................................................ **25**

*A.    GMBS violated the FDCPA by restraining and maintaining the restraint on an account that contained exempt unemployment insurance benefits.*...................................................................................*27*

*B.    GMBS violated the FDCPA by using strong arm tactics and misrepresentations to induce Crespo sign the Conditional Release, including that it was the "only way" to release his account and that they would release the account by tomorrow.*..............................................................................................................*32*

*C.    While the FDCPA is a strict liability statute, there is evidence a reasonable juror could believe support an inference of knowledge and intent, and make the FDCPA violations particularly pernicious.*................................*35*

    1.    Timing of Conditional Release demand is especially pernicious. ..........................................36

    2.    GMBS admits it uses conditional releases to obtain exempt funds, demonstrating knowledge and intent.............................................................................................................................37

    3.    Thigpen tacitly admitted to Crespo that the deposits into the account were from unemployment insurance, demonstrating knowledge and intent.........................................................................37

    4.    GMBS immediately attempt to seize the $1,200 in unemployment benefits when New Economy Project provides bank statements, demonstrating intent to do so from the outset. ....................................38

    5.    Conditional Release a standard form suggesting a pattern and practice................................38

*D.    Defendants arguments related to the pre-OSC FDCPA claims are without merit.*................................*39*

    1.    The state court already rejected the arguments the of GMBS to Crespo acknowledged the judgment. 39

    2.    New Economy Project did not represent Crespo in the collection lawsuit or for the OSC. ...................39

    3.    EIPA does not come into play because the misconduct happened prior to receipt of the EIPA Exemption Claim Form, which is why the timing of the Conditional Release is especially pernicious. ..............................40

*E.    GMBS violated the FDCPA by using the Conditional Release to oppose Crespo's pro se OSC to vacate the sewer service default judgment, for a debt GMBS knowingly inflated.*................................................*40*

*F.    Conversion for failure to timely and fully return.*...........................................................*41*

GMBS committed conversion by 1) not delivering Crespo any money by April 11, 2022 the date ordered to be returned and 2) by not returning the full amount, even today. ¶¶276-280; 294. Plaintiff is not arguing that the restraint of the M&T Bank account is conversion, nor is he arguing that the failure to release the restraint is conversion. Def. Mem. p. 23-25.  Notably, while GMBS opposes a conversion claim as to the return of the money, it does not move to dismiss the FDCPA claim for the same. However, as previously noted, Plaintiff is seeking an FDCPA claim for Thigpen inducing Crespo to sign the Conditional Release with the promise the account would be released by the next day when in reality, it was not released for two months.........................................................................................................**41**

    1.    Conversion by intentionally not timely complying with Order to return money within 30 days............42

    2.    Conversion for not returning all monies taken................................................................44

    3.    CPLR Article 52 does not apply to failure to comply with court order. ....................................44

GMBS argues that CPLR Article 52 is the exclusive remedy available for a conversion claim for any allegedly unlawful restraint. Def. Mem. p. 27, 28. However, as previously noted, Plaintiff is not seeking a conversion claim for the bank restraint. GMBS then asserts Article 52 also precludes a conversion claim for failure to timely and fully comply with a court order to return previously garnished wages. *Id*. However, none of the cases cited stand for that proposition. And Courts have found conversion for failure timely comply with

orders to return money. *See e.g. Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 587-590 (S.D.N.Y. 2015)(garnished wages). ................................................................................................................44

    *G.*    *Punitive damages for gross negligence.* ......................................................................................*45*

**V.**  **CONCLUSION** ............................................................................................................... **45**

# I.    INTRODUCTION

Plaintiff Jose Crespo brought suit against the debt collection law firm Gutman, Mintz, Baker & Sonnenfeldt, LLP ("GMBS"), GMBS's collector Gary Thigpen, and GMBS's attorney Eric Keilbach for violating the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), for committing conversion, and committing negligence and gross negligence all in an attempt to obtain and retain exempt unemployment insurance benefits, and vigorously fighting a pro se order to show cause to vacate a default judgment based upon a conditional release they duped and strong-armed him into signing as "the only way" to release exempt funds. State law claims were also brought against the landlord plaintiff in the underlying collection lawsuit, 1511 Sheridan LLC, and their property company, Hilltop Management Group LLC for conversion, negligence and gross negligence, but those parties have defaulted. Neither Defendants nor Plaintiff has moved for or against summary judgment against those two defendants. Plaintiff had originally brought claims under GBL 349 against all defendants but stipulated to voluntarily dismiss those claims. [Dkt. No. 84]

# II.    STATEMENT OF FACTS

The following facts correspond to Plaintiffs' Local Rule 56.1 ("Pl. 56.1"), Statement of Material Facts In Opposition to Defendants' Motion for Summary Judgment and in Support of His Motion for Summary Judgment based on exhibits attached to the corresponding Declaration of Ahmad Keshavarz ("Keshavarz Decl").

## Background on GMBS Law Firm and Employees

Defendant Gutman, Mintz, Baker & Sonnenfeldt, LLP, ("GMBS") is a New York debt collection law firm that engages in business in New York. Pl. 56.1 ¶ 33. Eric Keilbach is a senior partner of GMBS. ¶ 34. GMBS has approximately 100 employees. ¶ 37. There are 15 employees

1

in the GMBS judgment collection department. ¶ 38.

Gary Thigpen is an account representative at GMBS. ¶40. His primary responsibilities are, "I answer incoming phone calls, I speak with sheriffs, marshals, I issue income executions and restraining notices, speak with banks, I review files and work – I work the judgments." *Id.* Mr. Thigpen's job responsibilities include following up on stipulations and conditional releases. ¶ 41. Thigpen has worked in the collection industry for about 30 years. ¶ 42. Thigpen works on more than a thousand judgment accounts a year. ¶ 43. Thigpen receives as many as 50 calls from consumers in a day. ¶ 44.

GMBS primarily collects on rental arrears that have been reduced to a judgment, and about 80 percent of the GMBS accounts are judgment accounts. ¶ 48. Rental arrears (mostly residential) accounts for roughly 99% of the judgments that GMBS collects on. ¶ 49. While the judgment creditors are landlords, the accounts are usually referred to GMBS for collection by property management companies, as opposed to the LLCs that owns the property. ¶ 53. For all practical purposes, the landlords engage with GMBS through the property management companies. ¶54. GMBS had not received any new cases from the management company in this case—Hilltop—in a long time. ¶ 55.

When making subpoenas to banks, GMBS provides a list of names and social security numbers to the bank to determine if a consumer has an account there, and, if so, issues an Information Subpoena and Bank Restraint. ¶ 56. GMBS sends EIPA Exemption Claim forms directly to the banks as opposed to the consumers. ¶ 57.

### Gutman Practice of Using Conditional Releases to Obtain Exempt Funds

If a consumer enters a conditional release, GMBS believes that it is legally entitled to those monies even if the funds are exempt from restraint. ¶ 58. According to Mr. Keilbach, the

benefit to GMBS of using a conditional release as opposed to a restraint is that GMBS could procure exempt income. ¶ 59.

Most of the conditional releases that GMBS sends to consumers are entered into. ¶ 60. When a consumer has entered a conditional release for a bank restraint, the GMBS employee who handled the conditional release is supposed to follow up to make sure that the bank, in fact, releases the account. ¶ 61. At GMBS, the employees who handle the conditional release would either be debt collectors or paralegals. ¶ 62.

When a consumer tells GMBS that their bank funds are exempt, the collector is supposed to ask the consumer for proof of the exemption, such as bank statements. ¶ 63. However, when a consumer states that they are "on unemployment," GMBS would not necessarily ask whether there were exempt funds in the consumer's account. ¶ 64. When a consumer states that they are "on unemployment," GMBS would not necessarily ask them for bank statements either, because, in their view, being on unemployment insurance does not necessarily mean they don't have a lot of other non-exempt money in the account. ¶ 65.

### Background on the Case:

### GMBS' First Lawsuit Against Mr. Crespo

On October 2, 2002, GMBS, initiated an action for rental arrears and possession of Mr. Crespo's residence, captioned *1511 Sheridan LLC v. Jose Crespo*, LT-83929-02/BX in the Civil Court of the City of New York, County of Bronx (the "First Lawsuit"). ¶ 68. GMBS sought $4,279.97 in arrears and fees, including rent from February 2002 through October 2002. ¶ 69. Over the period of the next several months the parties came to several stipulations with the court ordering the landlord to make essential repairs and Mr. Crespo to make payments or enter into agreed judgments. ¶¶ 71-79. In the First Stipulation of October 21, 2002 the Court ordered

repairs and Crespo entered into an agreed judgment for $3,996.97. ¶79. The landlord failed to make the court ordered substantial repairs. ¶¶83-85. In the Second Stipulation of the February 5, 2003 the Court again ordered the landlord to make repairs and Crespo agreed to pay withheld rent. ¶ 83. The landlord again failed to make the court ordered repairs. ¶ 84. Concluding the landlord would never make the repairs, no matter how many times they were ordered by the court, Crespo agreed to leave. ¶ 85-89. On July 15, 2003 Crespo filed an Order to Show Cause ("OSC") because he received an eviction notice when he was current on the payments in the Second Stipulation and, indeed, the landlord had not made the Court ordered repairs. *See Keshavarz Decl.* [**Exhibit X**, Order to Show Cause, July 15, 2003, Index No. CV-83929-02/BX].

Importantly, attached to the July 15, 2003 OSC Crespo filed and served on GMBS included receipts and money orders showing Crespo had paid some of the months of rent that GMBS for which GMBS would later sue Crespo for in 2005. *Id.* Concluding the landlord would never make the court ordered repairs, on August 4, 2003, Crespo entered into a Third Stipulation with GMBS. ¶ 87. The parties agreed to a judgment of possession for the landlord and a stipulation of settlement waiving $1,000 in outstanding arrears and for entry of judgment for $2,574.98. ¶¶ 87-88. Notably, the August 4, 2003 stipulation settled any claims for outstanding arrears up to the date of the stipulation. *Id.*

### GMBS' Second Lawsuit Against Mr. Crespo: suing for rent known not to be owed.

Unbeknownst to Mr. Crespo, on January 21, 2005 GMBS sued Mr. Crespo again, this time for rent for months that GMBS knew was settled by the Landlord retained Defendant GMBS to file another lawsuit on January 21, 2005, captioned *1511 Sheridan LLC v. Jose Crespo*, Index No. CV-002890-05/BX in the Civil Court of the City of New York, County of Bronx ("Second Lawsuit")**. ¶ 90.

4

The Second Lawsuit sought a money judgment of $4,078.98 for rental arrears for the months of February 2003 through October 2003. ¶ 91. However, GMBS had entered into the Third Stipulation in the First Lawsuit, which settled arrears up to August 4, 2003. ¶ 87-88. Furthermore, the July 2003 OSC in the First Lawsuit attached proof of payment for some of the same time period in the Second Lawsuit. *See Keshavarz Decl.* [**Exhibit X**, Order to Show Cause, July 15, 2003, Index No. CV-83929-02/BX].

The court entered a default judgment against Crespo on April 7, 2005 for a $4,833.91, plus interest and fees, based on the false representations in by GMBS in the collection lawsuit about the months of rent that were owed. ¶ 94.

It is the wrongful collection attempts in connection with the collection of the inflated judgment in the Second Lawsuit that forms the basis of this FDCPA lawsuit.

As a State Court judge would rule 17 years later when she vacated the default judgment and dismissed the Second Lawsuit, GMBS used a false affidavit of service to enter judgment; Mr. Crespo did not learn of the judgment until 2019 when GMBS began garnishing his wages; and Crespo had a reasonable basis for not attempting to vacate the default judgment until 2021 and thus did not acquiesce to the judgment. ¶¶ 100-101;106; 103; 270.

## Events Leading Up to The Present Action

Around November 2019, Mr. Crespo lost his job in Buffalo. For a few months, he tried unsuccessfully to find another job in Buffalo. ¶ 118. Around the beginning of March 2020, he moved back to his hometown of New York City because his unemployment benefits application had not yet been approved and he could no longer afford his rent. ¶ 125. At first, he stayed with his sister, but in June 2020 she lost her apartment and had to move into their mother's one-bedroom apartment, where two other relatives also reside. ¶ 126.  Because his mother's

apartment was overcrowded, he had to leave. ¶ 119. Mr. Crespo became homeless. ¶¶ 119-120. He was not sleeping on the subway. But he was skipping from the couch of one friend to the couch of another. *Id.* In March 2021, he cashed out the $1,000 in his 401(k)-retirement account and deposited it into his M&T Bank account. ¶ 127.  Crespo was ultimately able to obtain unemployment insurance benefits that were direct deposited into his account by the NYS Department of Labor. ¶ 145.

### GMBS Restrains of Mr. Crespo's Account

On February 13, 2020, GMBS learned that Mr. Crespo had lost his employment, and that the income execution was being terminated. ¶ 129. GMBS was not aware of any other employment obtained by Mr. Crespo after February 13, 2020. ¶ 130.

On or about August 26, 2021, GMBS served M&T Bank with an Information Subpoena and Bank Restraint. ¶ 131. Unbeknownst to Mr. Crespo, on September 3, 2021, GMBS had received a response to its information subpoena.¶ ¶165-166.

All of the $5,081.99 was from unemployment insurance payments made by direct deposit to Mr. Crespo's bank account. ¶¶133; 166-167.

Upon his return to the country, Mr. Crespo urgently needed this money released so he could pay his bills, which he did through autopay, including for his phone, storage unit, student loans, personal loans (which he had taken out to help cover his college tuition), and credit cards. ¶ 136.

When Mr. Crespo learned about the restraint, he became very anxious because he had bills for his phone, storage unit, student loans, personal loans, and credit cards set up to debit automatically from his restrained bank account, and he was scared about missing payments on these bills due to the restraint. ¶ 137.

On or around August 30, 2021, Mr. Crespo found he could not access the money in his M&T Bank account. ¶ 132. On or around September 2, 2021, Mr. Crespo called his bank to find out why he could not access his account. ¶138. But the bank said it could not help him and gave him the phone number for GMBS, and told Crespo to call them. *Id.*

## Contact with GMBS Collector Gary Thigpen & Conditional Release

On September 2, 2021, Mr. Crespo called GMBS and spoke to Defendant Gary Thigpen. ¶ 139. Mr. Crespo told Mr. Thigpen that all the money in Mr. Crespo's bank account was COVID-19 stimulus funds and unemployment benefits. ¶ 140. Mr. Thigpen told Mr. Crespo that GMBS would call M&T Bank to find out how much money was in the account, see how much they would be willing to take to release the account, and then call him back. ¶ 141.

According to Thigpen's account notes, M&T told him that there was $1400 after exemption. ¶ 142. Thigpen did not ask the bank if there were direct deposits from the NYS Department of Labor even though Mr. Crespo told him he was "on unemployment." Thigpen did not ask Crespo to email him bank statements. Mr. Thigpen called Mr. Crespo back and told him that they would release his account in exchange for a payment of $1,200 from his account. ¶ 143. As Mr. Crespo recalls:

> He said that he would take $1,200, and that he -- that they would take an initial payment of $1,200; that he would set up monthly payments for me to continue paying, and that they would release the account as soon as I signed and returned the paper notarized, which I did on the same day." ¶ 143.

> "But when he first said this, I says, 'You know, this is unemployment money. I don't think, you know, that you're allowed to do this.' And he didn't care. He didn't go into this explaining, like, 'Oh, wow, I didn't know.' No. He was, like, 'Well, **the only way** you're going to get your money released is if you sign this-- this agreement.'  And he hung up, called me back, and said, 'Oh, we'll take $1,200.'" ¶ 143.

Mr. Crespo had read online that COVID-19 stimulus funds and unemployment benefits

were exempt from debt collection, and so he again told Mr. Thigpen that the money in his account was COVID-19 stimulus funds and unemployment benefits and therefore exempt. ¶ 144. Mr. Crespo again told Mr. Thigpen that the money in the account was unemployment money and that they had no right to garnish it to relieve the debt. ¶145. As Mr. Crespo recalls:

> I explained to him, again, that it was unemployment money and stimulus money. And I told him that I verified it online that they had no right to take that money to relieve the debt. Any -- any debt collection was a no-go with the stimulus and the unemployment money. ¶145.

Mr. Thigpen acknowledges that Mr. Crespo told him that he was "on unemployment" insurance. ¶ 146. Indeed, Thigpen's own accounts notes state that Crespo told him he was "on unemployment." ¶¶ 129-130; 149. The New York Department of Labor pays unemployment benefits through direct deposit into the bank account of the recipient, ¶ 147, and the bank statements indicate this. ¶205.

Mr. Thigpen tacitly acknowledged to Mr. Crespo that Thigpen knew that unemployment insurance benefits were being deposited into his account. ¶ 149. Specifically, during their September 2 conversation, Mr. Thigpen told Mr. Crespo that they could get him on a payment plan so that in the future, as the unemployment gets deposited, his accounted wouldn't be frozen again. *Id.* As Mr. Crespo testified:

> "…Cause his -- his idea was 'Let me get you on a payment plan so **in the future, as your unemployment money gets deposited**, your account won't get frozen again…' which would have been the outcome; right? If they took the 1,200. At -- at some point, it would've gotten back to the amount where they could freeze it again." ¶ 149.

Mr. Crespo felt that Mr. Thigpen came off as a predator. ¶ 150. Mr. Crespo testified:

> "He came across as a predator, 'cause that's what he is." *Id.*

> "But, you know, frustration on top of frustration, you know what I'm saying? There -- there-- he's a predator. He's a liar, you know what I'm saying?" *Id.*

Mr. Thigpen testified that if a consumer tells him they're unemployed, he will send them a conditional release. ¶ 151.

During the September 2, 2021 call, Mr. Crespo informed Mr. Thigpen that he would not settle and that he planned to fight the judgment in court. ¶ 152. Even after Mr. Crespo informed GMBS that his account contained unemployment insurance payment, GMBS threatened Mr. Crespo that if he did not agree to the Conditional Release he would execute on the judgment in the near future. ¶¶ 152-154.

Mr. Thigpen was very forceful over the phone, and Mr. Crespo felt like he was being hammered. ¶ 154.

> "The feeling hammered was 'cause he -- he didn't want to listen to the fact that I kept telling him that it was unemployment money and stimulus money. All he cared about was me signing the paper, sending it back to him so that I could -- so he could release my money, which he didn't do." *Id.*

On September 2, 2021, after the phone call, Mr. Thigpen sent Mr. Crespo a Conditional Release whereby Mr. Crespo would authorize M&T Bank to release to GMBS $1,200 from his account in exchange for the release of the balance of the account. ¶ 156. The Conditional Release had the signature of Mr. Keilbach, but his digital signature is already pre-inserted when the form is generated. ¶¶157-159. It is the standard form GMBS uses for conditional releases sent to banks. ¶ 159. Mr. Crespo signed the Conditional Release and returned it to GMBS via email the same day, September 2, 2021. ¶ 160.

Critically, Mr. Crespo signed the Conditional Release because Thigpen said this was "**the only**" way to get access to his money. ¶ 161. As argued later in this memorandum, this is a false representation: Mr. Crespo could (or should be able to) get his money back if he completed and sent an Exemption Claim Form. But in the EIPA process, the consumer does not receive the exemption claim form until at least several days after a consumer calls the debt collector, after

being directed to by the bank when the consumer calls to ask why he cannot access his account. ¶ 332.

Mr. Crespo signed the Conditional Release because Mr. Thigpen was strong-arming him and told him that the only way he would get access to his money was by signing the agreement. ¶ 161.

> "Well, he was very forceful in that he wanted me to sign that paper; that was the only way I was going to get access to my money." *Id.*
>
> "'Cause at that point, we're not, really, having a cordial conversation; right? I'm somewhat animated 'cause I have no money and he knows he has the upper hand 'cause he's the one that has my money frozen. So it's not like we're on an even playing field." *Id.*
>
> "I felt that calling him would be adverse to my health, to my peace of mind, to the trip that I was going to go take. And this gentleman, who I don't know, who's supposedly supposed to be representing some firm that I owe money to, misrepresented himself. From the beginning of the conversation he said...'The only way you're going to get access to your money is by signing the agreement, getting it notarized, returning it, and I will unfreeze your account.' It never happened. It never happened. So why would I call him again? To get lied to further? To get more frustrated?" *Id.*

In addition, Mr. Crespo signed the conditional release because he felt anxious about not having access to his account for his upcoming trip. ¶ 162. On September 2, 2021, Mr. Crespo's other checking account at Citizens Bank only had a balance of $53.22. ¶ 163.

Mr. Thigpen told Mr. Crespo that he would unfreeze the bank account that day or the next. *See Keshavarz Decl.* [**Exhibit_**(*Crespo* Crespo Depo. Trans. 174:09-22)]. ¶ 164.

> "...Cause he said, 'Sign this and I'll release it today...At the latest, the next day. At the latest, the next day.' He said, 'It all depends on how fast you get this back to me.'" [**Exhibit_**(*Crespo* Crespo Depo. Trans. 396:24-397:08)].

On or around September 4. 2021, Mr. Crespo had still not regained access to his account prior to his trip, so he had to borrow $1,000 from Anthony Cartagena, a friend who was accompanying him on the trip. ¶ 168.

> "The only reason he loaned me the money is 'cause he was going on the trip, and if I didn't have access to my money, I would have had to cancel my trip. So it wasn't that I went borrowing the money, you know what I'm saying? It was something that he offered

to do so that I could still take my trip and not have the anxiety that I was going through while I was there." *Id.*

Mr. Crespo had booked the trip months prior, in June of 2021 – nearly 3 months prior to bank account being restrained. ¶ 169. It was a trip with friends and was intended to celebrate his graduation. *Id.* He had paid in June roughly $460-480 on airfare and $1,100 for a two-week stay at an all-inclusive resort. ¶ 170. Had he not gone he would have forfeited the money he paid for the trip. ¶ 168. Mr. Crespo paid Mr. Cartagena the $1000 back in early December 2021, after his M&T Bank account was unfrozen. ¶ 171.

GMBS apparently attempted – but in fact failed  --to fax the conditional release to M&T bank on September 2, 2021. ¶ 172-174. GMBS collector Brian Chiantella sent an email on October 28, 2021 to Gloria Coker, who works at GMBS, stating that the fax number on for M&T Bank on the September 2, 2021 Conditional Release was the wrong number for M&T bank and, he believed, that is why it was not previously processed. ¶ 174. In addition, there is no fax confirmation sheet in the records produced by GMBS for the fax on September 2, 2021 while fax confirmation sheets were produced when GMBS faxed the Conditional Release to M&T Bank on October 28, 2021, as well as for other faxes sent by GMBS in this case, such as a fax to the Sheriff. ¶ 173.

### Mr. Crespo's Account Remains Restrained for Months

For nearly two more months, GMBS did not take the $1,200 from Mr. Crespo's bank account or release his account. ¶ 175. Between September 2, 2021 and the end of September, Mr. Crespo attempted to transfer funds from another bank account (ending in 0717) to his restrained M&T account (4700) multiple times to see if he could access those funds. ¶ 176. However, all of the transfers were rejected. *Id.* Mr. Crespo testified:

        "'Cause I tried -- 'Cause I tried at the beginning of September; I tried at the

> beginning of October; I tried at the beginning of November; and I'm guessing that I also tried it in between those, you know, September 1st and October 1st." *Id.*

Mr. Crespo attempted to make these transfers in order to see if his account had been released, as Mr. Thigpen had told him. ¶ 177. Mr. Crespo called his bank several times and confirmed each time that his bank had still not received the Conditional Release from GMBS. ¶ 178. Mr. Crespo offered to send the Conditional Release to the bank himself, but his bank told him that it needed to receive the Conditional Release directly from GMBS. ¶ 179.

In their motion, GMBS takes Crespo to task for not calling Thigpen when he still could not access his account after the Conditional Release. Def. Mem. p 16. But Mr. Crespo had good reasons for never wanting to talk to Thigpen again. ¶ 180-181. He had already spoken to GMBS several times, which was very stressful for him because they were very aggressive. *Id.* He did not want to go through that again, so he did not call them again to ask about the agreement. *Id.*

On September 12, 2021, M&T Bank sent a letter and exemption claim form to Mr. Crespo's mother's apartment. ¶ 182. Mr. Crespo did not see this letter and form until September 19, 2021 when after he returned from the Dominican Republic. ¶ 183. The documents stated he could withdraw up to $3,600 from his bank account. ¶ 182. Mr. Crespo called his bank to ask about these documents, and he was told that filling out the Exemption Claim Form would "not make any difference" and that he could withdraw $3,600 but would then forfeit the remaining amount of money in his account. ¶184. Mr. Crespo did not want to forfeit the remaining amount of money in his bank account. ¶ 185. He also did not want to withdraw the $3,600 because he was homeless and did not want to keep that much cash on his person.  ¶ 186. He therefore decided that he had better not withdraw the $3,600 from his bank account. ¶ 187.

Two weeks after Mr. Crespo had signed the conditional release, he realized his bank account was still restrained when he tried to use his debit card to get home from the airport. ¶

188.

### **Impact of Bank Restraint on Mr. Crespo**

Mr. Crespo did not have access to his M&T Bank account from September 1, 2021 through the end of November 2021. ¶ 193. Mr. Crespo described some of the effects of the restraint:

> "Not only could I not access it or transfer it, but I couldn't pay any bills with it either…all -- all my bills…Phone bill, credit card bills, storage. I couldn't access money to go get food. I couldn't access money to go get a haircut or shave if I had an interview. You know, those kind of things." *Id.*

Having his bank restrained for months despite having signed the conditional release was stressful, frustrating and made him feel helpless. ¶ 194. Mr. Crespo explained his feelings about this as follows:

> "…it's, like, if you're going through another heart attack. I mean, you don't feel the elephant sitting on you, but you feel the tingling on the – between the shoulder and your elbow on the back side of your arm, on the side – on the side of your – of the ribs, the shortness of breath, the – the anxiety; it feels like your shirt is choking you." *Id.*

> "I mean, I want to say helpless, you know what I'm saying? 'Cause here -- here you have some money that the government is giving you, right, 'cause of you having worked and lost your job. Having been through what the entire country is going through, and then having someone who knows better; right? 'Cause he should know better no matter what. That is what his job is; right? And it says clearly, none of this money, whether unemployment, stimulus is not to cover debt, 'cause it was something that was -- that came out at the same time; right? So when the pandemic hit – I don't know if it was Senator Warren or something who made this a priority so that this would not happen; so that, you know, predators like this guy or like these people wouldn't come out and -- and do what they did. 'Cause imagine, they did that to me with all these safeguards. Imagine what they've been doing to people all these years…" *Id.*

Because of the restraint on his account, Mr. Crespo was unable to pay his bills for his phone, storage unit, credit cards, and personal loans, incurring multiple late fees. ¶ 195. He had also been applying for jobs, but he could no longer afford to pay for the haircut and shave he would need to get before a job interview; nor could he have afforded public transportation to get

to any job interviews. ¶ 196.  His mother helped him out with meals when she could, but she also has serious health issues, does not earn much money, and is the primary caretaker for several family members. ¶ 197.

With his bank account still restrained and his bills piling up, Mr. Crespo went to the clerk's office at the Civil Court of the City of New York, County of Bronx, to see if there was anything else he could do, and was given a list of free legal services he could reach out to. ¶ 198.

### GMBS immediately attempts to seize Crespo's Unemployment Deposits When a Legal Services attorney emails bank statement.

Mr. Crespo got into contact with the nonprofit organization New Economy Project ("NEP") through their NYC Financial Justice Hotline, which provided him with free limited-scope legal assistance to try to help him get his exempt funds released and vacate the sewer service judgment against him.  ¶199.

Attorney Susan Shin from NEP agreed to provide Mr. Crespo with limited legal assistance to send an email in order to facilitate the release of his bank account. ¶ 200-201. On October 27, 2021 at 9:34pm, Ms. Shin, on behalf of Mr. Crespo, emailed Keilbach to seek the release of the exempt funds. ¶202.  Ms. Shin made clear to GMBS that she was providing only "limited legal assistance" in relation to seeking to have GMBS agree to release the money. ¶ 203. Indeed, Ms. Shin wrote "Mr. Crespo is cc'ed on this email and …you may also respond only to Mr. Crespo if you prefer."  ¶204.

In the October 27 email Ms. Shin attached emailed GMBS, attaching an extensive breakdown, along with supporting documentation of bank statements, showing that all the money in the bank account at the time of GMBS's restraint was exempt unemployment benefits and demanding that the account be released immediately. ¶ 205. The July and August 2021 bank statements demonstrate all of the money in the account was exempt. *See* Keshavarz Decl.

[**Exhibit CC** October 27, 2021 mail from Shin to Keilbach with Bank Statements etc., pp. 20-24]. A debt collection law firm should be able to do this simple "lowest intermediary balance calculation" in about 60 seconds. *See Arias*, 875 F.3dat 136 (describing calculation method). Here the ending balance was $5,081.99 on September 3. The total deposits in July and August were $5,392, of which $4,392 were labeled as unemployment insurance direct deposits.

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮▮▮▮0717 | JUL.03-AUG.04,2021 |
| BEGINNING BALANCE | $6,258.50 |
| DEPOSITS & CREDITS | 3,440.00 |
| LESS CHECKS & DEBITS | 3,594.58 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $6,104.00 |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮▮▮▮0717 | AUG.05-SEP.03,2021 |
| BEGINNING BALANCE | $6,104.00 |
| DEPOSITS & CREDITS | 1,952.00 |
| LESS CHECKS & DEBITS | 2,974.01 |
| LESS SERVICE CHARGES | 0.00 |
| ENDING BALANCE | $5,081.99 |

This is more than enough to document that all of the $5,081.99 balance is exempt because the exempt unemployment funds are considered on top of the $3,000 standard deduction for bank accounts with direct deposit public benefits. CPLR §§ 5205(l), 5222(h).

The bank account statements disclosure by abbreviation on the bank statements show the deposits were NYS Department of Labor Unemployment Insurance Direct Deposit ("NYS DOL UI DD UI DD") for $300.00 and $188 for August 31, for example. ¶205.

| 08/31/2021 | NYS DOL UI DD UI DD | | 300.00 |
|---|---|---|---|
| 08/31/2021 | NYS DOL UI DD UI DD | | 188.00 |

The statement abbreviation is exactly the same as the one noted by M&T Bank's Information Subpoena Response to question four GMBS received on September 4, 2021 ("NYS DOL UI DD UI DD  $300.00"). *See Keshavarz Decl.* [**Exhibit QQQ,** M&T Bank September 3, 2021 answers to GMBS Information Subpoena]. The bank response was in response to the question, "Does debtor have automatic credits (paychecks, social security, etc.) deposited to any accounts. If yes from where (including name and address)."  These were the last two direct deposits into the account, all that the bank could fill into the one-inch space GMBS allowed for a

response, ¶ 165-167, as reproduced here:

Q. No. 4  Does debtor have automatic credits (paychecks, social security, etc.) deposited to any accounts.  If yes from where (including name and address)

*[handwritten: Nys Dol WI DO WI DO $ 88.²²]*
*[handwritten: Nys Dol WI DO WI DO $ 300.⁻⁻]*

Q. No. 5  What is debtor's home address and home telephone number?

In the October 27 email Ms. Shin provided additional documentation of exempt funds, ¶ ¶ 206, 207, but the July and August 2021 statements were all that was needed to demonstrate all the funds were exempt under the lowest intermediary balance calculation ("LIB").  The LIB is the method to calculate whether mixed funds in an account are exempt. *Arias,* 875 F.3d at 136 (*citing to* CPLR § 52220a(c)(4)).  Crespo's account is entirely exempt under LIB for the same reason the social security deposits in *Arias* demonstrated all the funds were exempt: "Here the bank statements show only deposits of SSRI and an ending balance lower than the sum of the exempt deposits. The entire balance was thus clearly exempt." *Arias,* 875 F.3d at 136.

On October 28, at 10:15am, Mr. Keilbach forwarded Susan Shin's email to both Michael Robert and Brian Chiantella, the Collections Manager and moments later also to Thigpen. ¶ 208. Brian Chiantella is the Collection Department Manager. Michael Roberts is an account representative and paralegal who helps collect judgments at GMBS. ¶ 209. In his email, Mr. Keilbach asks "let me know your thoughts" as to Ms. Shin's email. ¶ 208. In response, Mr. Chiantella asked whether Mr. Crespo was receiving unemployment insurance or getting payments from a retirement account. ¶ 211.

Within 7 minutes of receiving Ms. Shin's email and attached documents, Mr. Chiantella was able to determine, and stated in a response email to Roberts and Thigpen that "it does look like 90% of the deposits came from unemployment." ¶212.  "I don't want to go in front of a judge on this." ¶212.  In response to the 10:15am email, Mr. Roberts responded saying that Mr.

Crespo had signed a conditional release on 9/2/21 but that they never got paid. ¶ 213. Mr. Chiantella responded to Mr. Roberts at 10:28am saying that those deposits were from months ago and that "if he still agrees to sign great, otherwise I don't see us winning this case in front of a judge at the moment." ¶ 214.

Around 10:25 am, Mr. Thigpen called M&T bank because he noticed that GMBS had not received payment, according to his account notes. ¶ 215. At 10:35 am, Mr. Thigpen forwarded the signed conditional release to Mr. Chiantella and Mr. Roberts. ¶ 216. At 10:39 am, Mr. Chiantella asked Gloria Coker, who works in the GMBS collection department, to fax the conditional release to M&T Bank because it was not properly sent in September. ¶ 217. At 10:57 am, Ms. Coker responded to Mr. Chiantella confirming that she had faxed the Conditional Release and scanned it to their hard drive. ¶ 218. At 11:00 am, Mr. Chiantella forwarded Ms. Coker's email to Mr. Roberts and Mr. Thigpen and said, "CR has been faxed to M&T, see below." ¶ 219. The email forwarded from Ms. Coker include an attachment of the September 2 conditional release with the October 28 fax confirmation sheet for its sending. ¶ 218.

At 11:33 am, Mr. Thigpen responded to Mr. Keilbach's 10:15 am email regarding Ms. Shin's email demanding immediate release of Mr. Crespo's bank account. ¶ 220. His response said, "doesn't look good but he signed and never mentioned exempt funds." *Id.* This indicates that, even though Crespo had documented his funds were exempt, it did not matter because he signed the conditional release. While Mr. Thigpen claims Crespo "never mentioned exempt funds," as previously noted his own account notes say Mr. Crespo said he was "on unemployment." ¶ 129-130.

Mr. Keilbach[1] knew that the conditional release was sent again to Mr. Crespo's bank and believed that, legally, they were entitled to the money. ¶ 221. Mr. Keilbach believed that, even though Mr. Crespo's funds were later determined to be exempt, because he had signed the conditional release, he had agreed to pay over the exempt funds. ¶ 222. Mr. Keilbach testified that because Mr. Crespo did not file an exemption claim form in the proscribed time and had signed a conditional release, GMBS had a legal right to obtain his exempt unemployment funds. ¶ 223.

On October 28, 2021 at 11:42am, Eric Keilbach at GMBS responded via email to Susan Shin at the New Economy Project, stating, "I just wanted to make sure you are aware that Mr. Crespo signed a conditional release for $1200 that we are following up with the bank about. He also apparently never filed an exemption claim with the bank." ¶ 224. Mr. Keilbach believed that after he spoke with Susan Shin from New Economy Project, she was going to get him a settlement offer, and they would work out an agreement on Mr. Crespo's judgment. ¶ 225. In other words, they would be able to extract money from Mr. Crespo in any event.

At 12:51 pm on October 28th, Mr. Keilbach emailed Ms. Shin informing her that, after review of the documentation, they would be contacting the bank and telling them to release Mr. Crespo's money "without prejudice." ¶ 226. At 12:55pm, Mr. Chiantella emailed Mr. Roberts and told him that they need to release Mr. Crespo's account. ¶ 227. At 12:57 pm, Mr. Chiantella emailed Mr. Keilbach and told him that he had just emailed Mr. Roberts for a release. ¶ 228. At 1:12 pm, Ms. Coker sent a scan of a bank release letter to Mr. Chiantella, Mr. Roberts, Mr. Keilbach and Mr. Thigpen. ¶ 229. The letter, which was signed by Mr. Keilbach, requested the immediate release of Mr. Crespo's M&T account. *Id.*

---

[1] Keilbach was testifying in a duel capacity as a Fed.R.Civ.P. 36(b)(6) corporate representative and as a 30(b)(1) witness.

When Mr. Crespo contacted his bank on October 29, 2021, he was told that GMBS had sent the Conditional Release and that $1,200 had been taken from his account. ¶ 230. On October 29, 2021, Ms. Shin emailed Mr. Keilbach again to ask why the money had not been released from Mr. Crespo's account. ¶ 231. Mr. Keilbach forwarded Ms. Shin's email to Mr. Chiantella, Mr. Roberts and Mr. Thigpen with the message, "This is why we can't just do this stuff." ¶ 232.

On October 29, 2021 at 11:17 am, Mr. Keilbach stated in a reply email to Ms. Shin and Mr. Crespo that if a check for the $1,200 was being sent to their office, they would send it to Mr. Crespo. ¶ 233. On October 29, 2021 at 11:33 am, Mr. Thigpen sent a full release for Mr. Crespo to M&T Bank. At 11:35 am, M&T's legal document processing account sent a response email confirming their receipt of the release. ¶ 235. At 2:32 pm, Mr. Keilbach emailed Ms. Shin and Mr. Crespo informing them that the bank was not going to process the conditional release and would fully release Mr. Crespo's account. ¶ 236.

GMBS believes that, as a legal matter, it should have received the $1,200 of Mr. Crespo's unemployment funds pursuant to the conditional release. ¶ 221-223. Mr. Keilbach testified he did not need to look at the documents Ms. Shin sent closely to determine if the funds in the account was exempt, but when pressed he could not point to anything in the documents that indicated the funds were anything but exempt. ¶ 238. GMBS does not believe that GMBS did anything wrong with respect to Mr. Crespo. ¶ 239.

### Mr. Crespo's Order to Show Cause

On November 4, 2021, with the assistance of New Economy Project, Mr. Crespo filed a *pro se* Order to Show Cause in the Civil Court of the City of New York, County of Bronx, to vacate the Default Judgment against him, order restitution of all funds levied and/or garnished, and dismiss the Collection Lawsuit for lack of personal jurisdiction. ¶ 240.

Mr. Crespo was *pro se* throughout the case and at all court hearings in this matter. ¶ 241. He went to all hearings alone. ¶241. New Economy Project did not file a notice of appearance. ¶ 201. In relation to the collection lawsuit, their limited scope representation was only to assist Mr. Crespo in the drafting of the Order to Show Cause. ¶ 200.

On November 17, 2021, there was an appearance in Bronx Civil Court to hear Mr. Crespo's *pro se* order to show cause. ¶ 242.  The date of the hearing for Crespo's OSC was calendared in GMBS's Account Notes system but for some reason they did not attend. ¶ 243-244. GMBS did not file an opposition to Crespo's *pro se* Order to Show Cause and did not appear for the November 17 hearing on the Crespo Order to Show Cause. ¶ 244.  As a result, the court marked the Order to Show Cause as "Submitted – No Opposition" on the November 17, 2021 return date. ¶ 247. Even though it filed no opposition and did not appear at the hearing, they made Mr. Crespo unnecessarily go to the hearing. ¶ 246.

On November 22, 2021, the court issued a decision on granting Mr. Crespo's Order to Show Cause ordering a traverse hearing for February 14, 2022, holding that Mr. Crespo had presented sufficient evidence to rebut the process server's affidavit, and set a traverse hearing. ¶ 248.

**GMBS attempts to use the Conditional Release to prevent Crespo from vacating the sewer service judgment.**

GMBS appeared at the February 18th hearing and argued that by signing the Conditional Release Mr. Crespo had acknowledged and consented to the Conditional Release. ¶ 249. On February 18, 2022, GMBS sent the Conditional Release to the judge, who told them they could have appeared and submitted it at the OSC motion stage. ¶ 251.

Notably, during the February 18, 2022 hearing, the judge found that Mr. Crespo was under duress in signing the Conditional Release. ¶ 252.  GMBS asked for a week to file an Order

to Show Cause to vacate their default in appearing. ¶ 253. The court granted GMBS' request to adjourn the hearing to February 25 so that Plaintiff could file and have a judge sign Order to Show cause to vacate the prior OSC granting Mr. Crespo a traverse hearing.  ¶ 254.

On February 23, 2022, GMBS filed an OSC but did not have or even present it to the judge to sign, as ordered on February 18 if GMBS was going to seek an OSC. ¶ 255. GMBS opposed Mr. Crespo's order to show cause on the basis that he had signed the conditional release, and that Mr. Crespo never challenged the income execution that occurred in 2019. ¶ 256. This is one of the arguments that the Court expressly considered and rejected in its Order vacating the default judgment, releasing restraints, and ordering monies previously collected from Mr. Crespo returned within 30 days. ¶ 257.

Mr. Keilbach believed that GMBS attorney Rohparvar sent the court the conditional release and filed an order to show cause because he would be able to settle the case, or at least vacate the default hearing. ¶ 258. Put differently, GMBS filed their OSC to pressure Crespo to pay the sewer service judgment on a known inflated debt. Because GMBS did not submit an order for the court's signature by February 25, 2022, the court did not consider the Conditional Release further. ¶ 259.

GMBS has argued that, because Mr. Crespo signed a Conditional Release, he waived his right to sue and that the default against GMBS on his order to show cause should be vacated. ¶ 260. GMBS has attempted to use the Conditional Release, which was signed under duress, in order prevent Mr. Crespo from vacating the judgment and releasing his bank account. ¶ 261.

## The Court Vacates Judgment Against Mr. Crespo

The court entered an order on March 8, 2022 that the Default Judgment be vacated and all monies collected be returned to Mr. Crespo within 30 days. ¶ 263. [*Note: this document is

titled "Amended Order Vacating Judgment," however there was no initial order in the Court fie]

In its Order, the Court considered and rejected the arguments that GMBS made in their order to show cause. ¶ 264. The Court noted that the Plaintiff did not produce either the process server or his records at the traverse hearing. ¶265. Instead, Plaintiff offered the stipulation of conditional release in support of their case, alluding to the fact that a defect in personal jurisdiction may be waived where a party submits to the court's jurisdiction. ¶ 266. The Court held that Crespo did not submit to the court's jurisdiction, nor did he offer to tender payment in partial satisfaction of the judgment, but only sought to regain access of his bank account. ¶ 267.

The Court held that the funds in the account were a combination of unemployment benefits and emergency stimulus payments, both exempt from restraint, garnishment, and levy under New York law. *CPLR Article 52 et seq.* ¶ 268. The Court held that Crespo only became aware of the default judgment when his bank account was levied upon, not when the judgment was entered. ¶ 269. The Court also ruled that, along with Mr. Crespo's testimony that he never lived at the purported service address, the January 2005 service was inadequate because it occurred 10 days before the filing of the summons and complaint. ¶ 270. The Court credited Mr. Crespo's explanation for the 19-month delay in becoming aware of the default judgment—that he experienced economic hardship and serious medical issues. ¶ 271.

On March 10, 2022 at 8:27 am, GMBS received notice of the order vacating judgment and ordering them to return Mr. Crespo's money. ¶ 274. This is reflected in their internal account notes. *Id.* On March 17, 2022, Mr. Crespo filed the order with notice of entry for Judge Powell's amended decision and order and mailed it to GMBS. ¶ 272. Mr. Crespo incurred expenses of $15.75 to mail a copy of the order and notice of entry via certified mail and return receipt to

GMBS. ¶ 273.

**Events After Judgment Was Vacated**

At 8:28am on March 10, 2022 GMBS received the judge's March 8 Order and was aware that it had been ordered to return all the money collected from Mr. Crespo within 30 days. ¶ 275. GMBS incorrectly states the date of the order was March 11; that was the date of the clerk stamp that it was filed, but the order itself was signed and dated March 8. *See Keshavarz Decl.* [**Exhibit II,** Order Vacating Judgment, March 8, 2022)].   Per the Order Vacating Judgment, GMBS should have returned the money by April 7, 2022. ¶ 276. However, by April 11, 2022, Mr. Crespo still had not received any of the money. ¶ 277. GMBS did not deliver any of the funds until April 21, weeks after being ordered to return the money. ¶ 280.

After receiving the order from the court dismissing the case with prejudice on or around March 10, 2022, GMBS was still waiting for the OSC to be signed and considering how to proceed. ¶ 278. GMBS believed it was too early to determine whether that had to return the money immediately because they still thought that their OSC would be signed. ¶ 279. On or around April 21, 2022, GMBS issued Mr. Crespo a check for $1,378.86, and delivered it to Mr. Crespo on around April 25, 2022.  ¶ 280.

This delay was not an accident: it was a conscious decision made by GMBS.  GMBS had a bizarre belief that the Court may self-vacate the March 8 traverse hearing order which dismissed the case with prejudice because of the unsigned OSC GMBS filed to vacate the Mr. Crespo's OSC (which successfully rebutted the process server affidavit and set the case for the traverse hearing).

Deciding to play with fire yet again, GMBS made the decision not to return the "all monies collected" from Crespo – the $1,458.30 in garnished funds – but only $1,378.86. ¶ 280-

281. The amounted returned consisted of the amount GMBS obtained for its attorney's fees and expenses, plus the $206.02 it previously paid out to its client. ¶ 282-283. It is not clear whether GMBS even told their client there was an order to return the money it previously garnished from Mr. Crespo. ¶ 285. GMBS did not make any attempts to obtain the $206 from their client that GMBS ultimately returned to Mr. Crespo because Mr. Keilbach felt that, since they missed the court date, it was inappropriate to ask for the money back since they should not have missed the court date. ¶ 284. Inexplicably, even today, there is $79.44 missing from Mr. Crespo's refund. ¶ 294.

### Mr. Crespo Follows Up on the Failure of GMBS to Return "all monies"

On April 28, 2022, Mr. Crespo, *pro se*, sent Eric Keilbach at GMBS an email explaining the deficiency and demanding that GMBS refund him the remaining $79.44. ¶ 286. On April 29, 2022, Mr. Keilbach responded to Mr. Crespo telling him that GMBS was following up with the Sheriff about "if they are sending back the difference." ¶ 287. But the amount that the sheriff had taken for poundage was only $69.44, leaving and unexplained missing balance of $10. ¶ 288.

On May 3, 2022, GMBS faxed the Erie County Sheriff's requesting a refund for the poundage. ¶ 289. GMBS believed that it **had** to reimburse Mr. Crespo for the poundage cost if the Sheriff had not done so. ¶ 290. On May 9, 2022, Mr. Crespo emailed Mr. Keilbach asking for an update on the return of the $79.44. ¶ 291. Mr. Keilbach and GMBS did not respond. *Id.* On May 25, 2022, Mr. Crespo again emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS again did not respond. ¶ 292. Even after being sued in this FDCPA action, GMBS still has not given Mr. Crespo the $79.44. ¶ 294. Mr. Crespo has also never been reimbursed for the $110 legal processing fee that his bank charged due to Defendants' restraint of his exempt funds. ¶ 294.

**GMBS's Exempt Money Restraints in *Arias* and *Fadlevich***

GMBS's restraint and lengthy retention of exempt social security and social security disability money from consumers in *Arias* and *Fadlevich* is some evidence a juror could consider in determining an absence of mistake or common scheme or plan as to Mr. Crespo. ¶ 295-300 & ¶ 301-367; See also Exhibit OOO, Arias Decision and Exhibit PPP, Fadlevich Complaint. For Mr. Fadlevich, from November 21, 2018 to July 15, 2019 (236 days), GMBS restrained anywhere from $7,519.68 to $25,042.08 of Mr. Fadlevich exempt funds restrained despite receiving a timely executed exemption claim form and bank statements showing direct deposits from SSDI. ¶ 354. Documents were emailed to Mr. Thigpen and mailed to GMBS four times over a period of months.

## III.    THE RULE 56 STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); Fed.R.Civ.P. 56(c). Summary judgment for Plaintiff is proper in this case because there is no genuine issue of any material fact and because Plaintiff is entitled to judgment as a matter of law as to the issues brought forth by this motion. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. at 322.

## IV.    ARGUMENT

The gravamen of Mr. Crespo's claims is the unitary course of conduct to restrain and attempt to seize exempt funds, to do so in a manner that undermines a consumer's ability to challenge a sewer service judgment; and in addition to refuse to promptly return the money garnished by using a sewer service judgment.

As to the unitary course of conduct, GMBS has violated the FDCPA by: 1) by restraining and maintaining the restraint on an account that contained exempt unemployment insurance benefits; 2) by using strong arm tactics and misrepresentations to induce Crespo to sign the Conditional Release, including stating that it was the "only way" to release his account and that they would release the account by tomorrow; 3) while the FDCPA is a strict liability statute, the knowledge of GMBS is indicated by a) the timing of the Conditional Release, b) the admission of GMBS that is uses Conditional Releases to obtain exempt funds, c) Thigpen's tacit admission that he knew the funds in the account were unemployment insurance, d) the information subpoena response documenting unemployment insurance direct deposits, e) that GMBS immediately attempted to seize Crespo's bank account funds when it received bank statements showing the money was exempt, and d) that the conditional release is a standard form.

GMBS violated the FDCPA by using the Conditional Release to oppose vacating the sewer service judgment. GMBS violated the FDCPA and committed conversion by intentionally not complying with a court order to timely return previously garnished funds, and for still refusing to return all the monies taken from Crespo. The FDCPA and conversion claims constitute negligence and gross negligence. Whether Plaintiff may recover punitive damages for conversion or gross negligence is a question for the jury.

To the degree that Plaintiff does not prevail on summary judgment for the above claims, at a minimum there are disputed facts from which a reasonable juror could find liability, and therefore the Summary Judgment Motion of GMBS should be denied.

Lastly, as the conduct of GMBS regarding restraining exempt funds is part of a unitary course of conduct, the Court should consider the practice as a whole, and not just the individual violations in a vacuum. *See Villalba v. Houslanger & Associates, PLLC*, 2022 WL 900538 * 11,

24 (E.D.N.Y. Mar. 28, 2022) (While Defendants argue the Stipulation was not unfair or deception, "In any event… offering the Stipulation here was just part of Defendants' efforts to collect an "invalid debt", *e.g.* judgments Defendants knew were likely entered on the basis of a sewer service judgment) (cleaned up).

### A. GMBS violated the FDCPA by restraining and maintaining the restraint on an account that contained exempt unemployment insurance benefits.

GMBS violated the FDCPA because it knew, or had reason to know, or consciously disregarded learning that it was seeking to garnished exempt funds. *See Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1517 (9th Cir. 1994) ("Finally, a jury could rationally find the filing of an application for a writ of garnishment when the Foxes were current in payments demanded by Citicorp agents to constitute an unfair or unconscionable means of collection or attempted collection of a debt under section 1692f."); *Arias,* 875 F.3d at 138 (citing *Fox* approvingly); *Bray v. Cadle Co.*, 2010 WL 4053794 at * 15 (S.D. Tex. 2010) ("The Court finds that Plaintiff has stated a claim under the FDCPA [1692f] by alleging that 1) his bank account was exempt by law from garnishment by the Social Security Act; and 2) Defendants garnished the bank account, despite knowing or having reason to know that it contained Social Security funds and despite having failed to conduct pre-garnishment discovery."); *Todd v. Weltman, Weinberg & Reis, Co., L.P.A.*, 348 F.Supp.2d 903, 915 (S.D.Ohio 2004) *aff'd sub nom. Todd v. Weltman, Weinberg & Reis Co.,* L.P.A., 434 F.3d 432 (6th Cir. 2006) (holding that plaintiff stated a claim under § 1692f for wrongful garnishment because defendants had no reason to believe plaintiff's bank account contained non-exempt funds, and Ohio law permitted pre-garnishment debtor's examination); *Hogue v. Palisades Collection, LLC*, 494 F. Supp. 2d 1043, 1051 (S.D. Iowa 2007)(holding consumer stated a claim under § 1692f where consumer alleged that the defendants garnished his bank account containing Social Security funds even though consumer

had provided a sworn affidavit stating that his bank account contained only Social Security funds, and where Iowa law provided for a pre-garnishment debtor's examination to determine the exempt status of funds); *Barrows v. Petrie & Stocking, S.C.*, 2008 WL 3540405 at * 8, 9 (W.D. Wis. 2008) ("by serving a garnishment summons and complaint [on the consumer's bank] that included disbursements to which they were not entitled" defendants violated, *inter alia,* 1692f(1)); *Billsie v. Brooksbank*, 525 F. Supp. 2d 1290, 1294 (D.N.M. 2007) (The refusal to return funds garnished from the wrong person states a 1692f cause of action that is not time-barred); *Lovelace v. Stephens & Michaels Associates, Inc*., 2007 WL 3333019 at * 4, 5 (E.D. Mich. 2007) (While the allegation that the debt collector drew a check from consumer's bank account without authorization stated a claim 15 U.S.C. § 1692f, disputed issues of material fact prevented summary judgment); *Lee v. Javitch, Block & Rathbone, LLP*, 484 F. Supp. 2d 816, 820-21 (S.D. Ohio 2007) ("Ohio law expressly requires the attorney to affirm that he has "a reasonable basis to believe" that non-exempt assets exist. If he has no basis, or a false basis, for his belief, such a statement could constitute 'unfair or unconscionable' conduct [under 1692f]); *Watkins v. Peterson Enterprises, Inc.*, 57 F. Supp. 2d 1102, 1108 (E.D. Wash. 1999) ("Writs [of garnishment] "B" and "C" included costs and fees associated with prior unsuccessful writs of garnishment. Since [the debt collector] was not permitted to recover those sums under Washington law, Writs "B" and "C" falsely represented [the consumer's] debt in violation of § 1692e. For the same reason, Peterson's decision *to serve* Writs "B" and "C" upon Telco [,the consumer's bank,] was an unfair collection practice in violation of § 1692f.").

*Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 531 (S.D.N.Y. 2013) adopted *Fox*, *Bray*, *Hogue*, *Todd*, and *Lovelace* as authority to support its own holding that the "(1) removing money from a bank account when a court has forbidden this to occur and (2)

deliberately refusing for many months to return money seized from a bank account where a court has ordered it returned 'forthwith'" states an FDCPA claim. "The least sophisticated consumer standard is used to determine whether a practice is unfair or unconscionable." *Arias,* 875 F.3d at 135.

The case at bar is worse than *Bray*, *Todd*, or *Hogue*, where the collection law firm just had the *ability* of post-judgment discovery to determine whether funds in an account may be exempt. GMBS had *already* performed its post-judgment discovery on whether Crespo's bank account contained exempt funds, and the answer was "yes." M&T Bank's verified answer to the GMBS information subpoena disclosed that the last two direct deposits into the restrained account were unemployment insurance direct deposits from the NYS Department of Labor. ¶ 167. This proves what Crespo had told Thigpen: that he was "on unemployment." ¶¶ 140; 145; 146. GMBS did not need to take the ""word" of a judgment debtor", Def. Mem. p. 5 because GMBS had the documentary evidence directly from the bank in response to its own information subpoena.

Is that, by itself, definitive proof that *all* of the money in excess of the $3,000 standard deduction was exempt? No, but it does not need to be for GMBS to be liable. However, the information subpoena question only asked, "Does debtor have automatic credits (paychecks, social security, etc.) deposited to any accounts. If yes from where (including name and address)." Of note, the subpoena gave the bank a very small space in which to answer—a line only one-inch-tall. ¶ 167. But the larger point is that, certainly by the point that GMBS received the subpoena response on September 3, 2021 it acted at its own peril by not telling M&T Bank to hold off on releasing the money under the September 2nd Conditional Release. That is, they should have told them to hold off until they could have looked into the exempt funds issue

further. In addition, the account does not need to be entirely exempt for the release to apply in part to exempt funds. At bottom, GMBS is attempting to deliberately avoid knowledge as to the extent to which Crespo's account contained exempt unemployment insurance payments. But Courts have often recognized that actual knowledge and the deliberate avoidance of knowledge are, "if not the same state of mind, the same degree of fault." *AMPAT/Midwest, Inc. v Illinois Tool Works, Inc.*, 896 F2d 1035, 1042 (7th Cir 1990). In other words, "knowledge may be proved by demonstrating that the defendant was conscious of a substantial chance that some fact obtained, but averted his eyes for fear of learning more." See *United States v. Ladish Malting* Co., 135 F.3d 484, 488 (7th Cir. 1998).

GMBS takes Crespo to task for not submitting copies of his bank statements so that GMBS would have more than his say so that the funds in the account were exempt. Crespo would not receive an ECF ("Exemption Claim Form")—which states that he may expedite the release of a restrained account if the consumer attached documentary proof—for 17 more days.. ¶¶ 189; 330. The obvious question is, why Thigpen didn't ask Crespo to email his last two months of bank statements. Thigpen is the professional debt collector, who has worked in the collection industry for 30 years and worked for a major debt collection firm. Meanwhile, Crespo is the least sophisticated consumer.

During their September 2, 2021 call, Crespo adamantly explained to Thigpen that most of the money in his account was unemployment income and COVID-19 stimulus money. Like the defendant in *Bray*, Thigpen and GMBS "knew or had reason to know" that Mr. Crespo's funds were exempt. ¶ ¶140-145; *Bray*, 2010 WL 4053794 at 15. After being put on notice on September 2 by Crespo and then again by M&T Bank's Information Subpoena response, GMBS consciously disregarded this fact by failing to inquire further into the status of the funds. ¶ ¶ 145;

165-167.

There is substantial evidence that shows that GMBS knowingly disregarded Crespo's rights. First, as stated above, Crespo repeatedly told Thigpen during their call that the funds were unemployment and stimulus money. ¶ ¶ 140; 145. Thigpen acknowledged this fact during the call when he told Crespo that they could get him on a payment plan so that, "in the future, as your unemployment money gets deposited, your account won't get frozen again…" ¶ 149. But, as Crespo testified, Thigpen clearly "didn't want to listen to the fact that [Crespo] kept telling him that it was unemployment money and stimulus money." ¶ 154.

GMBS' deliberate disregard of this fact continued September 3, 2021, when they received M&T Bank's response to their information subpoena. In their response to the question regarding Crespo's automatic deposits, they listed "NYS DOL UI DD UI DD" (New York State Department of Labor Unemployment Insurance Direct Deposit) as the two most recent deposits:

Q. No. 4  Does debtor have automatic credits (paychecks, social security, etc.) deposited to any accounts.  If yes from where (including name and address)

Nys Dol UI DD UI DD $188.⁰¹
Nys Dol UI DD UI DD $300.⁰⁰

Q. No. 5  What is debtor's home address and home telephone number?

Defendants conveniently left this fact out of their own memorandum, stating that the bank's response simply "stated Plaintiff's place of business was Installs LLC and that he had over $5,000 in his account." Def. Mem. p. 12. However, they clearly knew what the abbreviation meant because, within minutes of seeing the same abbreviation in the bank documents that Susan Shin sent, Chiantella (Collection Department Manager) noted that "it does look like 90% of the deposits came from unemployment. I don't want to go in front of a judge on this."¶ 212. Even after receiving this information from M&T Bank GMBS chose to "avert [their] eyes" rather than inquire further. *Ladish*, 135 F.3d at 488

GMBS argues that "at the time Plaintiff spoke with Mr. Thigpen, Plaintiff did not provide

GMBS or M&T Bank with an exemption claim form…or any documentation" demonstrating that his funds were exempt. Def. Mem. p. 15. However, this September 2 call was Mr. Crespo's first contact with GMBS, which was made immediately after learning that his account was restrained. ¶¶ 138-139. At this point, there was no reason for Mr. Crespo to know that he should send bank statements or documentation. Indeed, there is no reason to expect the average consumer to know this unless they have prior experience with this exact situation, which Mr. Crespo did not. Mr. Thipgen, on the other hand, is not the "average person" with respect to debt collection and he should have known to ask Mr. Crespo for documentation.

GMBS' intent to wrongfully garnish Crespo's exempt funds can be further inferred from the fact that, almost immediately after receiving Shin's email with detailed documentation, GMBS tried to restrain Crespo's account. ¶ 205. After Keilbach received the email, he forwarded it to Chiantella, Roberts, and Thigpen. ¶ 208. At this point, they realized they'd never gotten paid from Crespo's garnished account because the fax number they had sent the conditional release to was incorrect. ¶ 213; 215; 217. Within 25 minutes of receiving Shin's email, Chiantella asked Gloria Coker to re-fax the conditional release to the bank, which she did. ¶¶ 217-219. This course of events clearly shows that GMBS intended to get paid regardless of whether the funds were exempt. In this way, they knowingly disregarded Mr. Crespo's rights.

**B. GMBS violated the FDCPA by using strong arm tactics and misrepresentations to induce Crespo sign the Conditional Release, including that it was the "only way" to release his account and that they would release the account by tomorrow**

Mr. Crespo testified he felt "hammered" by Thigpen to sign. ¶ 154. He felt that Thigpen had all the power because GMBS had his bank account was frozen and he had no money and he needed the money. ¶¶ 161-164. He was afraid that without access to the money he would have to forfeit the $1,500 all-inclusive trip that he had paid for months earlier as a graduation present for

himself, and for which he was about to leave. ¶¶ 168-170. Indeed, at the February 18 traverse hearing, the state Court judge concluded that Mr. Crespo felt under duress in signing the Conditional Release. ¶ 252.

Critically, Thigpen repeatedly stated (falsely) that the "***only way***" Crespo could get his money released was to sign the Conditional Release. ¶¶ 143;161. This is false. As GMBS well knows, if Crespo filled out the ECF, he would get the money in 10 days. ¶ 332.Clearly, GMBS wanted Crespo to sign the release immediately, before Crespo could learn of his ECF rights. The ECF form suggests that the consumer can attach bank statements to the executed form to expedite release of the money. ¶¶ 330-332. GMBS knows this as well given their extensive experience in the field and their own mention of the exemption claim form in this case. ¶ ¶ 57; 223-224.

The "only way" statements by Thigpen make this situation squarely an *Easterling* violation. *Easterling v. Collecto, Inc.*, 692 F.3d 229 (2d Cir. 2012). In *Easterling* the debt collector mailed the consumer a collection letter stating that her student loans are "NOT eligible for bankruptcy discharge." *Id.* 692 F.3d at 235, 236. The district court dismissed the complaint, holding while it was "technically possible" for the instant consumer to obtain a discharge it was extremely unlikely given that she had obtained a bankruptcy before listed the student loan debts as "nondischargeable," that she had no current intent to seek discharge, and for other reasons. The Second Circuit reversed, holding that while there may be very high hurdles for the consumer to overcome to obtain a student loan discharge, it could still be possible in the future. Thus, the collector's statement that the consumer's loan was ineligible for bankruptcy was false on its face.

Just as it is "fundamentally misleading in that it suggests that the debtor has no possible means of discharging her student loans in bankruptcy," it was fundamentally misleading to tell

33

Crespo that the "only way" to get his account released was to sign the Conditional Release.

This situation was significantly more misleading than *Easterling* because GMBS knew that in a few more days, Crespo would have the ECF form that could force GMBS to release the account. The representations are materially misleading for a number of reasons. In *Arias*, the representations by GMBS to the consumer as to his burden of proof to demonstrate that the funds in his account were exempt were materially deceptive because they "had the "capacity to discourage debtors from fully availing themselves of their legal rights," *Arias* at 136, 137 *quoting Easterling* at 235. In *Arias,* the GMBS violated 1692e by "suggesting that (1) the commingling of exempt and non-exempt funds renders the balance non-exempt, and (2) the consumer must disprove commingling by producing bank statements starting from a zero balance." *Arias,* 875 F.3d at 136-137. Likewise, in the instant case, Thigpen's representation to Crespo that the "only way" his bank account could be released was by signing the Conditional Release had the "capacity to discourage" Crespo from "fully availing" himself of his "legal rights." *Arias,* 875 F.3d at 136-137 (*quoting Easterling* at 235). Most clearly, Crespo could exercise his EIPA and ECF rights which, as GMBS knew, the bank would be mailing him in a few days. Or Thigpen could ask Crespo for bank statements to prove that he was "on unemployment" and whether some or all of the funds were exempt. Or GMBS could look at the response to its own information subpoena showing that the last two direct deposits were exempt unemployment insurance benefits and either ask Crespo for statements or ask the bank whether there were additional direct deposits.

Thigpen's "only way" statement is also materially deceptive because it has the potential to "influence a consumer's decision to pay a debt or if they would impair the consumer's ability to challenge the debt." *Somerset v. Stephen Einstein & Assocs., P.C.*" 351 F. Supp. 3d 201, 207

(E.D.N.Y. 2019). These forceful statements "influenced" Crespo's "decision to pay the debt" by deceiving him in to signing a release of $1,200 of unemployment insurance benefits to pay towards a sewer service judgment. As discussed in the OSC section below, the duping and pressuring Crespo into signing the Conditional Release, made it more difficult to later challenge the underlying sewer service judgment. GMBS would later use the Conditional Release to argue that Crespo acknowledged the judgment, and thus waived his right to challenge the judgment. ¶ 266. While Crespo ultimately prevailed on this argument in Court, it was an additional barrier.

The most obvious way GMBS violated the FDCPA is that Thigpen induced Crespo to sign the Conditional Release. Mr. Thigpen told Crespo that if he signed the Conditional Release he would release the account that day or, at the latest, the next. Pl. 56.1 ¶ 164. But the account was not released for 2 more months when New Economy Project emailed Keilbach. GMBS attempts to say the release the money on September 2 was the fault of the bank. It was not. Thigpen either did not fax or did not fax to the correct number the Conditional Release on September 2. Pl. 56.1 ¶ 172-174. Emails among the GMBS debt collectors on October 28 indicate the fax number on the Conditional Release was wrong, that M&T Bank never received the Conditional Release. Id. ¶ 174. That is why GMBS produced fax confirmation sheets for faxes sent throughout the collection activities, but the only fax confirmation sheet for the Conditional Release was that it was faxed to M&T Bank on October 28, 2021. *Id.* ¶ 173. The FDCPA of course is a strict liability statute, so regardless of why the fax was not sent (or even if the bank did not release the account because of the fault of the bank), Thigpen's representation to Crespo was still false and GMBS is liable for violating the FDCPA.

> **C. While the FDCPA is a strict liability statute, there is evidence a reasonable juror could believe support an inference of knowledge and intent, and make the FDCPA violations particularly pernicious.**

1. Timing of Conditional Release demand is especially pernicious.

When Mr. Crespo was not able to access the funds in his bank account, he quickly called his bank to find out why. ¶ 138. The bank gave Mr. Crespo the phone number of the law firm that restrained his bank account and told him to call them if he had questions. *Id*. It is easy to see how this would not be an uncommon chain of events when a consumer learns he cannot access his funds.

This makes GMBS's rapid use of a Conditional Release especially pernicious in effect (if not by design) for consumers whose frozen accounts contain exempt funds. The restraint of a bank account is immediate upon the bank's receipt. NY CPLR 5222. But the consumer would not receive the Exemption Claim Form until several days later as per the New York Exempt Income Protection Act ("EIPA"), CPLR 5222-a. Nor would the consumer receive the disclosures of what funds are exempt from restraint, most notably in the instant case that "under state and federal law, certain types of funds cannot be taken from your bank account... [including] Unemployment insurance." *Id.*

The timing difference is because EIPA forms are mailed by the debt collection law firm to the bank, who then has two business days to turn around and mail it to the consumer. ¶ 329. In the instant case, Mr. Crespo's account was restrained around August 26, but he did not receive the ECF at his mailing address until September 12. Mr. Crespo was out of the country at this time, so he did not see the mailing from the bank until September 19, 2021. ¶ 183.

Due to this lag time in receiving the EIPA forms, vulnerable consumers whose bank accounts contain desperately-needed government benefits (e.g. unemployment insurance, social security retirement, or disability payments) are in the position of being directed to call the debt collection law firm before 1) learning certain types of funds in their accounts are exempt or 2) being provided with the self-help mechanism of the ECF. In the instant case Mr. Crespo had

some knowledge from the internet that unemployment insurance money is supposed to be exempt from restraint, but no knowledge of the ECF mechanism to protect those funds as those forms would not arrive by mail for another 10 days. ¶ 144. Further, the ECF form, per the language required CPLR 5222-a(b)(4) expressly suggests (but does not require) for the consumer to attach "written proof your money is exempt… [which] can include… bank records showing the last two months of account activity."

2.  GMBS admits it uses conditional releases to obtain exempt funds, demonstrating knowledge and intent.

If a consumer enters a Conditional Release, GMBS's position is that it is legally entitled to those monies even if the funds are exempt from restraint. ¶¶ 221-223.  According to Mr. Keilbach, the benefit to GMBS of using a conditional release as opposed to proceeding with a restraint is that GMBS could procure exempt income. ¶ 59.

Thigpen consciously takes steps to avoid learning the funds in a restrained bank account are exempt. When Thigpen calls banks to verify the amounts in the account to determine how much to demand for the Conditional Release he never asks if funds are exempt by, for example, being direct deposit by the NYS Department of Labor. Indeed, when Crespo told Thigpen he was "on unemployment" and Thigpen called the bank, he did not (and does not) ask if there are direct deposits from the NYS Department of Labor, which is how unemployment insurance benefits are paid out.  More importantly, if Thigpen were truly concerned that Mr. Crespo was not "on unemployment," Thigpen could have just asked the bank whether he received direct deposit unemployment insurance deposits when he called.

3.  Thigpen tacitly admitted to Crespo that the deposits into the account were from unemployment insurance, demonstrating knowledge and intent.

Crespo testified that Thigpen told him, "Let me get you on a payment plan so in the future, as your unemployment money gets deposited, your account won't get frozen again." This

37

statement is a tacit admission by Thigpen that he believed Crespo was getting unemployment insurance direct deposits. ¶ ¶ 149, 150.

4. GMBS immediately attempt to seize the $1,200 in unemployment benefits when New Economy Project provides bank statements, demonstrating intent to do so from the outset.

On October 27, 2021 legal services attorney Susan Shin of the New Economy Project email bank statements and an analysis showing all the money in Mr. Crespo's account was exempt direct deposit unemployment benefits. Pl. 56.1 ¶202; 205. The next morning at around 10:158 am, Keilbach forwarded the email to Thigpen, Chiantella (the Collection Department Manager), and Robert (a collector) and asks, "Let me know your thoughts." ¶ 208. Within 7 minutes of receiving the forwarded email Chiantella concluded "90% of the deposits came from unemployment." ¶ 212. At this point, they realize that the September 2nd Conditional Release had the wrong fax number and was never received by the bank. ¶ 174. The three collectors decided that, even though the documents proved that the money in the account was exempt, since Crespo had signed the Conditional Release already, the thing to do was to seize the $1,200 of exempt funds by faxing the Conditional Release to the bank now – this time to the correct fax number. ¶¶ 217-219. And that is what they did, and with great efficiency. *Id.*

5. Conditional Release a standard form suggesting a pattern and practice

GMBS asserts the Conditional Release was some sort of negotiated agreement. It was not. Thigpen said it was the "only way" to release his funds. ¶ 161. The Conditional Release for Crespo is the standard form GMBS uses, and it is even pre-inserted with Keilbach's signature so Thigpen can send it without any attorney review. ¶¶ 156-160. The position of GMBS is that once the consumer signs the Conditional Release, GMBS is legally entitled to the funds, even if exempt. GMBSuses the form instead of waiting for the funds to be turned over via the restraint in order to be able to seize exempt funds. ¶¶ 221, 222. GMBS admits it benefits from using the

Conditional Release as opposed to allowing restrained money to be seized in the order course it allows GMBS could procure exempt income.  ¶ 59. This supports a claim for willfulness for gross negligence. It is also evidence that a factfinder could use to infer that the Conditional Restraint to seize exempt money was not a mistake but was intentional.

### D. Defendants arguments related to the pre-OSC FDCPA claims are without merit.

#### 1. The state court already rejected the arguments the of GMBS to Crespo acknowledged the judgment.

GMBS rehashes the same arguments it raised before Judge Verena C. Powell in the Bronx Civil Court lawsuit and which Judge Powell flatly rejected. GMBS contends the Conditional Release was "voluntarily executed" and "unequivocally" acknowledged the judgement and was a promise to satisfy the same. Def. Mn. pp. 1, 4, 15, 16. But during the February 18, 2022 hearing, the judge found that Mr. Crespo was under duress in signing the Conditional Release.  ¶  252.  The  Court  held  that  Crespo  did  not submit to the court's jurisdiction,  nor  did  he offer  to tender  payment  in  partial satisfaction  of  the judgment, but only sought to regain access of his bank account. ¶ 267. GMBS argues that by not filing the OSC for approximately 11 months from the beginning of the garnishment, Crespo was "implicitly acknowledging that he owed this debt." Def. Mem. p. 4.  However, Judge Powell credited Mr. Crespo's explanation for the 19-month delay in becoming aware of the default judgment—that he experienced economic hardship and serious medical issues. Pl. 56.1 ¶  271. Therefore the delay was not an acknowledgment of the debt, the Court held. ¶ 271. GMBS cannot re-litigate these decided issues or even if it could their arguments fail now just as they did then.

#### 2. New Economy Project did not represent Crespo in the collection lawsuit or for the OSC.

Despite the suggestions of GMBS, the scope of representation of the New Economy

Project (NEP) was to the sending of the emails on October 27 and 28 informing Keilbach thet were restraining exempt money Pl. 56.1 ¶¶ 201-204 and assistance in the drafting of the pro se OSC. ¶ 200, 201, 241.    Mr. Crespo was *pro se* throughout the case and at all court hearings in this matter. ¶ 241. He went to all hearings alone. ¶241. New Economy Project did not file a notice of appearance. ¶ 201.

   3.  <u>EIPA does not come into play because the misconduct happened prior to receipt of the EIPA Exemption Claim Form, which is why the timing of the Conditional Release is especially pernicious.</u>

Throughout its memorandum of law, GMBS argues that an FDCPA claim cannot lie because Crespo did not complete and submit an EIPA exemption claim form with supporting documents "as was his statutory obligation if he desired to formally challenge the restraint on his account and seek its release." Def. Mem. 2; *see generally* Def. Mem. 2, 5, 6, 11, 12, 15-18, 20. However, the FDCPA violation related to pressuring and duping Crespo to sign the Conditional Release occurred on September 2.  As explained in section C 1, the timing of the Conditional Release is particularly pernicious because GMBS is taking advantage of the fact that the consumer will often call GMBS (at the direction of the bank) before receiving the EIPA forms. As Thigpen testified, if a consumer tells him they're unemployed, he will send them a conditional release. Pl. 56.1 ¶ 151

More generally, EIPA is an additional layer of protection for consumers to facilitate the prompt release of exempt funds. It is a shield for consumers to have additional rights and to protect their federal and state law rights to exempt funds.  It is not a sword that collectors can use against consumers to restrain and attempt to seize exempt funds if the consumer does not timely follow the EIPA procedures.

   **E.  GMBS violated the FDCPA by using the Conditional Release to oppose Crespo's pro se OSC to vacate the sewer service default judgment, for a debt GMBS knowingly inflated.**

The duping and pressuring Crespo into signing the Conditional Release, made it more difficult to later challenge the underlying sewer service judgment. GMBS would later use the Conditional Release to argue that Crespo acknowledged the judgment and this waived his right to challenge the judgment. While Crespo ultimately prevailed on this argument in Court, it was an additional barrier. Just as with the plaintiff in Arias, Crespo's "ultimate success" in court did not obviate the fact that the use of the Conditional Release was unfair or unconscionable. *Arias,* 875 F.3d at 137. In addition, GMBS used the Conditional Release as an argument for seeking and obtaining an adjournment of the initial traverse hearing setting, requiring Crespo "to appear at an unnecessary hearing." *Arias,* 875 F.3d at 138. Also, while the misrepresentations in the instant cases by GMBS related to the OSC and the Traverse hearing happened in the context of court proceedings, so too did actionable misrepresentations in *Arias*. The objection to the exemption claim form was a motion GMBS filed in Court which misrepresented the consumer's burden demonstrating funds in a bank account are exempt. A motion is a representation to the Court. However, *Arias* holds representations in Court proceeding (there an objection to an exemption claim form filed with the court) was a representation to the consumer as to her burden of proof. Even if not a representation to the consumer it is still conduct in violation of the FDCPA, which applies not just to representations, but also to "means." In addition, *Arias* rejected the argument that debt collection misconduct in litigation could not form the basis of FDCPA liability; indeed that was the heart of the violations in the decision.

### F. Conversion for failure to timely and fully return.

GMBS committed conversion by 1) not delivering Crespo any money by April 11, 2022 the date ordered to be returned and 2) by not returning the full amount, even today. ¶¶276-280; 294. Plaintiff is not arguing that the restraint of the M&T Bank account is conversion, nor is he arguing that the failure to release the restraint is conversion. Def. Mem. p. 23-25. Notably, while

GMBS opposes a conversion claim as to the return of the money, it does not move to dismiss the FDCPA claim for the same. However, as previously noted, Plaintiff is seeking an FDCPA claim for Thigpen inducing Crespo to sign the Conditional Release with the promise the account would be released by the next day when in reality, it was not released for two months.

1. <u>Conversion by intentionally not timely complying with Order to return money within 30 days.</u>

GMBS argues that its return of Crespo's money was not untimely because its obligation to do so would only be triggered by receipt of the notice of entry of the order.  Def. Mem. p. 22, fn. 21; 26. This exact argument was rejected in Okyere v. Palisades Collection, LLC, 961 F. Supp. 2d 522, 535 (S.D.N.Y. 2013) ("We also reject the argument that the Houslanger defendants cannot be held liable [for conversion] because the complaint does not allege that service of the order [to return money] was made in accordance with N.Y. C.P.L.R. § 2220.") Just as in the case at bar, Pl. 56.1  ¶ 215, while Houslanger may not have been served a notice entry it "had possession of the order." Okyere at 535.

GMBS argues the Order to return the money applied only to the Plaintiff, 1511 Sheridan, LLC, not to GMBS.  However, the Sheriff made the garnishment payments to GMBS in the name of GMBS.  GMBS kept all the garnishment payments other then $206, which it paid to Hilltop, the property management company for 1511 Sheridan.  GMBS had all of Crespo's money at some point, and all of Crespo's money other than $206 when it received the Order. The Order does not specifically state who shall return the money, just that "all monies collected shall be returned." ¶ 263. It was GMBS that collected the monies and that had possession of $206 of the money when it received the Order.

The Bronx Civil Court's order to return the wrongfully garnished money applies to GMBS. Under the doctrine of restitution, when money is taken from a party based on an

erroneous judgment, it is fundamental that they be restored to their prior position before the error was made. *M.S. Berkoff Co. v. McGuire*, 54 Misc. 3d 82, 83 (N.Y. App. Term. 2017) ("When money is collected upon an erroneous judgment which, subsequent to the payment, is reversed, the legal conclusion is that the money belongs to the person from whom it was collected and an action for restitution will lie.") It follows that when a firm has possession of money taken based on an erroneous order, it is incumbent upon them to return that money. *See Forstman v. Schulting,* 108 N.Y. 110 (1888); *Forstman* and its progeny stand for the proposition that money obtained during litigation which is later shown to be either wrongfully acquired or unjustly retained can be ordered to be restored by either the party or its attorney. *Id.* at 112-113; *see also Wright v. Nostrand,* 100 N.Y. 616, 616(1885) ("[T]he Superior Court upon whose execution the money was paid, and whose officer the plaintiff as receiver is, has undoubted jurisdiction over the whole matter, and can compel the repayment of the money either by the plaintiff or his attorney."); *see also Goldberg & Connolly v. Graystone Constr. Corp.*, 65A.D.3d 1082, 1083-84 (2d Dept. 2009)(Appeal of order granting plaintiff law firm's request to transfer funds held in escrow into firm account. Funds were collected from a judgment that was later overturned. The court overturned the order and directed the law firm to pay money to the defendant whose judgment was vacated.)

In the present case, Mr. Crespo's funds were wrongfully acquired (as the result of a default judgment obtained without service), then unjustly retained by GMBS even after the court ordered that all monies collected be returned. GMBS argues that the March 8, 2022 order vacating judgment applies to 1511 Sheridan, not them. However, the courts order simply stated that "all monies collected shall be returned to Jose L. Crespo within thirty days." ¶ 263. Thus, restitution may be compelled against both 1511 Sheridan and GMBS. Here, GMBS is the entity that had

possession of the wrongfully taken, exempt funds. Therefore, it was up to them to promptly return the money to Mr. Crespo

2.    Conversion for not returning all monies taken.

As stated in the Statement of Facts section, GMBS still has not returned all of the money GMBS caused to be taken from him despite written demands by Crespo since April 2022 to do so.  On April 28, 2022, Mr. Crespo, pro se, sent Eric Keilbach at GMBS an email explaining the deficiency and demanding that GMBS refund him the remaining $79.44. ¶ 286. On April 29, 2022, Mr. Keilbach responded to Mr. Crespo telling him that GMBS was following up with the Sheriff about "if they are sending back the difference." ¶ 287. But the amount that the sheriff had taken for poundage was only $69.44, leaving and unexplained missing balance of $10. ¶ 288.  On May 3, 2022, GMBS faxed the Erie County Sheriff's requesting a refund for the poundage. ¶ 289. GMBS believed that it had to reimburse Mr. Crespo for the poundage cost if the Sheriff had not done so. ¶ 290. On May 9, 2022, Mr. Crespo emailed Mr. Keilbach asking for an update on the return of the $79.44.  ¶ 291. Mr. Keilbach and GMBS did not respond. Id. On May 25, 2022, Mr. Crespo again emailed Mr. Keilbach asking for an update on the return of the $79.44. Mr. Keilbach and GMBS again did not respond. ¶ 292. Even after being sued in this FDCPA action, GMBS still has not given Mr. Crespo the $79.44. ¶ 294. Mr. Crespo has also never been reimbursed for the $110 legal processing fee that his bank charged due to Defendants' restraint of his exempt funds. ¶ 294.

3.    CPLR Article 52 does not apply to failure to comply with court order.

GMBS argues that CPLR Article 52 is the exclusive remedy available for a conversion claim for any allegedly unlawful restraint. Def. Mem. p. 27, 28. However, as previously noted, Plaintiff is not seeking a conversion claim for the bank restraint. GMBS then asserts Article 52 also precludes a conversion claim for failure to timely and fully comply with a court order to

return previously garnished wages. *Id*. However, none of the cases cited stand for that proposition. And Courts have found conversion for failure timely comply with orders to return money. *See e.g. Polanco v. NCO Portfolio Mgmt., Inc*., 132 F. Supp. 3d 567, 587-590 (S.D.N.Y. 2015)(garnished wages).

### G. Punitive damages for gross negligence.

In the present case, GMBS' conduct could certainly stir in a reasonable jury "the character of outrage frequently associated with crime." That is, GMBS consciously deprived Mr. Crespo of property that was wrongfully taken from him in the first place. Then, despite a court order with clear directives, they chose not to return the bulk of the money to Mr. Crespo within the ordered time, and not to return the $79.44 at all. This was especially egregious because GMBS knew that Mr. Crespo was struggling financially, was on unemployment, and urgently needed access to his funds. ¶ ¶136;140; 149; 205-212. Like in *Koch*, GMBS' conduct at least amounts to a "wanton disregard" for Mr. Crespo's rights. Again, GMBS acted with wanton disregard because it failed to ensure that the wrongfully taken unemployment funds were promptly returned to Mr. Crespo even after being ordered to do so. It did this knowingly and with no regard for Mr. Crespo's rights under the FDCPA or as a recipient of unemployment funds.

### V.    CONCLUSION

For these reasons, Plaintiffs prays the Motion for Summary Judgment of GMBS be denied, that Plaintiff's Cross-Motion be granted or, at a minimum

Dated: Brooklyn, New York
         September 24, 2024

Respectfully submitted,

/s/

_____

Ahmad Keshavarz
THE LAW OFFICE OF AHMAD KESHAVARZ
16 Court Street, 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@newyorkconsumerattorney.com
*Attorneys for the Plaintiff*

cc: To all counsel via ECF