UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE CRESPO,

                                    Plaintiff,

                -v-

GUTMAN, MINTS, BAKER &
SONNENFELDT, LLP, *et al.*,

                                    Defendants.

22-CV-6599 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Jose Crespo brings claims against Defendants Gutman, Mintz, Baker &

Sonnenfeldt, LLP ("GMBS"), Gary Thigpen, and Eric Keilbach (collectively, the "Gutman

Defendants"), as well as Defendants 1511 Sheridan LLC ("1151 Sheridan") and Hilltop

Management Group LLC, for violations of the Fair Debt Collection Practices Act ("FDCPA"),

15 U.S.C. §§ 1692 *et seq.*, conversion, and negligence (including gross negligence).  Before the

Court are the Gutman Defendants' and Crespo's cross-motions for summary judgment.  For the

reasons that follow, both motions are denied.

I.    **Background**

The following facts are drawn from the parties' statements of material facts and

responses.  (*See* ECF Nos. 88 ("Defs. SOMF"), 93 ("Pl. SOMF"), 101 ("Defs. Resp. SOMF").)

A non-movant's factual allegations, if supported by sufficient evidence in the record to persuade

a reasonable jury, are presumed true in resolving a motion for summary judgment.  *See Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

A.    **State Court Rental Arrears Proceedings**

In 1999, Crespo rented an apartment from 1151 Sheridan.  (Defs. SOMF ¶ 1.)  In

February 2002, Crespo stopped making rental payments on the apartment, and in October of that

1

year, 1151 Sheridan sued him in Bronx County Civil Court for rental arrears.  (*Id.* ¶ 2.)  That litigation ended in a stipulation entered into in August 2003, which the Gutman Defendants contend required Crespo to vacate the apartment.  (*See id.* ¶ 3.)  Crespo maintains that that stipulation settled all existing rental arrears through August 2003.  (Pl. SOMF ¶ 87.)

In January 2005, 1151 Sheridan initiated a second lawsuit in Bronx County Civil Court against Crespo for rental arrears totaling $4,078.98 for the period from February 2003 through October 2023.  (Defs. SOMF ¶ 4; Pl. SOMF ¶¶ 90-91.)  Crespo was never served in connection with the second lawsuit; the summons and complaint were delivered to an address at which Crespo did not live at the time.  (Pl. SOMF ¶¶ 96-98.)  Crespo never appeared in that lawsuit, and in April 2005 a default judgment was entered against him for $4,873.91 (the "2005 Default Judgment").  (Defs. SOMF ¶ 6.)  Crespo now contends that that amount improperly included rent for the period between February 2003 through August 2003, which he argues had been settled by the stipulation in the first lawsuit.  (Pl. SOMF ¶¶ 91-93, 95.)

### B.    GMBS's Efforts to Execute on the Default Judgment

In or around 2018, 1151 Sheridan retained GMBS to execute on the 2005 Default Judgment.  (*See* Defs. SOMF ¶ 7.)  GMBS is a debt collection law firm.  (Pl. SOMF ¶ 33; Defs. Resp. SOMF ¶ 33.)  Keilbach is a senior partner at GMBS; Thigpen is an account representative in GMBS's judgment collection department.  (Pl. SOMF ¶¶ 34, 38-40.)  At first, GMBS worked to execute on the 2005 Default Judgment by garnishing Crespo's wages, causing an income execution for $11,873.91—reflecting the amount of the 2005 Default Judgment plus accrued statutory interest—to be issued by the Erie County Sheriff's office and taking a total of $1,458.30 between January 21, 2019 through November 10, 2019.  (Defs. SOMF. ¶¶ 7-8; ECF

No. 87 ("Mem.") at 22 n.20.)[1]  Around the end of January 2019, Crespo's job's human resources department informed him of the income execution.  (Pl. SOMF ¶ 106.)  Upon learning of the 2005 Default Judgment, Crespo recognized the plaintiff as his former landlord.  (*Id.* ¶ 108.)  At the time, Crespo did not challenge the 2005 Default Judgment or the income execution.  (*See id.* ¶¶ 114-17.)  Around November 2019, he lost his job.  (*Id.* ¶ 118.)

On August 26, 2021, GMBS issued an information subpoena with a restraining notice to M&T Bank to collect the remaining debt Crespo owed.  (Defs. SOMF ¶ 10.)  As is required by New York law, the subpoena contained the notice to M&T Bank, in all capital letters, that "ACCOUNTS CONTAINING SOLELY EXEMPT FUNDS SHOULD NOT BE RESTRAINED."  (Defs. SOMF ¶ 11; Pl. SOMF ¶ 11.)  On September 2, 2021, Crespo called M&T Bank to ask about the restraint, and he was referred by the bank to GMBS.  (Pl. SOMF ¶ 138; Defs. SOMF ¶ 13.)

Crespo called GMBS and spoke to Thigpen on the phone.  (Pl. SOMF ¶ 139; Defs. SOMF ¶ 13.)  According to Crespo, he told Thigpen that "all the money in [his] bank account was COVID-19 stimulus funds and unemployment benefits" and, from what he had learned online, was exempt from debt collection.  (*Id.* ¶ 140, 144-45.)  Crespo contends also that Thigpen acknowledges that Crespo mentioned that he was "on unemployment."  (*Id.* ¶ 146 (citing ECF No. 92-4 at 89:7-89:19).)  According to Crespo, Thigpen responded that "GMBS would call M&T Bank to find out how much money was in the account, see how much they would be willing to take to release the account, and then call him back."  (*Id.* ¶ 141.)  M&T Bank informed

---

[1] Though the Gutman Defendants' statement of material facts states that the income execution was for $11,873.91 (Defs. SOMF ¶ 7)—a fact that Crespo admits (*see* Pl. SOMF ¶ 7)—the purported copy of that execution filed with both the First Amended Complaint and the Gutman Defendant's motion for summary judgment appears to list the amount as $11,515.16 (See ECF Nos. 35-13, 92-28.)  The disparity is not relevant at this stage of the case.

Thigpen that there was $1400 in the account after statutorily exempted unemployment benefits. (*Id.* ¶ 142.)  Then, according to Crespo, Thigpen called Crespo back and offered to release the account in exchange for an immediate payment of $1,200 (the "Conditional Release"), saying it was the "only way" for the account to be released.  (*Id.* ¶ 143.)  Crespo testified that "Thigpen was very forceful over the phone" and that Crespo felt "hammered" and "strong-arm[ed]" into signing the Conditional Release.  (*Id.* ¶¶ 154, 161.)

The Gutman Defendants offer a different version of the call, one where Thigpen perhaps knew that Crespo was on unemployment, but not that all of the funds in his M&T Bank account were unemployment benefits.  (Defs. Resp. SOMF ¶ 144-46.)  Moreover, the Gutman Defendants deny that Thigpen said the "only way" for Crespo to have the restraint on his account lifted would be to sign the Conditional Release.  (*Id.* ¶ 143.)  It is not disputed, however, that Crespo signed the Conditional Release "for the release of his account in consideration for $1,200."  (*Id.* ¶ 143; Pl. SOMF ¶ 160.)  GMBS attempted to fax the Conditional Release to M&T Bank the same day but did not receive a fax delivery confirmation (or, at least, was unable to produce any such confirmation in discovery).  (Pl. SOMF ¶¶ 172-73.)  GMBS does not concede that M&T Bank did not receive the September 2, 2021 fax.  (*See* Defs. Resp. SOMF ¶ 174.)

The next day, on September 3, 2021, M&T Bank returned the information subpoena concerning Crespo's account to GMBS, listing Crespo's place of business as "Install's LLC" and noting that the account contained $5,081.99.  (Defs. SOMF ¶ 12.)  In the "one-inch space GMBS allowed for a response" concerning any "automatic credits" deposited into the M&T Bank account, the bank indicated two recent deposits from New York's unemployment insurance program.  (*See* Pl. SOMF ¶ 167.)

On or around September 4, 2021, Crespo had still not regained access to his M&T Bank account, even though he had signed the Conditional Release two days before. (Pl. SOMF ¶ 168.) In order to pay for an upcoming trip, he borrowed $1,000 from a friend to pay for airfare and an all-inclusive resort stay in the Dominican Republic. (*Id.* ¶¶ 169, 183.) For the rest of September, Crespo continued to try to access funds in his M&T Bank account only to find that it was still restrained. (*Id.* ¶¶ 176-77.) He called M&T Bank several times to ask about the account, confirming "each time that his bank had still not received the Conditional Release from GMBS." (*Id.* ¶ 178.) However, Crespo did not attempt to contact GMBS, as he "did not want to go through that again." (*Id.* ¶¶ 180-81.)

On September 12, 2021, M&T Bank sent to Crespo's mother a debt collection exemption form and letter stating that Crespo could withdraw up to $3,600 from the account immediately, but that the remaining funds in the account would be forfeited. (*Id.* ¶¶ 182-84.) Crespo did not see the documents until September 19, 2021, when he returned from the Dominican Republic. (*Id.* ¶ 183.) But when he called M&T Bank, Crespo was told that filling out the form "would 'not make a difference,'" and, not wanting to forfeit the remainder of his account or carry $3,600 in cash while homeless, declined to use the form. (*Id.* ¶¶ 184-86.)

GMBS issued a second restraint on Crespo's bank account on September 27, 2021, though the Gutman Defendants maintain that it was issued on another of Crespo's accounts, rather than the one at issue in this case. (*See id.* ¶¶ 190, 192; Defs. Resp. SOMF ¶ 190.) "Crespo did not have access to his M&T Bank account from September 1, 2021 through the end of November 2021" (Pl. SOMF ¶ 193), though the Gutman Defendants insist that Crespo "could have withdrawn $3,600 immediately regardless of whether the conditional release had been received by the bank" or could have called "GMBS and [had] them re-send the conditional

release." (Defs. Resp. SOMF ¶ 193.) Crespo testified in his deposition about a variety of emotional harms he suffered as a result of the account restraint, including stress and cardiac symptoms, as well as his inability to pay bills or afford expenses necessary for his then-ongoing job search. (*See* Pl. SOMF ¶¶ 121-24, 193-96.)

C.    **Assistance from the New Economy Project and Release of the M&T Bank Account**

Crespo learned of the New Economy Project ("NEP") from a list of free legal services he received at the clerk's office of the Bronx County Civil Court. (*Id.* ¶¶ 198-99.) NEP attorney Susan Shin agreed to provide Crespo "limited legal assistance in order to facilitate the release of his bank account." (*Id.* ¶ 200.) On October 27, 2021, Shin emailed Keilbach requesting the return of Crespo's funds and attached to the email bank statements and other documents showing the funds were exempt from debt collection. (*Id.* ¶¶ 202, 205.) Keilbach forwarded the email to others at GMBS, including Thigpen, asking for their thoughts. (*Id.* ¶ 208.) Internally, GMBS employees quickly realized most or all of the funds in Crespo's M&T Bank account were exempt from debt collection, and that though it would be "great" if Crespo agreed to make payments pursuant to the Conditional Release, their position was legally tenuous. (*See id.* ¶¶ 212-14.)

On October 28, 2021, "Thigpen called M&T [B]ank because he noticed that GMBS had not received payment" pursuant to the Conditional Release Crespo had signed. (*Id.* ¶ 215.) Thigpen also forwarded the signed Conditional Release to GMBS collector Brian Chiantella, who asked Gloria Coker in GMBS's collection department to fax the Conditional Release to M&T Bank. (*Id.* ¶¶ 216-17; *see also* ECF No. 96 ("Opp. & Cross-Mot.") at 14.) The same day, Keilbach emailed Shin, writing, "I just wanted to make sure you are aware that Mr. Crespo signed a conditional release for $1200 that we are following up with the bank about. He also apparently never filed an exemption claim with the bank." (Pl. SOMF ¶ 224.) But later that

same day, Keilbach emailed Shin again to inform her that GMBS "would be contacting the bank and telling them to release Mr. Crespo's money 'without prejudice.'" (*Id.* ¶ 226.)  On October 29, 2021, when Crespo contacted M&T Bank, "he was told that GMBS had sent the Conditional Release and that $1,200 had been taken from his account," though the Gutman Defendants counter that there is no evidence any money was ever actually taken from the account. (*Id.* ¶ 230; Defs. Resp. SOMF ¶ 230.)  Shin then emailed Keilbach to ask why the account was not released. (Pl. SOMF ¶ 231.)  Keilbach forwarded that email to others at GMBS, adding "This is why we can't just do this stuff," before sending a full release of Crespo's account to M&T Bank and telling Shin that GMBS would send any check received back to Crespo. (*Id.* ¶¶ 232-34.)

### D.    Crespo's Order to Show Cause and Vacatur of 2005 Default Judgment

On November 4, 2021, Crespo, then *pro se*, filed an order to show cause against 1151 Sheridan in Bronx County Civil Court to vacate the 2005 Default Judgment and obtain restitution of his garnished wages for lack of personal jurisdiction. (*Id.* ¶ 240; ECF No. 92-55.)  GMBS, though aware of that matter, made no submissions on behalf of 1151 Sheridan and did not appear for a November 17, 2021 hearing. (*Id.* ¶¶ 242-44.)  Crespo contends that GMBS did not appear because it had no basis to oppose the order to show cause—a characterization that the Gutman Defendants deny. (*Id.* ¶ 246; Defs. Resp. SOMF ¶ 246.)  The next day, the court ordered a traverse hearing (a hearing concerning the validity of service of process) for February 18, 2022.[2] (Pl. SOMF ¶ 248.)  At that hearing, GMBS appeared and raised the Conditional Release as a basis for Crespo's obligation to pay 1151 Sheridan. (*Id.* ¶ 249.)  GMBS also requested, and

---

[2] Plaintiff's statement of facts first states that the traverse hearing was scheduled for February 14, 2022, but then repeatedly refers to the hearing as the "February 18 hearing." (*Compare* Pl. SOMF ¶ 248 *with id.* ¶¶ 249-52.)  Defendants admit all of the above. (Defs. Resp. SOMF ¶¶ 248-52.)  The difference is immaterial, and for the purposes of this Opinion the Court assumes that the hearing occurred on February 18, 2022.

obtained, time to file its own order to show cause to vacate the default resulting from its failure

to appear at the November 17 hearing.  (*Id.* ¶¶ 253-54.)  The court adjourned the traverse hearing

to February 25, 2022.  (*Id.* ¶ 254.)  Crespo maintains that that adjournment was a dilatory tactic

on the part of GMBS, which the Gutman Defendants deny.  (*Id.* ¶ 262; Defs. SOMF ¶ 262.)

On February 23, 2022, GMBS filed the Conditional Release, but did not present it for the

judge's signature, or—according to the Gutman Defendants—oppose Crespo's order to show

cause.  (*See* Pl. SOMF ¶¶ 255-56; Defs. Resp. SOMF ¶ 256.)  On March 8, 2022, the court

vacated the 2005 Default Judgment for insufficient service of process.  (ECF No. 92-35 ("March

8 Order") at 4.)  The March 8 Order also ordered the return of "all monies collected" to Crespo

within thirty days.  (*Id.*)  On March 10, 2022, GMBS became aware of the March 8 Order.  (Pl.

SOMF ¶ 274; Defs. Resp. SOMF ¶ 274.)  By that time, GMBS contends, it was not in possession

of any of Crespo's funds, and in any event was not bound by the March 8 Order because it was

not a party to the litigation, though the parties agree that GMBS retained all but $206.02 of the

wages it had garnished on behalf of 1151 Sheridan.  (Defs. Resp. SOMF ¶¶ 275, 282; Pl. SOMF

¶ 282.)  Nevertheless, Crespo maintains that "GMBS should have returned the money by April

22, 2011" but never did so.  (*Id.* ¶ 276-77.)  The Gutman Defendants acknowledge that, during

that period, GMBS was still waiting for the court to rule on its own order to show cause.  (*Id.*

¶ 278.)  But "[o]n or around April 21, 2022, GMBS issued Mr. Crespo a check for $1,378.86,"

which was $79.44 less than the total amount of wages garnished.  (Pl. SOMF ¶¶ 280-81.)

On April 28, 2022, Crespo emailed Keilbach "explaining the deficiency and demanding

that GMBS refund him the remaining $79.44."  (*Id.* ¶ 286.)  Keilbach answered that GMBS had

asked the Erie County Sheriff's office if it would return the money it exacted for poundage,

which GMBS contended constituted the entirety of the $79.44 difference.  (*Id.* ¶¶ 287-88.)

Crespo argues now, and submits documentation potentially showing, that the amount taken by the Sheriff was only $69.44, leaving $10 unaccounted for.  (*Id.* ¶ 288; *see also* ECF No. 92-10 at 48.)  Crespo sent additional emails to GMBS inquiring about the status of the poundage—and the additional $10 he argues was not poundage—but never heard back or received those funds.  (*Id.* ¶¶ 291-94.)

### E.    Present Action

On August 3, 2022, Crespo, no longer *pro se*, sued the Gutman Defendants, 1151 Sheridan, and Hilltop Management Group LLC in this Court, asserting claims for violation of the FDCPA, as well as under New York General Business Law § 349 and common law conversion, negligence, and gross negligence.  (*See* ECF No. 1.)  Crespo amended his complaint on January 24, 2023.  (ECF No. 35 ("AC").)  The Clerk of Court entered certificates of default as to 1151 Sheridan and Hilltop Management Group LLC on September 16, 2022 and April 28, 2023, respectively, leaving only the Gutman Defendants.  (ECF Nos. 15, 54.)  On August 27, 2024, the Court approved Crespo's voluntary dismissal of his Section 349 claim against the Gutman Defendants.  (ECF No. 84.)

The Gutman Defendants moved for summary judgment as to all claims on August 28, 2024 (ECF No. 85), and filed an accompanying memorandum of law (Mem.) and statement of material facts (Defs. SOMF).  Crespo opposed the motion, and filed a cross-motion for summary judgment, on September 24, 2024.  (Opp. & Cross-Mot.)  Crespo also filed responses to the Gutman Defendants' statement of material facts, coupled with his own.  (Pl. SOMF.)  The Gutman Defendants replied in further support of their motion, and in opposition to Crespo's cross-motion, on October 18, 2024 (ECF No. 99 ("Defs. Reply")), and filed a response to Crespo's statement of material facts (Defs. Resp. SOMF).  Crespo replied in further support of his cross-motion on November 4, 2024.  (ECF No. 102 ("Pl. Reply").)

9

## II.    Legal Standard

A court must grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, a court "must resolve all ambiguities and draw all inferences in favor [of] the nonmoving party." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023). In moving for summary judgment, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; rather, it "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (quotation marks and emphasis omitted). Further, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (cleaned up) (quoting *Anderson*, 477 U.S. at 252).

## III.    Discussion

Crespo asserts against the Gutman Defendants claims for violation of the FDCPA, as well as common law conversion and negligence (including gross negligence) under New York law.

(*See* AC ¶¶ 154-170, 183-87.)[3]  Crespo and the Gutman Defendants both move for summary

judgment, apparently with respect to every claim.  (*See* Mem.; Opp. & Cross-Mot.)  Crespo also

seeks punitive damages but does not seek summary judgment with respect to that aspect of his

claims.  (*See* Opp. & Cross-Mot. at 48.)  The Court addresses each claim in turn.

A.    **Fair Debt Collection Practices Act ("FDCPA")**

The FDCPA "establishes certain rights for consumers whose debts are placed in the

hands of professional debt collectors for collection."  *DeSantis v. Computer Credit, Inc.*, 269

F.3d 159, 161 (2d Cir. 2001).  "In particular, section 1692e of the FDCPA provides that '[a] debt

collector may not use any false, deceptive, or misleading representation or means in connection

with the collection of any debt.'"  *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233 (2d Cir. 2012)

(quoting 15 U.S.C. § 1692e).  A representation is "deceptive" if, evaluated from the standpoint of

an objective "least sophisticated consumer," it is "open to more than one reasonable

interpretation, at least one of which is inaccurate."  *Id.* (quoting *Clomon v. Jackson*, 988 F.2d

1314, 1318-19 (2d Cir. 1993)).  However, to be actionable, a misrepresentation must also be

"material," meaning it has "the potential to affect the decision-making process of the least

sophisticated consumer."  *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 85 (2d Cir.

2018) (quotation marks and brackets omitted).  But because the FDCPA is a strict-liability

statute, "a consumer need not show intentional conduct by the debt collector to be entitled to

damages."  *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996).

---

[3] Crespo voluntarily dismissed his claim for violation of New York General Business
Law § 349 as asserted against the Gutman Defendants.  (*See* AC ¶¶ 171-182; ECF No. 84.)  The
stipulated dismissal does not purport to dismiss the Section 349 claim as asserted against the
remaining defendants, who have defaulted (*see* ECF Nos. 15, 54).

One brand of FDCPA-actionable misrepresentations comprises untrue statements made by debt collectors concerning debtors' legal rights. For example, in *Easterling*, the Second Circuit held that a debt collection notice—informing a student loan debtor who had recently completed Chapter 7 bankruptcy that her account was "NOT eligible for bankruptcy discharge"—was deceptive despite the stringent standards for discharging student loan debt and reopening a Chapter 7 bankruptcy, as it was technically possible for the plaintiff to discharge her debt. 692 F.3d at 232, 234-35. And in a similar case, the Second Circuit held that a debt collector's representation that a debtor "failed to provide any documentation that he never commingled [his] account with non-exempt funds" was inaccurate because "New York's EIPA did not require [him] to disprove commingling." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 136 (2d Cir. 2017). The Second Circuit has explained that such misrepresentations fall squarely within the FDCPA because they have the "capacity to discourage debtors from fully availing themselves of their legal rights." *Id.* (quoting *Easterling*, 692 F.3d at 235). That brand of misrepresentation is also sufficiently "material," as misstating a debtor's legal rights "can reasonably be expected to affect how or even whether [the debtor] responds to a debt collector's objection to a claim that the restrained funds are exempt from garnishment." *Id.* at 137-38.

This case is straightforward under *Easterling* and *Arias*. Crespo alleges, and adduces sufficient evidence to for a reasonable jury to find, that he "told Mr. Thigpen that all the money in [his] bank account was COVID-19 stimulus funds and unemployment benefits"—which are exempt—and that Thigpen replied that "the only way you're going to get your money released is if you sign this [] agreement." (Pl. SOMF ¶¶ 140, 143.) Like in *Easterling*, Thigpen's alleged statement was technically untrue. Instead of signing the agreement, Crespo could have waited

for his bank to submit an exemption form to GMBS, submitted the form on his own, or otherwise communicated to GMBS that his funds were exempt. (*See* Opp. at 37.)  Those other procedures may have been difficult—though the record does not show that they would be, as Shin ultimately did just that by sending GMBS the records herself (*see* Defs. Resp. SOMF ¶¶ 205-12)—but *Easterling* instructs that a debt collector's representation incorrectly implying that a difficult-to-obtain form of relief is unobtainable is actionable under the FDCPA.  And *Arias* explains why such a misrepresentation is material:  When a debtor is misled regarding their legal rights in debt collection, that is, of course, prone to influence them to accept the less-than-ideal solutions that they believe remain.  Crespo makes precisely that allegation, explaining that he felt "hammered" and "strong-arm[ed]" into signing the agreement as a result of Thigpen's statements.  (Pl. SOMF ¶¶ 154, 161.)[4]

The Gutman Defendants' arguments to the contrary are unavailing.  First, they insist that Thigpen never represented that the "only way" to remove the restraint would be to sign the agreement.  (*See* Defs. Reply at 28-29.)  But the Court is not to resolve factual disagreements of this sort when deciding motions for summary judgment.  *See Rupp v. Buffalo*, 91 F.4th 623, 636 (2d Cir. 2024) ("When the issue is whether a party is entitled to summary judgment, determinations of credibility, choices between permissible inferences, and the weighing of the evidence are beyond the authority of the court.").  No more helpful is the Gutman Defendants' alternative argument that "there would be nothing misleading or deceptive [about] advising Plaintiff that the only way to get his account *immediately* unrestrained would be to negotiate a

---

[4] Though the Gutman Defendants do not argue explicitly that Crespo knew that Thigpen was misstating his rights, that would be irrelevant, as "'the operative inquiry [] is whether the hypothetical least sophisticated consumer' would be misled by the debt collector's misrepresentation."  *Arias*, 875 F.3d at 137 (quoting *Easterling*, 692 F.3d at 234).

settlement and release." (Defs. Reply at 29 (emphasis added).) Crespo does not allege that Thigpen said the agreement would be necessary for "immediate" relief, but instead that it was the "only way" to remove the account restraint. (*See* Pl. SOMF ¶ 143.) Moreover, even if the parties agreed that Thigpen used the word "immediate," there would still be a triable issue, as the hypothetical least sophisticated consumer could very well be deceived by that statement into thinking that a procedure lasting a few days was not available to them. In sum, the parties genuinely dispute whether Thigpen told Crespo that he needed to sign an agreement to remove the restraint on his account when such an agreement was not the "only way" to obtain that relief. That precludes summary judgment in favor of either party. Accordingly, the cross-motions for summary judgment are denied with respect to the FDCPA claim.[5]

### B.    Conversion

"According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'" *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)). "The tort of conversion does not require [the] defendant's knowledge that he is acting wrongfully, but merely an intent to

---

[5] Crespo does not indicate whether other undisputed facts support summary judgment in his favor with respect to the FDCPA claim. His other theories mostly concern allegations about what GMBS knew of the contents of his bank account before Shin provided extensive documentation. (*See, e.g.*, Opp. & Cross-Mot. at 30-35.) Those allegations are disputed with evidence in the record. (*See* Defs. Resp. SOMF ¶¶ 139-46.) Crespo's other theory of FDCPA liability—that GMBS tactically delayed litigation in order to prolong it or its client's retention of Crespo's funds (*see* Opp. & Cross-Mot. at 44)—is likewise rife with factual disputes (*see, e.g.*, Defs. Resp. SOMF ¶ 262) and ineligible for summary judgment. Moreover, Plaintiff does not distinguish between disputed and undisputed facts in his cross-motion or indicate whether he seeks summary judgment as to particular elements of his claims, particular claims in their entirety, or every claim. For all those reasons, Plaintiff has not made a showing that "there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." *Cf.* Fed. R. Civ. P. 56(a).

exercise dominion or control over property in a manner inconsistent with the rights of another."
*LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997) (quoting *Fashions Outlet of Am., Inc. v. Maharaj*, No. 88-CV-7231, 1991 WL 143421, at *2 (S.D.N.Y. July 22, 1991)). "New York law recognizes an action for conversion of money . . . ." *Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 228 (S.D.N.Y. 2003). Such an action lies not "to enforce a mere obligation to pay money," *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 540 (S.D.N.Y. 2009), but "where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question," *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (1st Dep't 1990). For example, "funds deposited in a bank account" sometimes do not meet that standard because they are "not sufficiently specific and identifiable[] in relation to the bank's other funds." *Fundacion Museo de Arte Contemporaneo de Caracas v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir. 1998). However, the mere commingling of specifically identifiable funds with others does not destroy a claim for conversion, so long as the funds in question are "a 'specific identifiable thing' for purposes of imposing liability for conversion." *LoPresti*, 126 F.3d at 42; *see also Kirschner*, 648 F. Supp. 2d at 542 ("Funds may be 'specifically identifiable' despite the fact that they are not alleged to be held in a segregated account."). The analysis turns not "on the nature of the account that received the funds (i.e., segregated or unsegregated), but instead on whether the money at issue was a specific sum." *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 171 N.Y.S.3d 44, 48 (1st Dep't 2022).

Crespo asserts two bases for his conversion claim: (1) GMBS's failure to return his garnished wages—in the amount of $1,458.30 (Pl. SOMF ¶ 281)—by the court-ordered date of April 11, 2022 (*id.* ¶ 276); and (2) GMBS's return of only $1,448.30, leaving $10 unpaid (*id.* ¶ 288). (*See* Opp. & Cross-Mot. at 44.) Actions for conversion may lie in New York despite the

monies in question having been paid prior to or during the litigation, as "nominal damages may be awarded as a result of the conversion and plaintiffs should be given an opportunity to prove at trial any other damages they sustained as a result of the conversion." *MacGuire v. Elometra Corp.*, 592 N.Y.S.2d 730, 730-31 (1st Dep't 1993); *see also Ray v. Balestriere Fariello*, No. 18-CV-11211, 2021 WL 3810640, at *11 (S.D.N.Y. Aug. 26, 2021) (similar). The Gutman Defendants maintain three primary arguments against the conversion claim.

First, the Gutman Defendants argue that Crespo never made a demand for a return of the garnished wages. It is true that, sometimes, New York law requires "that a demand be made and be met by a refusal to make out a claim of conversion." *Cf. Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 49 (2d Cir. 1996). But that is true "only where the property is held lawfully by the defendant." *Id.* (citing *White v. City of Mount Vernon*, 633 N.Y.S.2d 369, 370 (2d Dep't 1995)). "[W]here the defendant holds the property unlawfully . . . 'no demand and refusal are necessary to render the defendant liable.'" *Id.* at 49-50 (quoting *Nat Koslow, Inc. v. Bletterman*, 197 N.Y.S.2d 583, 586 (Sup. Ct. N.Y. Cty. 1960)). Under that principle, "one in lawful possession shall not have such possession changed into an unlawful one until he be informed of the defect of his title and have an opportunity to deliver the property to the true owner." *Marks v. Energy Mats. Corp.*, No. 14-CV-8965, 2015 WL 3616973, at *3 (S.D.N.Y. June 9, 2015) (quoting *Leveraged Leasing*, 87 F.3d at 49)). Thus, the question is whether and when GMBS had knowledge that it possessed Crespo's garnished wages illegally.[6]

All of the evidence on this score comes from Keilbach's deposition, in which he confirmed that GMBS received the March 8 Order but believed that it may not have been final,

---

[6] It is true that none of the Gutman Defendants was party to the proceeding that generated a formal order that the garnished wages belonged to Crespo. But the law of conversion requires only knowledge that possession is illegal, and Crespo proffers evidence of just that.

as the firm was waiting on the judge to sign its submitted order to show cause.  (*See* ECF No. 92-2 ("Keilbach Dep.") at 154:8-154:23; *see also* Defs. Resp. SOMF ¶ 274.)  However, when directed to a document from April 21, 2022 stating "per court order refund Jose all money collected," Keilbach testified that "[a]t some point between March 10th and April 21st," GMBS decided to return the wages.  (*See* Keilbach Dep. at 156:15-157:5.)  And though Keilbach could not "recall the exact date," it was earlier than April 21, 2022 that GMBS made a "decision . . . that [the Court] still [hadn't] made a decision on the order show cause," and thus they "weren't going to wait any longer."  (*Id.* at 156:22-157:3.)  Therefore, even if GMBS had some basis for believing, on March 10, 2022, that it was still entitled to possess the garnished wages, the record supports a reasonable inference that at some point after that GMBS determined it no longer had any such entitlement.  It follows that there is a genuine dispute of fact as to whether at any point GMBS retained the funds despite knowing it no longer had any legal basis for doing so.  If true, that constitutes conversion.  *See Okyere v. Palisades Collection*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. Sept. 16, 2013) (Gorenstein, Mag. J.) ("The allegation that Moses took possession of the money despite being aware of the court order staying all enforcement proceedings is more than sufficient to allow the reasonable inference that Moses took the money despite knowing that he was prohibited from doing so.").  Even though the bulk of those funds were eventually returned, "[r]eturning property to the rightful owner . . . does not absolve defendants of all liability from the alleged conversion," because a "claim for conversion will exist even when the deprivation is partial or temporary."  *Id.* (quoting *Pierpoint v. Farnum*, 254 N.Y.S. 758, 763 (2d Dep't 1931)); *see also Toshoku Am., Inc. v. Rhoda Lee, Inc.*, 622 N.Y.S.2d 943, 944 (1st Dep't 1995) (noting that a conversion claim lies where a defendant "withhold[s] . . . goods when it was asked to release them").  Moreover, because Crespo has

since made an explicit demand for at least $10 (*see* Pl. SOMF ¶ 289), and there exists a genuine dispute about whether that remaining sum was exacted by the Sheriff or by GMBS (*see id.* ¶¶ 287-88; ECF No. 92-10 at 48), the Gutman Defendants' argument based on the demand-and-refusal rule does not defeat the conversion claim.

Second, the Gutman Defendants argue that "there is no evidence that GMBS possessed the garnished wages at the time of the Order, which was approximately 3 years after the last garnishment." (Defs. Reply at 34.) The contend specifically, citing Keilbach's deposition, that "[t]he entire amount garnished from Plaintiff's wages went to GMBS's client 1511 Sheridan. $206.02 was paid directly to 1511 Sheridan. The rest of 1511 Sheridan's money was paid from 1511 Sheridan to GMBS as reimbursement of the costs that GMBS had incurred." (*Id.* at 34 n.20.) But Keilbach, when asked whether "[t]he $206.02 . . . was about how much was given to the client out of the garnishments," replied, "[t]hat is correct." (Keilbach Dep. at 61:25-62:5.) Contrary to the Gutman Defendants' argument in briefing, Keilbach's deposition suggests that GMBS retained a significant portion of Crespo's garnished wages. And there is no evidence in the record, identified by the Gutman Defendants, to support their contention that all of the funds flowed directly through GMBS to 1511 Sheridan.[7] There is thus a genuine dispute as to whether any of the garnished wages were retained by GMBS, in a "specific and identifiable" sum, and therefore eligible for an action for conversion. But even if the Gutman Defendants were correct, under New York law, "[c]onversion can occur 'when the defendant refuses to return the property after a demand *or sooner disposes of the property.*'" *Slue v. N.Y.U. Med. Ctr.*, 409 F. Supp. 2d 349, 364 (S.D.N.Y. 2006) (emphasis added) (quoting *White*, 633 N.Y.S.2d at 370). For that

---

[7] For the proposition that GMBS was not in possession of any of Crespo's garnished wages at the time the March 8 Order was issued, the Gutman Defendants cite the March 8 Order itself. (*See* Defs. Resp. SOMF ¶¶ 275, 279.)

additional reason, GMBS's contention regarding the identity and location of the funds at the time of the March 8 Order likewise does not defeat the conversion claim.

Third, the Gutman Defendants argue that no action for conversion lies "[w]here certain funds may have been improperly restrained," and instead, the plaintiff must bring a "summary proceeding commenced under CPLR Article 52." (Mem. at 33 (quoting *Greene v. People's Neighborhood Bank*, 141 N.Y.S.3d 163, 166 (3d Dep't 2021)).) But *Greene* concerned funds improperly *restrained*, not, as Crespo alleges here, *garnished* and subsequently retained by the defendant. Where a defendant is alleged to have retained garnished wages following a legal order that they be returned, a conversion action is not precluded by Article 52. *See, e.g.*, *Villalba v. Houslanger & Assocs., PLLC*, No. 19-CV-4270, 2022 WL 900538, at *20 (E.D.N.Y. Mar. 28, 2022) (permitting a claim for conversion to proceed based upon "allegedly improper garnishment," even though the wages were subsequently returned before the commencement of suit); *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 587-90 (S.D.N.Y. 2015) (granting plaintiff's motion for summary judgment as to liability for conversion based on garnished wages); *see also Stinson v. Houslanger & Assocs., LLC*, No. 18-CV-11350, 2021 WL 4443289, at *9 (S.D.N.Y. Sept. 28, 2021) (dismissing a claim for conversion based on wage garnishment, not because the tort is barred by statute, but because "there [was] no evidence that Defendants . . . took ownership of any of [Plaintiff's] money"). And the New York Court of Appeals' recent decision in *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC* held only that a plaintiff may not use the tort of conversion to challenge a defendant's failure to comply with the procedural requirements of Article 52, and did not preclude tort liability against a defendant who retains funds after a valid judgment compels the funds' return. *See* 37 N.Y.3d 591, 601-04 (2021). This third argument likewise does not defeat the conversion claim.

Finally, though the Gutman Defendants are not entitled to summary judgment with respect to the conversion claim, neither is Crespo, as several essential elements of his claim comprise genuinely disputed factual issues. Accordingly, the cross-motions for summary judgment are denied with respect to the conversion claim.

### C.    Negligence, Gross Negligence, and Punitive Damages

The Gutman Defendants' only argument for dismissing the negligence claim is that, "[i]f there is no violation of the statutory requirements [of the FDCPA], then there would be no duty of care or breach of the required duty of care." (Mem. at 34.) Because the Court has already determined that genuine disputes of fact preclude granting the motion for summary judgment with respect to the FDCPA violations, and the Gutman Defendants present no other arguments for dismissing the negligence claim, the motion for summary judgment is likewise denied with respect to this claim. And because, as summarized more thoroughly above, Crespo's allegations are disputed, the cross-motion for summary judgment must also be denied.

As to the gross negligence claim, the Gutman Defendants contend that such a claim may be maintained only by a showing of "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." (*Id.* at 35 (quotation marks omitted).) Crespo's allegation that Thigpen intentionally lied to Crespo about his statutory rights—supported by some evidence in the record, though disputed—qualifies. For the same reason, the Court cannot dismiss the request for punitive damages, as intentionally misrepresenting another's rights constitutes at least "a conscious disregard for the rights of others and . . . demonstrates a high degree of moral culpability." *Marcoux v. Farm Serv. & Supplies, Inc.*, 283 F. Supp. 2d 901, 908 (S.D.N.Y. 2003) (quotation marks omitted); *see also Bennett v. State Farm Fire & Cas. Co.*, 78 N.Y.S.3d 169, 173 (2d Dep't 2018) ("Punitive damages may properly be awarded where, inter alia, a defendant's conduct is grossly negligent."). Moreover, that Crespo supplies internal

GMBS records questioning the legality of their own conduct (*see, e.g.*, Pl. SOMF ¶¶ 214, 232) raises the triable inference that GMBS knew it was acting in disregard of Crespo's rights. Because there is a genuinely disputed allegation of intentional wrongdoing, the motions for summary judgment must be denied with respect to the gross negligence claim and the request for punitive damages.

## IV.    Conclusion

For the foregoing reasons, the cross-motions for summary judgment are DENIED.

The Clerk of Court is directed to close the motion at ECF No. 85.

The parties are directed to confer and file a joint status letter on or before April 4, 2025, addressing (1) proposed jury trial dates from May 2025 through September 2025, with anticipated length of the trial; and (2) whether the parties wish to be referred to the Court's mediation program or the designated magistrate judge for a settlement conference.

SO ORDERED.

Dated:  March 20, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge